## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

**BEFORE: THE HONORABLE MARK A. BARNETT, CHIEF JUDGE**

————————————————————x
:
CARBON ACTIVATED TIANJIN CO., LTD.,                                :
CARBON ACTIVATED CORPORATION,                                       :
DATONG JUQIANG ACTIVATED CARBON                                     :
CO., LTD., SHANXI INDUSTRY                                          :
TECHNOLOGY TRADING CO., LTD.,                                       :
DATONG MUNICIPAL YUNGUANG                                           :
ACTIVATED CARBON CO., LTD. and                                      :
BEIJING PACIFIC ACTIVATED CARBON                                    :
PRODUCTS CO., LTD.,                                                 :
:
          Plaintiffs,                                    :     **Court No. 21-00131**
:
          v.                                           :
:
UNITED STATES,                                                     :
:
          Defendant,                                     :
:
          and                                          :
:
CALGON CARBON CORPORATION and                                      :
CABOT NORIT AMERICAS, INC.,                                        :
:
          Defendant-Intervenors.                         :
————————————————————x

## PLAINTIFFS' MOTION FOR JUDGMENT
## ON THE AGENCY RECORD PURSUANT TO RULE 56.2

Pursuant to Rule 56.2 of the Rules of this Court, Plaintiffs Carbon Activated Tianjin Co.

Ltd., Carbon Activated Corporation, Datong Juqiang Activated Carbon Co., Ltd., Shanxi Sincere

Industrial Co., Ltd., Datong Municipal Yunguang Activated Carbon Co., Ltd., and Beijing

Pacific Activated Carbon Products Co., Ltd., respectfully move for judgment on the agency

record. Plaintiffs and Plaintiff-Intervenors challenge certain aspects of the U.S. Department of

Commerce's ("Commerce") final results in the antidumping duty administrative review of *Certain Activated Carbon from the People's Republic of China: Final Results of Antidumping Duty Administrative Review, Final Determination of No Shipments, and Final Rescission of Administrative Review, in Part; 2018-2019*, 86 Fed. Reg. 10,539 (Feb. 22, 2021).

Plaintiffs request that the Court remand this matter to Commerce with instructions to recalculate their antidumping duty margins. The legal arguments in support of this motion are detailed in the attached Memorandum of Law in Support of Plaintiffs' Motion for Judgment on the Agency Record.

Respectfully submitted,

_/s/ Dharmendra N. Choudhary_____
Francis J. Sailer
Dharmendra N. Choudhary
Jordan C. Kahn

GRUNFELD, DESIDERIO, LEBOWITZ, SILVERMAN & KLESTADT LLP

1201 New York Ave., NW, Suite 650
Washington, DC 20005
(202) 783-6881

*Counsel for Plaintiffs Carbon Activated Tianjin Co., Ltd., Carbon Activated Corporation, Datong Juqiang Activated Carbon Co., Ltd., Shanxi Industry Technology Trading Co., Ltd., Datong Municipal Yunguang Activated Carbon Co., Ltd., and Beijing Pacific Activated Carbon Products Co., Ltd.*

Dated: September 16, 2021

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE MARK A. BARNETT, CHIEF JUDGE**

——————————————————————x
:
CARBON ACTIVATED TIANJIN CO., LTD.,  :
CARBON ACTIVATED CORPORATION,  :
DATONG JUQIANG ACTIVATED CARBON  :
CO., LTD., SHANXI INDUSTRY  :
TECHNOLOGY TRADING CO., LTD.,  :
DATONG MUNICIPAL YUNGUANG  :
ACTIVATED CARBON CO., LTD. and  :
BEIJING PACIFIC ACTIVATED CARBON  :
PRODUCTS CO., LTD.,  :
:       **Court No. 21-00131**
Plaintiffs,  :
:       **PUBLIC VERSION**
v.  :
:
UNITED STATES,  :
:
Defendant,  :
:
and  :
:
CALGON CARBON CORPORATION and  :
CABOT NORIT AMERICAS, INC.,  :
:
Defendant-Intervenors.  :
——————————————————————x

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR
JUDGMENT ON THE AGENCY RECORD PURSUANT TO USCIT RULE 56.2**

Francis J. Sailer
Dharmendra N. Choudhary
Jordan C. Kahn

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP
1201 New York Ave., NW, Suite 650
Washington, DC 20005

*Counsel for Plaintiffs Carbon Activated
Tianjin Co., Ltd., Carbon Activated
Corporation, Datong Juqiang Activated
Carbon Co., Ltd., Shanxi Industry
Technology Trading Co., Ltd., Datong
Municipal Yunguang Activated Carbon Co.,
Ltd., and Beijing Pacific Activated Carbon
Products Co., Ltd.*

Dated: September 16, 2021

## TABLE OF CONTENTS

STATEMENT PURSUANT TO USCIT RULE 56.2 ................................................................ 1

   A.   Administrative Determination Subject to Appeal ................................................ 1

   B.   Issues of Law Presented and Summary of the Argument ................................. 1

   C.   Reasons for Contesting the Administrative Determination ............................... 3

STANDARD OF REVIEW .............................................................................................. 3

STATEMENT OF FACTS ............................................................................................... 4

ARGUMENT .............................................................................................................. 5

   I.   COMMERCE UNLAWFULLY VALUED BITUMINOUS COAL ............................... 5

     A.   Facts .......................................................................................................... 5

     B.   HTS 2701.12 Import Data is a Basket Category Distorted by Coking Coal ............. 10

     C.   Commerce Improperly Valued Bituminous Coal ........................................ 11

   II.   COMMERCE UNLAWFULLY VALUED CARBONIZED MATERIAL ................. 16

     A.   Facts ........................................................................................................ 16

     B.   Commerce Unlawfully Rejected HTS 4402.90.9000 ................................ 17

     C.   Commerce Should Have Selected HTS 4402.90 ...................................... 18

   III.   COMMERCE UNLAWFULLY VALUED LIQUID CAUSTIC SODA .................... 26

     A.   Facts ........................................................................................................ 26

     B.   HTS 2815.12 Should Be Used to Value Liquid Caustic Soda ................. 26

   IV.   COMMERCE UNLAWFULLY VALUED HYDROCHLORIC ACID ..................... 28

     A.   Facts ........................................................................................................ 28

     B.   Malaysian Data Should Not Be Used to Value HCl ............................... 29

   V.   COMMERCE UNLAWFULLY VALUED STEAM ........................................... 31

     A.   Facts ........................................................................................................ 31

     B.   Commerce Should Have Used HTS 2711.21 ........................................... 31

   VI.   COMMERCE UNLAWFULLY VALUED ANTHRACITE COAL ....................... 34

     A.   Facts ........................................................................................................ 34

     B.   Russian Data Should Be Used to Value Anthracite Coal ....................... 35

   VII.   COMMERCE UNLAWFULLY CALCULATED SURROGATE FINANCIAL RATIOS ................................................................................................... 37

     A.   Facts ........................................................................................................ 37

     B.   The 2018 Bravo Statement is Insufficiently Disaggregated .................... 38

     C.   Commerce Should Have Used the 2018 JSC Financial Statements .......... 42

D.    The Romcarbon 2018 Statement Affords a Suitable Alternative Choice................... 44

CONCLUSION.......................................................................................................... 47

## **TABLE OF AUTHORITIES**

**Cases**

*An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States*,
    203 F. Supp. 3d 1256 (CIT 2017) ............................................. 36

*Calgon Carbon Corp. v. United States*, 2017 WL 384685 (CIT Jan. 27, 2017) ......................... 31

*Carbon Activated. v. United States*, 503 F. Supp. 3d 1278 (CIT 2021) ....................................... 13

*Catfish Farmers of Am. v. United States*, 37 CIT 717 (2013) ...................................................... 40

*Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938) ......................................................................... 3

*CP Kelco US, Inc. v. United States*, 2015 WL 1544714 (CIT Mar. 31, 2015) ............................ 24

*Dorbest Ltd. v. United States*, 604 F.3d 1363 (Fed. Cir. 2010) .................................................... 46

*Elkay Mfg. Co. v. United States*, 180 F. Supp. 3d 1245 (CIT 2016)............................................. 30

*Gerald Metals, Inc. v. United States*, 132 F.3d 716 (Fed. Cir. 1997) ................................... passim

*Jacobi Carbons AB v. United States*, 619 Fed. Appx. 992 (Fed. Cir. 2015) ......................... 23, 24

*Lucent Techs., Inc. v. Gateway*, Inc., 580 F.3d 1301 (Fed. Cir. 2009) .................................. 12, 27

*Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927 (Fed. Cir. 1984) .............................. 3

*Motor Vehicle Mfgrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) .............. 4, 33

*Peer Bearing Co.-Changshan v. United States*, 752 F. Supp. 2d 1353 (CIT 2011) .................... 36

*Queen's Flowers de Colom. v. United States*, 21 CIT 968 (1997) ................................................ 41

*Save Domestic Oil, Inc. v. United States*, 357 F.3d 1278 (Fed. Cir. 2004) ....................... 4, 14, 42

*Shantou Red Garden Foodstuff Co. v. United States*, 880 F. Supp. 2d 1332 (CIT 2012) ........... 36

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951) ............................................................... 3

*Vinh Hoan Corp. v. United States*, 179 F. Supp. 3d 1208 (CIT 2016) ................................... 46, 47

*Vulcan Threaded Products Inc. v. United States*, 311 F. Supp. 3d 1357 (CIT 2018).................. 25

*Weishan Hongda Aquatic Food Co. v. United States*, 917 F.3d 1353 (Fed. Cir. 2019) .............. 44

*Yantai Oriental Juice Co. v. United States*, 26 CIT 605 (2002) ............................................ 33, 34

**Statutes**

19 U.S.C. § 1516a ............................................................................................................................ 3

19 U.S.C. § 1677b ..................................................................................................................... 3, 45, 46

19 U.S.C. § 1677m .................................................................................................................... 12, 28

**Administrative Decisions & Publications**

*Activated Carbon from China*, 74 Fed. Reg. 57,995 (Nov. 10, 2009) (final results) .................. 22

*Activated Carbon from China*, 76 Fed. Reg. 67,142 (Oct. 31, 2011) (final results) .................... 22

*Activated Carbon from China*, 78 Fed. Reg. 70,533 (Nov. 20, 2013) (final results) ............ 17, 18

*Activated Carbon from China*, 83 Fed. Reg. 53,214 (Oct. 22, 2018) (final results) .............. 45, 46

*Activated Carbon from China*, 84 Fed. Reg. 27,758 (June 14, 2019) (preliminary results) ......... 41

*Activated Carbon from China*, 84 Fed. Reg. 68,881 (Dec. 17, 2019) (preliminary results) ... 41, 45

*Activated Carbon from China*, 85 Fed. Reg. 23,947 (Apr. 30, 2020) (preliminary results)
............................................................................................................................... 5, 12, 28

*Activated Carbon from China*, 86 Fed. Reg. 10,539 (Feb. 22, 2021) (final results) ............ passim

*Activated Carbon from China*, Inv. No. 731-TA-1103 (Final),
   USITC Pub. 3913 (Apr. 2007) ................................................................................ 19

*Activated Carbon from China*, Inv. No. 731-TA-1103 (2nd Rev.),
   USITC Pub. 4797 (June 2018) ................................................................................ 19

*Chlorinated Isocyanurates from China,* 80 Fed. Reg. 4,539 (Jan. 28, 2015) (final results) ......... 40

*Citric Acid from China*, 74 Fed. Reg. 16,838 (Apr. 13, 2009) (final determination) .................. 41

*Citric Acid from China*, 80 Fed. Reg. 77,323 (Dec. 14, 2015) (final results) .............................. 44

*Crystalline Silicon Photovoltaic Cells from China*, 80 Fed. Reg. 40,998 (July 7, 2015)
   (final results) ................................................................................................................ 32

*Fresh Garlic from China*, 78 Fed. Reg. 36,168 (June 17, 2013) (final results) ........................... 43

*Freshwater Crawfish Tail Meat from China*, 78 Fed. Reg. 22,228 (Oct. 9, 2012) (final results) ................................................................................................................ 43

*Frozen Fish Fillets from Vietnam*, 75 Fed. Reg. 38,985 (July 7, 2010) (final results) ................ 35

*Hardwood Plywood Products from China,* 84 Fed. Reg. 65,783 (Nov. 29, 2019) (final determination) ...................................................................................... 15

*Helical Spring Lock Washers from China*, 73 Fed. Reg. 4175 (Jan. 15, 2008) (final results) ..... 29

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 84 Fed. Reg. 27,587 (June 13, 2019) ..................................................................... 4

*Polyethylene Terephthalate Film, Sheet, and Strip from China,* 76 Fed. Reg. 9,753 (Feb. 22, 2011) (final results) ............................................................................ 41

*Polytetrafluoroethylene Resin from China*, 83 Fed. Reg. 20,039 (Apr. 30, 2018) (preliminary results) ......................................................................................... 31, 32

*Tapered Roller Bearings from China,* 77 Fed. Reg. 65,668 (Oct. 30, 2012) (final results) ......... 40

*Wooden Bedroom Furniture from China*, 73 Fed. Reg. 49,162 (Aug. 20, 2008) (final results) .. 30

*Xanthan Gum from China*, 82 Fed. Reg. 11,434 (Feb. 23, 2017) (final results) ........................ 25

## **Other Authorities**

DICTIONARY.COM ............................................................................................................... 32

This Memorandum of Law is filed on behalf of Plaintiffs Carbon Activated Tianjin Co., Ltd. ("CA Tianjin"), Carbon Activated Corporation (collectively, "Carbon Activated"), Datong Juqiang Activated Carbon Co., Ltd. ("DJAC"), Shanxi Industry Technology Trading Co., Ltd., Datong Municipal Yunguang Activated Carbon Co., Ltd., and Beijing Pacific Activated Carbon Products Co., Ltd.

## STATEMENT PURSUANT TO USCIT RULE 56.2

### A.     Administrative Determination Subject to Appeal

Plaintiffs seek judicial review of the U.S. Department of Commerce's ("Commerce" or the "Department") final results in the twelfth administrative review ("AR12") of the antidumping duty ("AD") order on activated carbon from the People's Republic of China ("China"). *Activated Carbon from China*, 86 Fed. Reg. 10,539 (Feb. 22, 2021) (final results), P.R. 316 ("*Final Results*"), accompanying Issues and Decision Memorandum, P.R. 304 ("IDM").

### B.     Issues of Law Presented and Summary of the Argument

1.     Commerce improperly valued bituminous coal using the basket category Harmonized Tariff Schedule ("HTS") 2701.12 that is distorted by inclusion of coking coal – a superior grade with distinct applications that the record evidences was not used by respondents. Such valuation was contrary to agency and judicial precedent, including the preceding review, and is not supported by Commerce's misplaced reliance on standards and translation.

2.     Commerce improperly valued respondents' coal-based carbonized materials using HTS 4402.90.10000 for coconut shell charcoal; this rationale is contradicted by extensive record evidence including U.S. International Trade Commission ("ITC") reports establishing that wood-based charcoal categorized in HTS 4402.90.9000 is comparable to coal-based carbonized

1

material. In accordance with agency and judicial precedent, Commerce should have valued this input using HTS 4402.90.

3.       Commerce unlawfully valued the liquid caustic soda reported by Carbon Activated's supplier as a solid caustic soda, which was clearly reported as a liquid input with diluted purity. Rather than request further information if necessary as required by statute, Commerce impermissibly speculated – based on an inapposite calculation – that the input was in sold form.

4.       Commerce unlawfully valued hydrochloric acid based in its incorrect finding that the input was not in aqueous form. Because this input was reported with a purity level less than 100%, it is necessarily in an aqueous form – as Commerce has previously recognized. Commerce therefore should not have used Malaysian data that is distorted by the inclusion of solid form hydrochloric acid not specific to the input, in contravention of agency practice.

5.       Commerce unlawfully valued steam under HTS 2711.11 for liquefied gas. These data are not product specific and are impeached by domestic price data. Steam should be valued under HTS 2711.21 per Commerce's practice because the input was properly reported in a gaseous state.

6.       Commerce unlawfully valued anthracite coal using Malaysian data that were not product specific. Per applicable precedent, Russian data should have been used because it covers the volatility of the input and represents the broadest market average.

7.        Commerce unlawfully calculated surrogate financial ratios using a single Malaysian statement that did not itemize the costs of raw materials, labor, and energy – causing multiple likely distortions in the calculated ratios. The ratio calculations contradict longstanding Commerce practice, including the preceding review, to not use statements from the primary

surrogate country that are insufficiently disaggregated. In accordance with this practice,

Commerce should have calculated ratios using statements from Russia or Romania.

### C.    Reasons for Contesting the Administrative Determination

Plaintiffs' reasons for contesting the administrative determination are set out below.

### STANDARD OF REVIEW

This Court must hold unlawful any aspect of Commerce's final determination that is

"unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19

U.S.C. § 1516a(b)(1)(B)(i) (2000). Substantial evidence is "such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v.

NLRB*, 305 U.S. 197, 217 (1938); *Matsushita Elec. Indus. Co. v. United States*, 750 F.2d 927,

933 (Fed. Cir. 1984). The substantial evidence standard requires more than mere assertion of

"evidence which in and of itself justified {the determination}, without taking into account

contradictory evidence or evidence from which conflicting inferences could be drawn." *Gerald

Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997) (quotation omitted). Rather "the

substantiality of evidence must take into account whatever in the record fairly detracts from its

weight." *Id.* (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)).

"In valuing {FOPs, Commerce} . . . **shall utilize, to the extent possible**, the prices or

costs of {FOPs} in **one or more market economy countries** that are – (A) at a level of

economic development comparable to that of the nonmarket economy {"NME"}; and

(B) **significant producers of comparable merchandise**." 19 U.S.C. § 1677b(c)(4) (emphases

added). Such "valuation . . . **shall be based on the best available information** regarding the

values of such factors in a market economy country or countries." 19 U.S.C. § 1677b(c)(1)(B)

(emphasis added).

Commerce must "cogently explain why it has exercised its discretion in a given manner." *Motor Vehicle Mfgrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 48 (1983) (citation omitted). "Despite Commerce's statutory discretion, . . . if Commerce had a routine practice for addressing like situations, it must either apply that practice or provide a reasonable explanation as to why it departs therefrom." *Save Domestic Oil, Inc. v. United States*, 357 F.3d 1278, 1283 (Fed. Cir. 2004).

## STATEMENT OF FACTS

Commerce in June 2019 initiated AR12 of the AD order on activated carbon from China, including the sales of Plaintiffs during the period of review ("POR") spanning April 1, 2018, through March 31, 2019. *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 84 Fed. Reg. 27,587, 27,589-90 (June 13, 2019), P.R. 151. Commerce in July 2019 selected Carbon Activated and DJAC as mandatory respondents. Commerce Decision Memorandum (Apr. 24, 2020), P.R. 259 ("DM") at 2, 9. They responded to the Department's AD questionnaires by reporting, *inter alia*, their factors of production ("FOP") and provided surrogate value ("SV") information as well as information rebutting the SV information provided by Defendant-Intervenors Calgon Carbon Corporation and Cabot Norit Americas, Inc. (collectively, "Petitioners"). First Surrogate Value Comments by DJAC and CA Tianjin (Nov. 12, 2019), P.R. 123-27 ("Initial SV Submission"); Final Surrogate Value Comments by DJAC and CA Tianjin (Mar. 30, 2020), P.R. 197-230 ("Final SV Submission"); Final Surrogate Value Rebuttal Comments by DJAC and CA Tianjin (Apr. 9, 2020) ("Final SV Rebuttal"), C.R. 247, P.R. 241-43. Petitioners also provided SV information. Petitioners' Submission of Surrogate Values (Nov. 12, 2019), P.R. 123-24 ("Petitioners' Initial SV Submission"); Petitioners' Submission of Surrogate Values (Mar. 30, 2020), P.R. 196 ("Petitioners' Final SV Submission").

On April 30, 2020, Commerce published its preliminary results of AR12, selecting

Malaysia as the primary surrogate market economy for China. *Id.* at 16; *Activated Carbon from*

*China*, 85 Fed. Reg. 23,947 (Apr. 30, 2020) (preliminary results), P.R. 272 ("*Preliminary*

*Results*"); U.S. Department of Commerce Memorandum (Apr. 24, 2020), P.R. 266-68 ("Prelim

SV Memo"), at 1. In July 2020, Carbon Activated and DJAC challenged Commerce's

preliminary use of certain SVs to calculate their AD margins in their Case Brief (July 20, 2020),

C.R. 279, P.R. 285. Commerce finalized its AD rates for Plaintiffs in February 2021, which were

appealed to this Court in March 2021. *Final Results*, 86 Fed. Reg. at 10,540; Summons (Mar. 23,

2021), ECF 1; Complaint (Apr. 4, 2016), ECF 12. Facts concerning Plaintiffs' specific claims are

set forth at the outset of each sub-section in the Argument below.

## ARGUMENT

### I.  COMMERCE UNLAWFULLY VALUED BITUMINOUS COAL

#### A.  Facts

Commerce requested that DJAC and Carbon Activated report in Field 3.1, the physical

material, CARBONU – *i.e.* the "type of source material used to produce the activated carbon" –

as one of the physical characteristics of the control number ("CONNUM"). The alternative codes

Commerce provided for CARBONU field included:

> 01 = Bituminous coal, metallurgical grade
> 02 = Bituminous coal, not metallurgical grade.

DJAC Section C Questionnaire Response (Aug. 26, 2019), C.R. 39-45, P.R. 86-87, at 6; Carbon

Activated Section C Questionnaire Response (Aug. 26, 2019), C.R. 50-53, P.R. 88-95 at 6.

The final sales databases submitted by both DJAC and Carbon Activated reported

CONNUMs based on CARBONU of "02 = Bituminous coal, not metallurgical grade." DJAC

Supplemental Section C Questionnaire Response (Mar. 4, 2020), C.R. 162-68, P.R. 173-75

("DJAC SCQR"), Exhibit SC-1; Carbon Activated Third Supplemental Questionnaire Response

(Apr. 10, 2020), C.R. 248, P.R. 244 ("CA 3SQR"), Exhibit 2.

Respondents submitted information demonstrating that metallurgical grade coal means a

coking coal:

- "Some coals can be used to produce coke, an important raw material used in steel making. These coals are referred to as *metallurgical coal, met coal,* or *coking coal*." Final SV Rebuttal Exhibit 1C: METALLURGICAL COAL, KENTUCKY GEOLOGICAL SURVEY (emphasis in original).

- "**Metallurgical coal** prices declined rapidly last year before stabilizing - The premium Australian hard **coking coal** (HCC) spot price stabilised in the US$150-165 range over the first quarter of 2020, after declining rapidly during 2019 to lows of around US$135 a tonne in November 2019." Final SV Submission Exhibit 4C (emphasis added).

As reported to Commerce, DJAC's supplier, [

], utilized non-coking bituminous coal of calorific value exceeding

5833 kilocalories/kilogram ("kcal/kg"). This supplier submitted a declaration attesting that its

bituminous coal was a non-coking coal variety with a gross heat value of [          ] kcal/kg.

Final SV Rebuttal Exhibit 1B. This supplier also provided test certificates for its bituminous

coal. DJAC Supplemental Section D Response (Mar. 20, 2020), C.R. 196-209, P.R. 192-95

("DJAC SDQR"), at 35-37, Exhibit SD-52. DJAC itself submitted a test report and a declaration

attesting that its bituminous coal was non-coking coal of heat value [          ] kcal/kg. *Id*. at 9,

Exhibit SD-10–11.

Carbon Activated's supplier, [

], purchased bituminous coal from three different suppliers and initially

reported them as three separate grades of bituminous coal: BITUMINOUSCOAL1 (Non-coking

Bituminous coal); BITUMINOUSCOAL2 (Non-coking Bituminous coal); and

BITUMINOUSCOAL3 (Coking Bituminous coal). Carbon Activated Response to Section D of

Questionnaire (Part II) (Sept. 30, 2019), C.R. 92, P.R. 112 ("CA DQR II"), Exhibit D-5.

Subsequently, [     ] submitted two purchase invoices for each supplier, totaling six invoices.

Carbon Activated Section D Supplemental Questionnaire Response (Part II) (April 6, 2020),

C.R. 214-227, P.R. 235-240 ("CA SDQR II"),[1] Exhibit SSD-3. Carbon Activated also provided a

signed declaration from [     ] clarifying that an erroneous description of input as coking coal

on one of its supplier's invoices had caused its initial misreporting of BITUMINOUSCOAL3 as

a coking coal. CA SDQR II at 2, Exhibit SSD-4B. The declaration also confirmed that

[     ] bituminous coal was exclusively a non-coking coal with a gross heat value of [

  ] kcal/kg. *Id*. Because the initially reported three grades of its bituminous coal shared similar

properties (non-coking coal and comparable heat value), [     ], in its revised FOP database,

collapsed BITUMINOUS COAL1, 2 & 3 into a single FOP: "BITUMINOUSCOAL." *Id*. at 2,

Exhibit SSD-9.

     In rebutting the CA SDQR II, Petitioners argued that the actual descriptions of goods

recorded on the invoices were as follows.

1.     Bituminous coal 1 sold by first supplier:
   Transaction 1 - semi-coke
   Transaction 2 - washed coal

2.     Bituminous coal 2 sold by second supplier:
   Transaction 1 - washed coal
   Transaction 2 - washed coal

3.     Bituminous coal 3 sold by third supplier:
   Transaction 1 - coking coal
   Transaction 2 - washed and fuel coal

---

[1] Although the bituminous coal descriptions were initially reported confidentially, this
information was subsequently made public in respondents' case brief.

Petitioners' Rebuttal to Carbon Activated's Supplemental Section D Response (Part II) (Apr. 16, 2020), C.R. 253, P.R. 250, at 3-4.

In sur-rebuttal, Carbon Activated rebutted Petitioners' arguments about the nature of coal. Regarding Bituminous coal 1, Transaction 1 – semi-coke, to distinguish semi-coking coal from coking coal, Carbon Activated submitted an independent article that categorized hard coking coal ("HCC") and pulverized coal injection coal ("PCI") together under metallurgical coal and distinguished them from semi-soft coking coal ("SSCC"). Response to Petitioners' Rebuttal to CA SDQR II (Apr. 23, 2020), C.R. 256, P.R. 253 ("CA Sur-rebuttal"), Exhibit 1B: *Market Demand Study: Australian Metallurgical Coke*. This article explained that SSCC "results in a low coke quality and more impurities. Semi-soft coking coal can also be sold as thermal coal." *Id*. at 7. The article concluded by stating that "***metallurgical coal is defined as hard coking coal and PCI coal. It does not include semi-soft coking coal***." *Id*. (emphasis in original).

Carbon Activated submitted evidence showing that non-coking coal was typically washed to lower its ash content and thereby improve its quality for: Bituminous coal 1, Transaction 2; Bituminous coal 2 – Transactions 1 and 2, described as "washed coal"; and Bituminous coal 3, Transaction 2, described as a "washed and fuel coal." *Id*. Exhibit 1C: *Noncoking Coal Washing* at 1; *Encyclopedia.com Coal Washing* at 1; *Coal Washing & Power Generation From Washery Rejects* at 2-3. Thus, Carbon Activated clarified that washed coal in this context meant a non-coking washed coal.

To rebut the argument that the word "metallurgical" in the name of the Bituminous coal 1 supplier, [                                                    ], suggested that it supplied metallurgical coal, Carbon Activated provided [              ] business record downloaded from National Enterprise Credit Information Publicity System evidencing that this

company also produced a number of metals and metal compounds such as magnesium,

limestone, ferrosilicon, calcium carbide and silica. *Id*. Exhibit 1A. As such, Carbon Activated

clarified that the word "metallurgical" in its name simply meant that it was a producer of metal,

not metallurgical coal.

For Bituminous coal 3, Transaction 1, described as a coking coal, Carbon Activated

clarified that this description was inadvertently recorded on a solitary invoice and that the correct

description should have been non-coking coal. CA SDQR II at 2, Exhibit SSD-4B ¶ 7; *see* Pre-

Preliminary Comments of DJAC and CA Tianjin (Apr. 16, 2020), C.R. 252, P.R. 249 ("Pre-

Prelim Comments"), at 5. Notably, the declaration from [      ] technical manager attested

that coking coal was technically unsuitable for producing subject merchandise. CA SDQR II

Exhibit SSD-4B ¶ 5.

Based on the foregoing, respondents in April 2020 requested that Commerce value the

non-coking bituminous coal input utilized by [      ] and [      ] using HTS 2701.12.9000

(Bituminous coal – other than coking coal) import data. Pre-Prelim Comments at 4-6. Yet,

Commerce preliminarily used Malaysian import data under HTS 2701.12 (Bituminous Coal, Not

Agglomerated) to value all of the bituminous coal raw input used to produce subject merchandise

reviewed in AR12. Prelim SV Memo at 4, Attachment 1.

Respondents thereafter argued Commerce should instead use HTS 2701.12.9000 for the

non-coking bituminous coal input of calorific value exceeding 5833 kcal/kg, utilized by [      ]

and [      ], emphasizing the record evidence that coking coal is fundamentally different from

non-coking coal. Case Brief at 7-17. They analyzed import data to show that Malaysian HTS

2701.12 prices were distorted by higher valued coking coal. *Id*. at 15-17. They also argued to

value DJAC's non-coking bituminous coal having a calorific value below 5833 kcal/kg using

PUBLIC VERSION

HTS 2701.19. *Id*. at 17-18. Commerce, however, declined to change its preliminary bituminous coal valuation. IDM at 16-19.

**B.     HTS 2701.12 Import Data is a Basket Category Distorted by Coking Coal**

Record evidence confirms that bituminous coal utilized by all three producers – DJAC, [     ], and [     ] – was uniformly of a **non-coking coal grade**. They differ only in terms of heat value; while [     ]'s and [     ]'s coal calorific value exceeded 5833 kcal/kg, DJAC's was lower than 5833 kcal/kg.

Commerce's SV choice of HTS 2701.12 ("Bituminous Coal, Whether Or Not Pulverized, But Not Agglomerated") covers bituminous coal with calorific value equal to or exceeding 5833 kcal/kg (as per note 2 to HTS Chapter 27) and contains the following two subheadings:

- HTS 2701.12.1000 – Bituminous coal: Coking coal; and

- HTS 2701.12.9000 – Bituminous coal: Other than Coking coal.

Final SV Rebuttal Submission Exhibits 1A, 4A. Further, HTS 2701.19 covers "Other Coal," which encompasses Bituminous coal – other than coking coal, *i.e.*, non-coking bituminous coal with a calorific value less than 5833 kcal/kg. *Id*.

Non-coking bituminous coal input, depending on its heat value, merits classification under one of two HTS headings:

- HTS 2701.12.9000 – calorific value equal to or exceeding 5833 kcal/kg; or

- HTS 2701.19 - calorific value lower than 5833 kcal/kg.

On the other hand, HTS 2701.12 captures both coking and non-coking coal. Record evidence establishes that coking coal is not comparable to non-coking coal. CA SDQR II Exhibit SSD-4B ¶ 5-6; CA Sur-rebuttal Exhibit 1B. As compared to non-coking coal, coking coal is a superior grade distinguishable by its end-use in production of coke, which, in turn, is used in

steel-making. Final SV Rebuttal Exhibit 1C. As such, to value the non-coking bituminous coal input, HTS 2701.12 is not only a basket category, but is also distorted by coking coal – a superior grade with distinct application. Consequently, HTS 2701.12 fails to provide a product specific and accurate SV for the specific non-coking bituminous coal input.

### C.    Commerce Improperly Valued Bituminous Coal

Commerce's use of the basket category HTS 2701.12, containing distorted data, to value bituminous coal is contrary to its established practice and judicial precedent. Conversely, Commerce's rationale for rejecting the alternative product specific HTS 2701.12.9000 and 2701.19 are both unpersuasive and contradicted by record evidence.

For [      ]'s and [        ]'s non-coking bituminous coal input of [              ] kcal/kg, HTS 2701.12.9000, which covers non-coking bituminous coal equal to or above 5833 kcal/kg, affords a product specific SV choice. Likewise, for DJAC's non-coking bituminous coal input of [            ] kcal/kg, HTS 2701.19, which includes non-coking bituminous coal of less than 5833 kcal/kg, affords a product specific SV choice. As set forth below, Commerce's rationale to reject these product specific SV choices are unsupported by the record evidence and otherwise contrary to well established precedent.

Commerce's first rationale is that "the mandatory respondents have not . . . provided any industry standards differentiating coking quality coal from non-coking quality coal, along with test reports, to substantiate their claims that the bituminous coal used in the production of subject merchandise is the kind of coal that meets the standard for non-coking quality coal." IDM at 18. This rationale should be rejected for several reasons.

First, this rationale is improper because Commerce never requested such industry standards despite requesting extensive information concerning bituminous coal throughout AR12

well before the *Preliminary Results*. *See* CA SDQR II at 1-2. If Commerce required industry standards to value this FOP, it was required by statute to "inform" Carbon Activated "of the nature of the deficiency" and "provide . . . an opportunity to remedy or explain the deficiency." 19 U.S.C. § 1677m(d). Moreover, Commerce impermissibly speculated as to the type and quality of coal covered by HTS 2701.12.9000 and 2701.19: "It is well established that speculation does not constitute substantial evidence." *Lucent Techs., Inc. v. Gateway*, Inc., 580 F.3d 1301, 1327 (Fed. Cir. 2009). Further, record evidence described below either contradicts, or, at a minimum, detracts from Commerce's rationale.

Second, Commerce fails to address a plethora of independent literature provided to differentiate coking (metallurgical) coal from non-coking (thermal) coal in terms of their underlying properties, end-uses and prices. Final SV Submission Exhibit 4C; Final SV Rebuttal Exhibit 1A, C & D; CA Sur-rebuttal Exhibit 1B. The name "coking coal" confirms that this grade of coal is utilized for a specific purpose, *i.e.* to produce coke for steel-making. Final SV Rebuttal Exhibit 1C. Because a non-coking coal is not used to produce coke, the two grades are disparate and mutually exclusive. Commerce neglected to address this fact that "fairly detracts" from its valuation. *Gerald Metals*, 132 F.3d at 720.

Third, in their signed declarations, all three producers – [      ], [      ], and DJAC – explained the practical reasons why *coking coal is unsuitable for the production of activated carbon*. Final SV Rebuttal Exhibit 1B ¶ 6; CA SDQR II Exhibit SSD-4B ¶ 5; DJAC SDQR Exhibit SD-11 § 5. For instance, [      ]'s technical manager explained that:

> We purchase coal from our coal suppliers to whom we look to provide us with non- coking bituminous coal, which, after being subjected to heating, results in a highly porous and non-agglomerated mass of carbon, with a large total surface area. A large surface area of carbon base material is critical to support the process of adsorption of foreign matters including gases and enhances the properties and value of the activated carbon. **Because heating coking coal results in lumps of**

12

> **coal while heating non- coking coal results in coal material that is highly porous with a larger surface area, coking coal is not suitable for production purposes of both us and the whole industry.**

CA SDQR II Exhibit SSD-4B ¶ 5 (emphasis added).

Therefore, heating coking coal results in an agglomerated lump form, instead of a non-agglomerated porous form with a larger surface area, a necessary requirement for adsorption of foreign matter. No record evidence refutes this fact. Consequently, the record unambiguously evidences that coking coal fails to qualify for use in production of activated carbon. Commerce's failure to address this critical point, "from which conflicting inferences could be drawn," invalidates its bituminous coal SV determination. *Gerald Metals*, 132 F.3d at 720.

Fourth, Commerce's rationale is directly contradicted by its diametrically opposite findings based on a similar evidentiary record in the remand proceeding of the preceding, (eleventh) administrative review ("AR11"). This Court in AR11 remanded the same two issues involved here - the nature of coal and its heat value:

> For the *Final Results*, Commerce selected Romanian import data under Harmonized Schedule ("HS") 2701.12 as the surrogate value for bituminous coal. . . .Commerce's understanding of the record evidence concerning the characteristics of Respondents' bituminous coal inputs is unclear. Commerce stated that "{R}espondents have not provided *any* evidence that they used {the type of bituminous coal that} would be categorized as HS 2701.19." I&D Mem. at 14 (emphasis added). There is, however, some indication in the record that Respondents (or their respective suppliers) consumed bituminous coal with a calorific value that is less than 5,833 kcal/kg. . . . It is unclear whether Commerce considered this evidence or found it insufficient. Accordingly, on remand, Commerce must also reconsider and further explain its view of the record on this issue.

*Carbon Activated. v. United States*, 503 F. Supp. 3d 1278, 1291 (CIT 2021).

On remand, analyzing similar record evidence (test reports and declarations), Commerce switched from HTS 2701.12 to 2701.19 to value DJAC's bituminous coal input, the same DJAC supplier, and a Carbon Activated supplier. Final Results of Redetermination, *Carbon Activated v.*

13

*United States*, Case No. 20-00007 (June 30, 2021), ECF 68-1 ("AR11 Remand"), at 7 ("we have valued the bituminous coal input used by {DJAC}, {DJAC's} supplier, and one of Carbon Activated's suppliers using import data reported under Malaysian HS subheading 2701.19"). Consistent with the AR11 remand methodology, DJAC's non-coking bituminous coal (less than 5,833 kcal/kg) should be valued under HTS 2701.19. Likewise, non-coking bituminous coal (more than 5,833 kcal/kg) utilized by DJAC's supplier, [      ] and Carbon Activated's supplier [        ] should be valued under HTS 2701.12.9000. By refusing to recognize the scope of the same HTS provisions in the context of the same input used by two identical parties and one supplier to the same exporter (CA Tianjin), Commerce neglected to provide the requisite "reasonable explanation" for deviating from its valuation in AR11. *Save Domestic Oil*, 357 F.3d at 1283.

As its second rationale, Commerce asserted that the CA supplier's purchase invoices were incorrectly translated. IDM at 18. Specifically, Commerce reasoned that "the mandatory respondents argue that the sales invoices on the record describe the input as semi-coke, washed coal, and washed and fuel coal, however, the translations provided in the record evidence only describe the materials purchased as 'non-coking bituminous coal 1,' 'non-coking bituminous coal 2,' and 'bituminous coal 3.'" *Id*. Commerce misrepresents the facts because "non-coking bituminous coal 1," "non-coking bituminous coal 2," and "bituminous coal 3" were simply noted on the three invoices to reflect the fact that they were supplied by three different suppliers. When Petitioners proffered English translations of the descriptions of input on different invoices, either "semi-coke" or "washed coal" or "washed and fuel coal," respondents presented independent and unrebutted evidence demonstrating that all three names were synonymous with non-coking bituminous coal. CA Sur-rebuttal Exhibit 1B-C.

14

The record was clarified that one of the descriptions, "coking coal," simply occurred by error. CA SDQR II Exhibit SSD-4B ¶ 7. Moreover, as the record evidences, coking coal cannot be used for the production of subject merchandise. *Id*. ¶ 5. Thus, not only is there no ambiguity about the correct translation of the input descriptions, but the record further demonstrates that all of the descriptions meant non-coking coal except for one word that was an error. *Id*. ¶ 7. Therefore, Commerce's unpersuasive references to translation inaccuracies do not support its valuation of bituminous coal.

Commerce misplaced reliance on inapposite precedent to reason "that where a respondent introduced translation inaccuracies, or incorrectly translated documents, such documents are not reliable." IDM at 18. In *Hardwood Plywood Products from China*, Commerce held a document as unreliable based on specific facts:

> Yuantai agrees that it provided an inaccurate translation of its source document. Yuantai states that it abbreviated a Chinese translation, which resulted in Commerce's preliminary finding that Yuantai submitted an incorrectly translated document, **but it does not clarify what the proper translation should have been**, and why an abbreviation would be so specific. . . . As such, Commerce continues to find that Yuantai's purchase contract is not reliable.

84 Fed. Reg. 65,783 (Nov. 29, 2019) (final determination), IDM Comment 4 (emphasis added)

In *Hardwood Plywood*, because an accurate English translation of the Chinese words was entirely missing from the record, Commerce found the document to be unreliable. *Id*. By contrast, there is no dispute here regarding the accurate English translation of the Chinese words used to describe the input. Accordingly, there are no ambiguity or reliability concerns. Consequently, Commerce is wrong in asserting that respondents "have not provided sufficiently detailed translations on the record." IDM at 18.

In sum, Commerce erred by using a distorted HTS 2701.12. The Department should instead have applied the correct HTS 2701.12.9000 and 2701.19 to value the non-coking

15

bituminous coal input. Specifically, Commerce should have valued [      ]'s and [      ]'s non-coking bituminous coal with heat value above 5833 kcal/kg using HTS 2701.12.9000 (with average unit value ("AUV") of 0.32 Malaysian Ringgit/kilogram ("RM/kg")). Final SV Submission Excel Workbook Tab: "SV Summary." Conversely, Commerce should have valued DJAC's non-coking bituminous coal of less than 5833 kcal/kg heat value based on 2701.19 (AUV of 0.48 RM/kg). *Id*.

## II.      COMMERCE UNLAWFULLY VALUED CARBONIZED MATERIAL

### A.      Facts

DJAC reported carbonized material as one of the FOPs. DJAC Section D Questionnaire Response (Sept. 19, 2019), C.R. 85-90, P.R. 103 ("DJAC DQR"), Exhibit D-5. Further, DJAC explained that the FOP was a coal-based carbonized material. DJAC SQDR at 14, Exhibit SD-7. Carbon Activated also reported carbonized material as a FOP that its suppliers utilized. CA DQR I Att. A, Exhibit D-5, Att. B, Exhibit D-5. CR 60; CA DQR II Att. C, Exhibit D-5. Like DJAC, Carbon Activated reported that its FOP was a coal-based carbonized material. CA SDQR I at 2, 9.

Commerce preliminarily valued respondents' coal-based carbonized material based on the Malaysian import data for coconut shell charcoal reported in HTS 4402.90.10000. SV Memo at 4. Respondents urged Commerce to instead value carbonized material using import data reported in HTS 4402.90 ("Wood Charcoal (Including Shell Or Nut Charcoal), Excluding That Of Bamboo") which encompasses both HTS 4402.90.1000 ("coconut shell charcoal") and 4402.90.9000 ("other wood charcoal"). Final SV Submission Exhibits 1, 2A; Final SV Rebuttal Exhibit 5. Commerce declined to make this change in the *Final Results*. IDM at 43.

## B. Commerce Unlawfully Rejected HTS 4402.90.9000

Commerce rejected HTS 4402.90.9000 ("other wood charcoal") with two unpersuasive

rationales and failed to support its solitary choice of HTS 4402.90.1000 ("coconut shell

charcoal") to value coal-based carbonized material. First, Commerce reasoned that "Carbon

Activated's suppliers did not purchase carbonized material that was made from wood or nut

charcoal so as to merit the inclusion of the HS 4402.90.9000, 'other wood charcoal.'" IDM at 43.

This rationale is meritless because Carbon Activated's suppliers did not purchase or utilize

coconut shell charcoal. Moreover, Commerce failed to demonstrate that coal-based carbonized

material was identical to coconut shell charcoal. Commerce's rationale does not support the

solitary choice of HTS 4402.90.1000, covering coconut shell charcoal.

Second, Commerce reasoned that "we do not have any record evidence so as to merit the

inclusion of HS 4402.90.9000, 'other wood charcoal.'" IDM at 43. This rationale is contradicted

by a plethora of record evidence including ITC reports, Section II.C, *infra*, establishing that

wood based charcoal covered in HTS 4402.90.9000 is comparable to coal-based carbonized

material in terms of key properties and cost. Commerce's failure to address this critical point

"from which conflicting inferences could be drawn" invalidates its carbonized material SV

determination. *Gerald Metals*, 132 F.3d at 720.

Third, Commerce cited its precedent from the fifth administrative review ("AR5"),

asserting that it had "found that the use of wood charcoal or other non-coconut-shell carbonized

materials would only be applicable had a respondent sold subject merchandise produced from

wood or nut charcoals." IDM at 43 (quotation omitted). Yet this precedent is distinguishable as

rendered in the context of a specific grade of activated carbon sold by a different respondent:

> **Petitioners correctly state that activated carbon may be manufactured from**
> **wood or nut charcoal**, in addition to coal. However, Jacobi has provided

17

certifications from industry experts which state that **activated carbon which meets certain specifications** with regard to iodine level, density and hardness **could not be produced from wood charcoal**. Further, the record demonstrates that the subject merchandise sold by Jacobi during the POR meet the specifications identified in the certifications.

*Activated Carbon from China*, 78 Fed. Reg. 70,533 (Nov. 20, 2013) (final results), IDM Comment 6 (footnotes omitted) (emphases added).

AR5 featured record evidence showing that the specific grade of activated carbon sold could not be produced from wood charcoal. Consequently, Commerce's findings were narrowly tailored. In contrast, in this case, there is no record evidence that subject merchandise sold could not have been produced from wood charcoal. Therefore, Commerce unpersuasively attempts to impart a universal application to its narrow findings rendered on the AR5 record. AR5 in fact refutes Commerce's AR12 valuation because the Department at that time agreed that activated carbon may be manufactured from wood charcoal. *Id*. Accordingly, for valuing carbonized material, Commerce's AR5 precedent supports the inclusion of wood based charcoal reported in HTS 4402.90.9000.

In sum, Commerce erred in rejecting HTS 4402.90.9000.

### C.    Commerce Should Have Selected HTS 4402.90

Record evidence shows that coal-based activated carbon shares certain properties with coconut shell-based activated carbon and certain other properties with wood-based activated carbon. In terms of cost, wood based activated carbon overlaps with the lower grades of coal-based activated carbon while coconut shell-based activated carbon overlaps with the higher grades of coal-based activated carbon.

In particular, the ITC and other information summarized below evidence key differences between coconut shell-based activated carbon and coal-based activated carbon. Because

carbonization constitutes a key step in the production of activated carbon, the choice of

carbonized material (whether based on coal, coconut shell or wood) for further processing is

directly related to the performance of the end-product. Accordingly, the differences between

different types of activated carbons can be directly traced to the differences between the

underlying corresponding carbonized materials. The record information set forth below, despite

exhaustive briefing, was ignored in Commerce's cursory analysis, thus requiring remand for

failure to consider contradictory record evidence. *Cf.* Case Brief at 18-24 *with* IDM at 43; *Gerald*

*Metals*, 132 F.3d at 720.

- **ITC reports distinguish between coconut shell-based activated carbon and coal-based activated carbon**

ITC reports underscore fundamental differences between coal- based and coconut shell-

based activated carbons:

| Coconut shell-based activated carbon | Coal-based activated carbon |
|---|---|
| Higher hardness | Lower hardness |
| Smaller pore sizes | Larger pore sizes |
| Different pore distribution ||
| Uses: Cigarette filters, home water filters, gold mining | Uses: Processing drinking water, filtering air and gases |

Final SV Submission Exhibit 5A: *Activated Carbon from China*, Inv. No. 731-TA-1103, USITC

Pub. 4797 (2nd Rev.) (June 2018), at I-10–11. The ITC reports also confirm that coconut and

coal-based activated carbons have "different physical structures" and "there is very little

interchangeability" between the two products. *Id.*: *Activated Carbon from China*, Inv. No. 731-

TA-1103, USITC Pub. 3913 (Final) (Apr. 2007), at 26. In addition, the two products have

"different markets" and there is a demonstrated "lack of customer overlap." *Id.* at 27.

- **Technical Differences between Coconut shell, Coal based and Wood based activated carbon**

Independent record evidence shows that both coconut shell-based activated carbon and wood-based activated carbons overlap as well as differ from coal-based activated carbon. Final SV Submission Exhibit 5B.  For instance, coconut shell and coal-based activated carbon share the same micropore and hardness levels but differ in terms of iodine number and water soluble ash. *Id*. Conversely, wood-based activated carbon shares iodine number with coal based activated carbon but differs in terms of apparent density and water soluble ash. *Id*.

Overall, while coal-based activated carbon is characterized by a few unique properties, it nonetheless shares certain properties with both coconut shell based activated carbon and wood-based activated carbon.

These facts suggest that the corresponding underlying inputs - coconut shell and wood-based charcoals –should also overlap and differ from a coal-based carbonized material. In sum, as compared to wood-based charcoal, coconut shell charcoal is not more comparable to coal-based carbonized materials.

- **Price data of Coconut shell, Coal based & Wood based Activated carbon**

Independent public domain information shows that prices of coal based activated carbon vary in a wide range. Coconut shell activated carbon prices, which are generally high, overlap with the higher price ranges of coal based activated carbon. On the other hand, wood based activated carbon prices, which are generally lower, overlap with the lower price ranges of coal based activated carbon. Final SV Submission Exhibit 5C.

The following chart summarizes these price data.

| Type of charcoal | Activated Carbon Price range (USD/MT) |
|---|---|
| Wood | 500-1865 |
| Coal | 500-2500 |
| Coconut shell | 1550-2150 |

In view of the above, the record evidence supports HTS 4402.90 – which averages the prices of coconut shell charcoal (relatively superior grade, costlier) and wood-based charcoal (relatively inferior grade, cheaper) – affording a reliable and undistorted SV for coal-based carbonized material. Conversely, Commerce's SV choice based solely on HTS 4402.90.1000 (coconut shell charcoal) is unrepresentative of a range of coal-based carbonized material and yields a distorted SV.

Finally, the choice of HTS 4402.90 – as against HTS 4402.90.1000 – to value coal-based carbonized material is also supported by price data of the underlying material, bituminous coal. The price of two grades of non-coking bituminous coal that could have been potentially used to produce coal-based carbonized material are:

- Higher heat value coal – HTS 2701129000 – 0.32 RM/kg; and

- Lower heat value coal – HTS 270119 – 0.48 RM/kg

Final SV Submission Excel Workbook Tab: "SV Summary." On the other hand, the two potential SV sources are:

- Coconut shell charcoal – HTS 4402901000 – 2.05 RM/kg. Final SV Memo Excel Workbook Tab: "MasterSV"; and

- Wood and coconut shell charcoal – HTS 440290 – 1.144 RM/kg. Final SV Submission Excel Workbook Tab: "SV Summary."

Bituminous coal is converted to coal-based carbonized material by the simple process of heating in a carbonization furnace. *See* DJAC DQR at 4, Exhibit D-2.1. In this process, the value addition is unlikely to be significant. Consequently, the value of the resulting carbonized

21

material should be proximate to the value of the starting raw material, bituminous coal (*i.e.*, slightly higher than either 0.32 or 0.48 RM/kg). Accordingly, the bituminous coal prices (0.32 or 0.48 RM/kg) can be properly used to benchmark the available surrogate value alternatives for coal-based carbonized material (1.144 or 2.05 RM/kg). This comparison reveals that between the two alternatives, the SV of 1.144 RM/kg in HTS 4402.90 is corroborated by the bituminous coal price data.

Therefore, based on the preponderance of record evidence, Commerce is required to select HTS 4402.90 with a SV of 1.144 RM/kg to value the coal-based carbonized material input.

### D.    Judicial and Agency Precedent Compel HTS 4402.90

In prior reviews, Commerce has not adhered to a rigid SV source for carbonized material. Instead, demonstrating a flexible approach in accordance with the record evidence presented in any proceeding, the agency selected the best SV choice for carbonized material.

In the first administrative review, it was determined that "the Department will continue to value coal carbonized materials under HTS 2704.00.90: "Other Cokes of Coal" for the final results, as we find it to be the best information available on the record." *Activated Carbon from China*, 74 Fed. Reg. 57,995 (Nov. 10, 2009) (final results), IDM Comment 3(e), Thereafter, Commerce in a few review proceedings preferred the HTS heading for coconut shell charcoal, considering it as the most comparable choice among the available alternatives. *See, e.g.*, *Activated Carbon from China*, 76 Fed. Reg. 67,142 (Oct. 31, 2011) (final results), IDM Comments 4(b) (in reversing its preliminary valuation, "the Department will use Indian HTS number 4402.90.10 "Coconut Shell Charcoal" to calculate the SV"). Yet in AR5, the Department acknowledged that wood-based charcoal could be used to produce activated carbon. Section II.B,

*supra*. Therefore, Commerce has affirmed that both wood-based charcoal and coconut shell-based charcoal can be used as carbonized material for the production of subject merchandise.

Commerce's findings have been upheld on judicial review. In the fourth administrative review, Commerce valued coal-based carbonized material based on HTS 4402 (averaging both wood-based and coconut shell-based charcoal), and the decision was affirmed by the U.S. Court of Appeals for Federal Circuit ("CAFC"):

> In these prior analyses, Commerce was choosing between coconut shell charcoal and the HTS category "Other Cokes of Coal" to find a comparable surrogate for coal-based carbonized material. Commerce's determination that coconut shell charcoal is better than "Other Cokes of Coal" does not mean that coconut shell data is better than wood charcoal. **Wood charcoal is also a type of charcoal and can also be used to create the subject merchandise.** Thus for the same reasons articulated by Commerce in the earlier periods of review, wood charcoal would be a better surrogate than "Other Cokes of Coal." There are no express findings or comparisons between wood charcoal and coconut shell charcoal, and this record does not establish any such conclusions.
>
> While coconut shell charcoal is more specific than "Other Cokes of Coal," the record does not compare coconut shell charcoal and wood charcoal. **Commerce's past practice does not demonstrate that coconut shell charcoal is a better match for coal-based carbonized material than the broader Philippine import data category, which includes wood charcoal and coconut shell charcoal.**
>
> {} Conclusion
>
> Here, the material input in question is carbonized material made of coal . . . With regard to the carbonized material made of coal, which constitutes the bulk of the subject merchandise, there is no evidence on this record comparing wood charcoal and coconut shell charcoal. **There are no findings nor have we been presented with record evidence that coconut shell charcoal is a better surrogate for coal-based carbonized material than wood charcoal.** Thus for the bulk of the imports at issue, **there is no proof that coconut shell charcoal is a better surrogate**. Neither of these data sources is specific to carbonized material made of coal and Commerce's past selection of coconut shell charcoal as the best available surrogate was based on a comparison with "Other Cokes of Coal," not wood charcoal. . . . We cannot conclude on this record that Commerce's decision that both data sources were specific to the inputs in question was not supported by substantial evidence.

*Jacobi Carbons AB v. United States*, 619 Fed. Appx. 992, 999 (Fed. Cir. 2015) (emphases added).

The CAFC thereby affirmed Commerce's decision that: (a) wood charcoal could be used to produce subject merchandise, and (b) between wood charcoal and coconut shell charcoal, the latter was not more comparable to coal-based carbonized material. Both findings are affirmatively demonstrated on the instant record. As already demonstrated, Section II.C, *supra*, not only is wood charcoal-based activated carbon produced and sold commercially but also that a comparative evaluation of the properties and prices of word charcoal and coconut shell charcoal compels a conclusion that both evidence similar comparability with coal-based carbonized material. Therefore, the instant record lends greater and unambiguous support to the CAFC's ultimate conclusion as compared to the leaner AR4 record. Accordingly, Commerce was required to follow its judicially approved AR4 precedent.

Conversely, judicial precedent requires that in AR12, on account of a distinguishable factual record, Commerce was not constrained by its precedent where, based on a sparse record, it had selected the SV of only coconut shell charcoal to value coal-based carbonized material. This Court has recognized that Commerce was not bound by past practice.

> Fufeng's past-practice claim also fails. Fufeng offers three investigations as evidence of three different purported past practices that it argues contravene Commerce's selection. . . . But citing isolated investigations does not prove the existence of past practices; it just proves that **Commerce thought differently on different facts at different times**. Fufeng's past-practice claim is therefore as unavailing as its substantial-evidence claim.

*CP Kelco US, Inc. v. United States*, 2015 WL 1544714, *10 (CIT Mar. 31, 2015) (emphasis added).

This Court subsequently reminded Commerce to make a record specific choice of SV instead of simply adhering to its precedent:

24

PUBLIC VERSION

> {A}s the Federal Circuit stated, "Commerce is required to base surrogate country selection on the facts presented in each case, and not on grounds of perceived tradition. Each administrative review is a separate exercise of Commerce's authority that allows for different conclusions based on different facts in the record." *Jiaxing*, 822 F.3d at 1299 (internal quotation marks omitted); *see also Goldlink*, 431 F.Supp.2d at 1327 (quoting *Timken Co.*, 166 F.Supp.2d at 616) (declaring that, Commerce has "broad discretion to determine the 'best available information' in a reasonable manner on a case-by-case basis").

*Vulcan Threaded Products Inc. v. United States*, 311 F. Supp. 3d 1357, 1367 (CIT 2018).

Therefore, in accordance with precedent and the underlying record here, Commerce should value coal-based carbonized material by averaging the wood charcoal and coconut shell charcoal values as reported in Malaysian HTS 4402.90 import data. Commerce should further adhere to its well established policy of applying a weighted – instead of a simple – average of data reported under the two disaggregated HTS sub-headings 4402.90.1000 and 4402.90.9000, under the 6-digit HTS 4402.90:

> Consistent with Department practice, **where we calculate an SV for a specific HTS category, we weight average the values reported under all HTS subcategories under that HTS category**. . . . When the Department has determined that a certain HTS category is the most specific category which matches the respondent's consumed input, its practice is to use the weighted-average value of imports under that specific HTS category as the best available {SV}.

*Xanthan Gum from China*, 82 Fed. Reg. 11,434-01 (Feb. 23, 2017) (final results), IDM Comment 10 (emphasis added)

Accordingly, for valuing carbonized material, Commerce should have applied a SV of 1.144 RM/kg obtained by weighted averaging of the data reported under HTS 4402.90. Case Brief at 24.

### III.     COMMERCE UNLAWFULLY VALUED LIQUID CAUSTIC SODA

#### A.     Facts

The following Carbon Activated suppliers reported their consumption of **liquid** caustic soda during the POR:

- [                                                    ]. Carbon Activated Response to Section D of Questionnaire (Part I), (Sept. 19, 2019), C.R. 60, P.R. 102 ("CA DQR I"), Attachment A at 4, 11, Exhibits D-1–2, D-4–6, D-9.3 & D-12.4; Carbon Activated Section D Supplemental Questionnaire Response (Part I) (Mar. 18, 2020) ("CA SDQR I"), C.R. 171-79, P.R. 184-90, at 2, 5-6, Exhibit SD1, SD-6, SD-11.

- [                                                    ]. CA DQR Attachment B Exhibits D-1, D-6.5; CA SDQR I Exhibit SD-17, SD-20.

Further, Carbon Activated reported utilizing liquid caustic soda with purity in the range of 30.6% to 33.1%, *i.e.* an average purity or concentration level of 31.9%. CA SDQR I at 1.

Commerce preliminarily valued Carbon Activated's LIQUIDCAUSTIC, *i.e.* liquid caustic soda, based on Malaysian import data reported in HTS 2815.11, which covers solid sodium hydroxide. Prelim SV Memo Attachment 1. In doing so, Commerce specifically referred to the "Input Description" as "**Solid** Sodium Hydroxide." Prelim SV Memo at 4 (emphasis added). Carbon Activated requested that Commerce: value the input as liquid caustic soda or liquid sodium hydroxide, a **different physical form** of sodium hydroxide classified under HTS 2815.12; and multiply that SV by 0.319 for the most accurate value of the 31.9% concentrated liquid caustic soda. Case Brief at 39-40. Commerce declined to make this change in the *Final Results*. IDM at 44-45.

#### B.     HTS 2815.12 Should Be Used to Value Liquid Caustic Soda

Commerce improperly valued the liquid caustic soda FOP reported by Carbon Activated's supplier as solid caustic soda, given that it was clearly reported as a liquid input with diluted purity. CA DQR I Attachment A at 4, 11, Exhibits D-1–2, D-4–6, D-9.3 & D-12,

PUBLIC VERSION

Attachment B Exhibits D-1, D-6.5; CA SDQR I at 2, 9-10, Exhibits SD-6, SD-17. Carbon

Activated alerted Commerce that the agency had misidentified the FOP as a "Solid" in the

preliminary valuation and requested correction. Case Brief at 39; Prelim SV Memo at 4. Yet the

Department thereafter impermissibly speculated that "Carbon Activated's suppliers actually

purchased solid sodium hydroxide and created liquid caustic themselves" as opposed to having

"purchased liquid sodium hydroxide in its diluted form." IDM at 45. According to Commerce,

such an inference is warranted because "something happens to the caustic soda input after its

purchase because once the input is applied into the production process, the volume reported is

larger than the volume purchased." IDM at 45.

"It is well established that speculation does not constitute substantial evidence." *Lucent

Techs.*, 580 F.3d at 1327 (citation omitted). Commerce concedes that "the record does not

specify whether Carbon Activated's suppliers" in fact purchased the FOP in solid form, but

employs that SV because "the record does not contain sufficient evidence to demonstrate that the

mandatory respondents, or their suppliers, purchased liquid caustic soda." IDM at 45. This

analysis has it backwards; Commerce should use the FOP in the form reported, unless evidence

establishes otherwise. There is no evidentiary basis for Commerce's speculation that solid form

sodium hydroxide was purchased and converted to liquid. Further, Commerce presumed that the

purchased quantity somehow increased, by simply comparing the total quantity of purchase

during the POR, [          ] MT with the total quantity of consumption, [

] MT during the same period. CA DQR I Attachment A, Exhibits D-5 & D-12.4. In

doing so, Commerce impermissibly compared apples (purchased quantity) with oranges

(consumption quantity) during the POR. In this case, a small portion of total consumption – *i.e.*,

[      ] MT out of [              ] is from purchases made prior to the POR. *See id*.

If Commerce needed information concerning the volume of this input to confirm its form, it was obligated to request that Carbon Activated demonstrate the opening balance of liquid caustic soda on April 1, 2018. Likewise, if Commerce had doubts that the liquid form FOP was improperly reported, it was required by statute to "inform" Carbon Activated "of the nature of the deficiency" and "provide . . . an opportunity to remedy or explain the deficiency." 19 U.S.C. § 1677m(d).  Commerce did not, before the *Final Results*, question the liquid form of the FOP, asking merely about "the chemical composition . . . of **liquid** caustic." CA SDQR I at 1 (emphasis added). Carbon Activated in March 2020, well before the *Preliminary Results*, submitted the requested "documentation" evidencing purity level of liquid caustic. *Id*. at 1, Exhibit SD-1. It was therefore "practicable . . . in light of the time limits established" for Commerce to request information proving the liquid nature of the reported FOP at the same time it requested the chemical composition. 19 U.S.C. § 1677m(d).

Commerce misplaces reliance to support its valuation of a liquid FOP on evidence that "the suppliers used a sodium hydroxide with purity in the range of 30.6 to 33.1 percent, as demonstrated by test reports." IDM at 45. Such evidence supports valuing the FOP using HTS 2815.12, for pure liquid sodium hydroxide, and multiplying that value by 0.319 – not to disregard the liquid nature of the reported FOP and presume that the input was sourced in solid form, as Commerce improperly speculated to value the FOP under HTS 2815.11 in the *Final Results*.

## IV.    COMMERCE UNLAWFULLY VALUED HYDROCHLORIC ACID

### A.  Facts

Carbon Activated reported having utilized an aqueous solution of hydrochloric acid ("HCl") with a concentration level in the range of [              ]. CA SDQR I Exhibit SD-1.

Commerce preliminarily selected Malaysian HTS 2806.10 (Hydrochloric Acid) import data to value the HCl utilized by DJAC and Carbon Activated. Prelim SV Memo at 4, Attachment 1. Emphasizing comparative import data reported during the POR from all six potential surrogate countries in HTS 2806.10, Carbon Activated requested that Commerce instead value its HCl using more specific import data for aqueous HCl provided in Brazilian HTS 2806.10.20, or alternatively Turkish HTS 2806.100.00.012. Case Brief at 48-51. Commerce declined to make this change in the *Final Results*. IDM at 40-41.

### B.  Malaysian Data Should Not Be Used to Value HCl

Commerce improperly disputed the aqueous nature of the HCl used to produce subject merchandise in AR12. It was manifestly unreasonable for Commerce to find that "contrary to the mandatory respondents' assertion that the record evidence shows that Carbon Activated utilized aqueous solution of HCL, the evidence on the record only demonstrates the purity level for HCl." IDM at 40. Yet the purity level less than 100% means that the HCl is necessarily in an aqueous solution – as confirmed by record evidence and Commerce practice. The record confirms that HCl exists in two forms: (1) anhydrous or liquid form (without added water); and (2) aqueous solution (with added water). Final SV Submission Exhibit 6B at 42/74. The latter form is expressed with purity levels; Commerce for example recognized that the mandatory respondent "used a {HCl} solution that was 31-percent {HCl} and 69-percent water," because evidence "supported that it used 31-percent concentrated {HCl}." *Helical Spring Lock Washers from China*, 73 Fed. Reg. 4175 (Jan. 15, 2008) (final results), IDM Comment 4. Accordingly, the HCl consumed with its concentration level ranging [            ] necessarily means that it was in an aqueous solution with [            ] water.

29

Remand is warranted because Commerce unreasonably ignored the significance of purity level in claiming that "the mandatory respondents did not meet the burden of substantiating their assertion that the HCl that they used was in fact in an aqueous state." IDM at 41. This flawed finding was critical to its use of Malaysian data to value HCL in the Final Results. *Id*. On remand, the Department should adhere to its practice – affirmed by this Court – "to prefer data that has greater specificity to the input it is valuing." *Elkay Mfg. Co. v. United States*, 180 F. Supp. 3d 1245, 1253 (CIT 2016). Commerce routinely employs "a secondary surrogate for purposes of valuing inputs . . . where {that secondary country's} **HTS category is more specific**." *Wooden Bedroom Furniture from China*, 73 Fed. Reg. 49,162 (Aug. 20, 2008) (final results), IDM Comment 12 (emphasis added). The Malaysian HCl data here are less specific than data from other countries, because Malaysia provides only a single HTS classification – 2806100000 for "Hydrogen Chloride (Hydrochloric Acid); Chlorosulphuric acid" – that covers both forms of HCl: (1) anhydrous or liquid form (without added water); and (2) aqueous solution (with added water). Final SV Submission Exhibit 6B. Accordingly, Commerce's SV for aqueous HCl – *i.e.*, HCl with a purity value less than 100% -- was distorted by the inclusion of non-specific, 100% pure liquid HCl.

Commerce should accordingly have valued HCL using a secondary surrogate country that provides a more specific classification. Brazil provides such specific data under HTS 28061020 for "Hydrogen Chloride (Hydrochloric Acid), in aqueous solution" – as distinct from HTS 28061010 for "Hydrogen Chloride (Hydrochloric Acid), gaseous, liquefied." Final SV Submission Exhibit 6B. Although Turkey also provides sufficiently specific import data for

aqueous HCl,[2] as compared with Brazil it has less imports of aqueous HCl during the POR by an order of magnitude. Case Brief at 50. The choice of Brazilian SV data due to their much higher import quantity is supported by Commerce precedent, as affirmed by this Court. *Calgon Carbon Corp. v. United States*, 2017 WL 384685, *2 (CIT Jan. 27, 2017).

### V.    COMMERCE UNLAWFULLY VALUED STEAM

#### A.    Facts

Per the Department's established derivative methodology for valuing steam at 14.52% of natural gas prices, Commerce preliminarily derived the SV of steam using 2.22 RM/kg for **liquefied natural gas** ("LNG") as reported in HTS 2711.11 ("Natural gas") from Malaysia. Prelim SV Memo at 6-7, Excel Workbook Tabs: "MasterSV"; "Steam." Respondents thereafter challenged the liquefied natural gas price as being not product specific and unreliable, requesting that Commerce instead use the product specific HTS 2711.21 ("In a gaseous state: Natural gas"). Relying upon data published by Trade Data Monitor ("TDM") that reported nil imports under Malaysian HTS 2711.21 during the POR, respondents proposed the corresponding import data from Mexico. Case Brief at 43-49. Commerce declined to make this change in the *Final Results*, clarifying that Malaysian data did exist under HTS 2711.21 as published by Global Trade Atlas ("GTA") dataset but maintaining valuation under 2711.11 IDM at 47-48.

#### B.    Commerce Should Have Used HTS 2711.21

Commerce's practice is to value FOPs "using the GTA data for HTS subheading 2711.11 or 2711.21, depending on whether the natural gas was purchased in gaseous or liquefied state."

---

[2] Turkey divides HCl into HTS 280610000011 for "Saf Hidroklorik Asit (Pure Hydrochloric Acid)" and 280610000012 for "Teknik Hidroklorik Asit (Tuz Ruhu) (Technical Hydrochloric Acid - Salt spirit)." Final SV Submission Exhibit 6A. Record evidence shows that the latter is a synonym for "hydrochloric acid solution" – an aqueous (water-based) solution of hydrogen chloride. *Id*. Exhibit 6C.

*Polytetrafluoroethylene Resin from China*, 83 Fed. Reg. 20,039 (Apr. 30, 2018) (preliminary

results), Decision Memorandum § VII.M.2. Commerce in the *Final Results* improperly

disclaimed any limits on its ability to choose either subheading, IDM at 47-48; 2711.21 is proper

for FOPs "consumed . . . in a gaseous form rather than liquid form." *Crystalline Silicon*

*Photovoltaic Cells from China*, 80 Fed. Reg. 40,998 (July 7, 2015) (final results), IDM Comment

19. The record evidences this practice. Final SV Submission Exhibit 8B.

It is undisputed that Carbon Activated in AR12 reported "steam" – which necessarily is

in a gaseous form, defined as "water in the form of an invisible gas or vapor." CA DQR at 12-13,

Exhibits D-1, D-5; DICTIONARY.COM ("steam"). Because Commerce never questioned the

manner in which steam was reported, it should have been valued as natural gas in the same

physical form – *i.e.*, gaseous state. HTS 2711.21 is product specific since it describes natural gas

in **gaseous state**. Because HTS 2711.11 (Liquid natural gas) is not product specific, Commerce's

valuation contradicted product specificity considerations and its agency practice.

Commerce acknowledged that "Malaysia imported 3,207,783 kg of natural gas under

HTS 2711.21 during the POR." IDM at 48. Specifically, the AUV in HTS 2711.21 for natural

gas (in gaseous form) is 0.645 RM/kg. Prelim SV Memo Excel Workbook Tab:

"Calculated_SV_Data" (POR total value of imports in HTS 2711.21 was 3,207,783 kg, valued at

2,067,815 RM, and yielding an AUV of 0.645 RM/kg). Yet Commerce improperly ignored this

data, even though it was not only product specific, but was also based on a substantial volume

representing a broad market average.

Conversely, Commerce improperly selected Malaysian HTS 2711.11 – even though this

subheading lacked product specificity – and dismissed respondents' reliability concerns. After

noting that "the mandatory respondents argue that the Malaysian data under HS 2711.11 are

unreliable because the domestic prices of natural gas during the POR were lower than the import prices of natural gas," Commerce summarily concluded that "the domestic prices the mandatory respondents provide are not supported by the underlying methodology used to derive those prices." IDM at 48. Yet Commerce abjectly failed to point out any flaws with the underlying methodology. Without any such rationale, Commerce failed to "explain why it has exercised its discretion in a given manner." *Motor Vehicle Mfrs.*, 463 U.S. at 48.

Moreover, respondents properly computed the official Malaysian price of piped natural gas in units of RM/kg from the originally reported units of RM/million British thermal unit ("mmBtu") based on an authoritative Natural Gas Handbook and publicly available natural gas density information. Final SV Rebuttal Exhibit 4; Final SV Submission Exhibit 7F-7G. These data sources are of high probative value and not impeached on this record. As such, the resulting Malaysian domestic market natural gas price of 1.55 RM/kg is reliable and accurate. Such contemporaneous Malaysian domestic market natural gas price detracts from the reliability of the significantly higher 2.22 RM/kg AUV (*i.e.*, 43% higher) of liquefied natural gas in Malaysian HTS 2711.11. This Court explained the issue as follows.

> Commerce's discussion, however, fails to explain why its use of imported coal data "best approximate{s}" the cost of coal incurred by Indian AJC producers during the POR. *Nation Ford,* 166 F.3d at 1376. While the data relied upon by Commerce may be "more contemporaneous" with the POR and not "aberrational or unreliable," these facts do not naturally lead to the conclusion that such data is an accurate reflection of the price paid for coal by domestic Indian AJC producers during the POR.
>
> **Commerce nowhere explains how the use of seemingly more expensive imported coal data is the best available information establishing the actual costs incurred by Indian AJC producers.**

*Yantai Oriental Juice Co. v. United States*, 26 CIT 605, 617 (2002) (emphasis added).

PUBLIC VERSION

Therefore, under *Yantai*, a hypothetical producer in Malaysia was unlikely to have purchased imported natural gas at 2.22 RM/kg, when the same product was available in the domestic market at a significantly lower price of 1.55 RM/kg. Therefore, Commerce's SV of 2.22 RM/kg based on HTS 2711.11 import data – besides being not product specific for valuing steam – was also unreliable.

Finally, Commerce reasons that "Malaysian import data under HS 2711.11 are the more appropriate source . . . because the data represent a significantly larger volume of imports . . . from multiple countries . . . {w}hereas the import data under HS 2711.21 represent a smaller volume of imports… from only one country." IDM at 48. In doing so, Commerce improperly compared import volumes reported under two different HTS subheadings covering distinct products. Moreover, Commerce failed to provide any precedent to support comparing the broad market average attributes of disparate HTS subheadings.

In sum, for valuing steam, Commerce erred in selecting HTS 2711.11 that was not product specific and, conversely, erred in rejecting a SV of natural gas (gas) reported in Malaysian HTS 2711.21 – 0.645 RM/kg.

## VI.   COMMERCE UNLAWFULLY VALUED ANTHRACITE COAL

### A.  Facts

Record evidence shows that anthracite coal utilized by all producers in the production of the subject merchandise had volatility content below 10%. DJAC's supplier, [       ]'s anthracite coal had a volatile content of [     ]. DJAC SDQR at 35-37, Exhibit SD-52. Carbon Activated supplier [                ] utilized anthracite coal with volatility content ranging from [
       ]. CA SDQR Part II at 1, Exhibit SSD-2. Carbon Activated supplier [
                    ] utilized anthracite coal with volatility content ranging from [

]. *Id*. at 7, Exhibit SSD-14.

Commerce preliminarily valued anthracite coal using Malaysian import data reported in HTS 2701.11 ("Anthracite Coal, whether or not pulverized, but not agglomerated"). Prelim SV Memo at 4; *see* Final SV Submission Exhibit 3. Analyzing import data, Respondents requested that Commerce instead value anthracite coal under Russian HTS 2701.11.1000 ("anthracite coal - with maximum yield of volatile substances {as calculated for dry not mineral basis} of not more than 10 % mass fraction"). Case Brief at 3-7. Commerce declined to make this change in the *Final Results*. IDM at 27-29.

### B.  Russian Data Should Be Used to Value Anthracite Coal

Malaysian HTS 2701.11 is less product specific and less representative of a broad market average as compared to Russian HTS 2701.11.1000 that specifies a volatility of "not more than 10 % mass fraction." Final SV Submission Exhibit 3. Comparative import data for anthracite coal reported from all six countries both at the 6 digit HTS 2711.11 level and beyond shows that among the six potential surrogate countries, only the Russian tariff breaks out the cost of anthracite coal in terms of its volatility content of equal or less than 10% and more than 10%. Case Brief at 4-5; Final SV Submission Exhibit 3.

The anthracite coal utilized by respondents in AR12 uniformly has a volatility content below 10%. DJAC SDQR at 35-37, Exhibit SD-52; CA SDQR Part II at 1, 7, Exhibits SSD-2, SSD-14. As such, Russian HTS 2701.11.1000 provides the most product specific data source in accordance with Commerce practice that considers, *inter alia*, using SVs that are "**from an approved surrogate country**" and "**specific to the input** in question." *Frozen Fish Fillets from Vietnam*, 75 Fed. Reg. 38,985, 38,986 (July 7, 2010) (final results) (emphases added). Russia qualifies as one of the six approved potential surrogate countries. OP List. Commerce refused to

use the more specific Russian data by arguing it will "only resort to a secondary surrogate country if data from the primary surrogate country are unavailable or unreliable." IDM at 28. Yet, as clarified by this Court: "Commerce, in past cases, has departed from that course of action when it has concluded that **better data were available from another country that qualified** as a surrogate country." *Shantou Red Garden Foodstuff Co. v. United States*, 880 F. Supp. 2d 1332, 1334 (CIT 2012) (emphasis added). The most that can be said is that Commerce's "preference for using data from a single country might support a choice between data sets that, upon a fair comparison, are otherwise seen to be **fairly equal**." *Peer Bearing Co.-Changshan v. United States*, 752 F. Supp. 2d 1353, 1373 (CIT 2011) (emphasis added).

It cannot be said that the Malaysian anthracite coal data are "fairly equal" because "better data were available from another country that qualified" – *i.e.*, Russian data that captured FOP volatility. Id.; *Shantou*, 880 F. Supp. 2d at 1334. As explained by this Court in affirming Commerce's selection of a more specific HTS than afforded by the primary surrogate country:

> Agifish also argues that Commerce lacked substantial evidence to conclude that the Vitarich and Bluebay price quotes are the best available information to value respondents' fish waste byproducts because they are not from the primary surrogate country. …. However, Commerce{} reasonably concluded that **Indonesian data is not specific because the HTS subcategories are overly broad** to the byproducts produced by respondents. Nothing in the statute or in Commerce's practice requires Commerce to select data from a primary surrogate country where it concludes such data is not the best available information to value respondent's FOPs. See 19 U.S.C. § 1677b(c)(1). Agifish points to no record evidence showing it is unreasonable for Commerce to conclude that more specific data from the Philippines is superior to Indonesian data where **the record lacks specific pricing data** from Indonesia.

*An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States*, 203 F. Supp. 3d 1256, 1283 (CIT 2017) (emphases added).

Per this precedent, Commerce should have used Russian HTS 2701.11.1000 based product specificity over the inferior Malaysian HTS 2701.11 that lacked such specificity. In

addition, Russian HTS 2711.11.1000 import data is based on 3,905,886,437 Kg, which is about eight times higher as compared to the Malaysian HTS 2711.11 import quantity of 484,415,312 kg. Therefore, compared to the Malaysian SV of RM 0.81/kg ($0.1996/kg), the Russian AUV ($0.0367/kg) is significantly more representative of a broad market average price. Consistent with its established policy to prefer data that is product specific and represents the broadest market average, Commerce should have selected Russian HTS 2701.11.1000 import data and valued anthracite coal at $0.0367/kg. Case Brief at 7.

## VII.   COMMERCE UNLAWFULLY CALCULATED SURROGATE FINANCIAL RATIOS

### A.   Facts

Financial statements from multiple countries were submitted by interested parties for use in calculating surrogate financial ratios in AR12:

- <u>Malaysia</u> – 2017 Century Chemical Works Sendirian Berhad ("Century"), 2017 Tan Meng Keong Sdn. Bhd. ("Tan Meng") and 2017 Bravo Green Sdn. Bhd. ("Bravo"), Petitioners' Initial SV Submission at 5, Attachment 5; 2018 Bravo Green, Petitioners' Final SV Submission at 13, Attachment SV2-4; and 2018 Mejsaya Abadi, Final SV Submission Exhibit 13A-13C.

- <u>Mexico</u> – 2018 Mexichem, Initial SV Submission Exhibit 8-B;

- <u>Romania</u> – 2018 Romcarbon S.A., Final SV Submission Exhibit 13G-13H; and

- <u>Russia</u> – 2018 JSC Sorbent ("JSC"). *Id*. Exhibit 13D-13F.

Commerce preliminarily valued financial ratios by applying the "2017 financial statements for three Malaysian companies that produce identical or comparable merchandise (*i.e.*, Century {}, Tan Meng {}, and Bravo {})." DM at 15-17; Prelim SV Memo at 9-11. Emphasizing that all Malaysian financial statements were unusable, respondents requested that Commerce instead use the 2018 financial statements of JSC Sorbent or Romcarbon. Case Brief at 25-39. Yet Commerce in the Final Results calculated surrogate financial ratios using the 2018

Bravo Green financial statement. IDM at 31-34; Commerce's Surrogate Values for the Final Results (Feb. 12, 2021) PR 306 ("Final SV Memo"), at 2, accompanying Final SV Worksheet ("Final SV Worksheet") Tab: "Bravo2018."

### B.  The 2018 Bravo Statement is Insufficiently Disaggregated

To support its choice of the 2018 Bravo financial statements, Commerce referenced its "practice . . . to use financial statements from the primary surrogate country to calculate surrogate financial ratios, unless such statements are unavailable or unreliable." IDM at 31-32. As set forth below, the Bravo financial statements are unreliable for valuing financial ratios for several data quality reasons.

First, Bravo's statements do not itemize the cost of raw materials, labor, and energy. Final SV Worksheet Tab: "Bravo2018." Instead, they itemize a basket category "Cost of sales" (Petitioners' Final SV Submission Attachment SV2-4 at 12), which represents the sum total of the following six cost elements:

  (i)    raw materials;

  (ii)   labor;

  (iii)  energy;

  (iv)   manufacturing overheads;

  (v)    change in finished goods inventory; and

  (vi)   traded goods.

Final SV Worksheet Tab: "Bravo2018." Yet Commerce, without explanation, allocated the entire amount reported in this line item solely to "raw materials." *Id*.

Such an arbitrary allocation of "Cost of Sales" has direct consequences on the resulting financial ratios. For instance, under "manufacturing overhead expenses," Commerce allocated

only two line items: depreciation for "Factory Building & Renovation" and depreciation for "Tools & Equipment, Plant & Machinery." *Id*. Bravo does not break out the costs of non-depreciation related manufacturing overheads, such as cost of consumables or cost of repairs that are likely included in its "Cost of sales." Final SV Submission Attachment SV2-4 at 12. Consequently, since Bravo's "cost of sales" potentially includes a portion of manufacturing overheads, it does not identify an accurate amount of manufacturing overhead expenses. Consequently, the Bravo overhead ratio is potentially distorted.

Further, Commerce allocated the total amount reported in a basket category line item, "Operating expenses" solely to selling, general and administrative expenses ("SGA"). Final SV Worksheet Tab: "Bravo2018." However, given the non-itemization of typically excluded costs such as transport expenses, "Operating expenses" potentially includes such excludable expenses. Consequently, the SGA ratio likely double counts transport expenses that distorts the ratio. It is axiomatic that Bravo's potentially distorted overhead and SGA ratios cascade into a distorted profit ratio. In sum, Bravo's insufficiently disaggregated reported expenses are irremediably flawed and yield potentially distorted financial ratios.

Notably, despite acknowledging that Bravo's breakouts "are not as detailed as Commerce prefers," Commerce summarily concludes that "the 2018 Bravo Green statements provide sufficient information to calculate surrogate ratios for factory overhead, SG&A and profit." IDM at 33. In making this finding, Commerce fails to address the tell-tale deficiencies underscored by respondents. *See* Case Brief at 26-30. This Court has required Commerce to consider and address all record evidence, including that which detract from its SV conclusions:

> Surrogate valuation is not an exact science, but Commerce must approximate the {FOPs} as accurately as feasible. Certainly Commerce has discretion as to what information in the record is "best," and there may be instances where data are clearly "better," but **if information is "available" in the record, the statute does**

**not confer discretion to avoid addressing it.** . . . **Commerce in this instance avoided considering the factors data for secondary material inputs, energy, and packing materials by determining, a priori, that the DAM 08/09 data represented the "best" data**, resulting in the selection of Bangladeshi as the primary surrogate country. That logic precluded a fair selection of "the country with the best factors data . . . as the primary surrogate country" in the context of the record as a whole, including whatever "fairly detracts" as well as supports the determination of what is the "best" available information. **The analysis is thus marred**.

*Catfish Farmers of Am. v. United States*, 37 CIT 717, 742 (2013) (emphasis added).

On the merits, Commerce's decision is contrary to its well established practice to reject

insufficiently disaggregated financial statements that contain basket category cost line items. In

*Chlorinated Isocyanurates from China*, Commerce explained its rationale to reject similar data:

The Department continues to find Siam PVS' financial statements lack the necessary information to allow for an accurate calculation of financial ratios. We need to identify specific line items that contain costs for raw materials, packaging, direct labor, and energy. Contrary to Petitioners claim, **Siam PVS' statements do not provide the same level of detail as the Aditya statements which include a specific line item for "Raw Materials and consumables." Rather, Siam PVS' statements include a general line item for "Cost of goods sold, net of the items below," without any specific detail needed to ensure that raw material and energy costs have been captured for purposes of calculating the financial ratios**.

80 Fed. Reg. 4539 (Jan. 28, 2015) (final results), IDM Comment 2 (emphasis added).

Likewise, in *Tapered Roller Bearings from China,* Commerce:

determined that the financial statement of Minebea is not sufficiently detailed to calculate overhead ratios because the financial statement lacks sufficient cost details. Specifically, **the financial statements do not break out raw material costs which results in a large gap of unknown costs** (*i.e.*, the financial statements do not contain the total cost of goods sold from the financial statements less total expenses broken out by nature in the notes to the financial statements). **As a result, we are not able to reasonably segregate the manufacturing overhead costs from the total costs in order to calculate the surrogate overhead ratio.** Therefore, the Department has determined that Minebea's financial statements do not contain the details required to calculate the surrogate overhead ratio.

77 Fed. Reg. 65668 (Oct. 30, 2012) (final results), IDM Comment 4 (emphasis added).

Similarly, in *Citric Acid from China*, Commerce held that:

> The remaining two Thai financial statements do not provide sufficient detail for the Department to calculate factory overhead. **Without factory overhead it is impossible to calculate any of the financial ratios** and it is the Department's practice to not use financial statements that do not contain sufficient detail to adequately calculate surrogate financial ratios.

74 Fed. Reg. 16,838 (Apr. 13, 2009) (final determination), IDM Comment 1 (emphasis added);

*see Polyethylene Terephthalate Film, Sheet, and Strip from China,* 76 Fed. Reg. 9753 (Feb. 22,

2011) (final results), IDM Comment 1.

Indeed, Commerce pursuant to this practice in AR11 rejected similar Malaysian

statements:

> {T}he petitioners provided audited 2017 financial statements for two Malaysian companies that produce identical or comparable merchandise (*i.e.*, Century Chemical Works Sendirian Berhad, and Ten Meng Keong Sdn. Bhd.). However, these financial statements lack usable financial data in that neither of them have separate line items breaking down the cost of raw materials and energy.

*Activated Carbon from China*, 84 Fed. Reg. 27,758 (June 14, 2019) (preliminary results),

Decision Memorandum ("AR11 DM"), at 15-16, unchanged, 84 Fed. Reg. 68,881 (Dec. 17,

2019) ("*AR11 Final Results*").

Given this AR11 precedent, Commerce's selection of the Bravo statement having

identical data flaws is directly contrary to its practice. "It is a general rule that an agency must

either conform itself to its prior decisions or explain the reasons for its departure." *Queen's*

*Flowers de Colom. v. United States*, 21 CIT 968, 976-77 (1997) (quotation omitted) ("The

rule . . . prohibit{s} the agency from adopting significantly inconsistent policies that result in the

creation of 'conflicting lines of precedent governing the identical situation. . . . Commerce has

the flexibility to change its position providing that it explain the basis for its change and . . . the

explanation is in accordance with law and supported by substantial evidence"). In AR12,

"Commerce gave no explanation for its departure from its position . . . . In fact, Commerce did not acknowledge that an inconsistency exists between those cases and the determination here." *Id.*; *see* IDM at 31-34. Remand is warranted because Commerce failed to provide the requisite "reasonable explanation" for deviating from AR11. *Save Domestic Oil*, 357 F.3d at 1283.

Pursuant to the extensive precedent detailed above, Commerce's selection of Bravo2018's financial statements is unlawful because the Department failed to provide any new rationale in support of its change in practice.

### C.     Commerce Should Have Used the 2018 JSC Financial Statements

In contrast to the insufficiently disaggregated and unreliable Bravo financial statements from Malaysia, JSC's 2018 financial statements from Russia are sufficiently disaggregated because they separately itemize both the cost of raw materials and labor. Final SV Submission Exhibit 13E at 006. Further, in JSC's ratio worksheet proposed by respondents, "Other expenses" is properly allocated to energy. *Id*. Exhibit 13D.[3] As such, JSC's statement identifies all three major critical cost components. In addition, JSC also separately itemizes another element of "cost of sales": "Actual cost of goods purchased for resale" – *i.e.*, cost of traded goods. *Id.* Exhibit 13E at P.12. Therefore, JSC disaggregates all major expense categories.

Commerce affirmed that JSC is a producer of identical and comparable merchandise (producing respiratory personal protective equipment, activated carbons, coagulants, and water treatment systems). IDM at 33. Further, Russia is a significant producer of comparable

---

[3] From "Sum Total of Cost of sales, Selling & Distribution expenses, Administrative expenses, Interest receivable and Other expenses" (2,191,583), subtract the "Total General Expenses" (2,116,738) – which is a sum of "Material Expenses" (raw material), "Labor payment expenses" and "Contribution to social funds" (labor), "amortization" (overhead), and "other costs" (SGA). Final SV Submission Exhibit 13D. The resulting Residual Expense of 74,845 is identical to the amount reported in "Other expenses." *Id*. Because all other accounting categories are already populated, "Other expenses" is appropriately allocated to Energy.

merchandise. Final SV Submission Exhibit 15A at 12 (total Russian activated carbon production during 2018 was 14,285 tons). Russia is therefore a suitable secondary surrogate country.

In sum, JSC satisfies all of the established criteria. Unlike Bravo's basket categories of expenses, which result in distorted ratios, JSC's statements afford discrete breakouts for all major cost elements, which, in turn, yields accurate ratios far superior to Bravo's.

Accordingly, Commerce's rejection of JSC is contrary to its well established practice to prefer a superior quality financial statement from a secondary surrogate country over an inferior quality financial from a primary surrogate country.

> Noting that **ArgiPure's** {sic} **financial statements are from the second surrogate country** (i.e., Thailand), Petitioners have argued that the Department should not use AgriPure unless there are no financial statements from the primary surrogate country. While the Department's preference is to rely upon the primary surrogate country for all surrogate values, whenever possible, the Department resortsto using a secondary surrogate country if data, including financial statements, from the primary surrogate country are unavailable or unreliable. . . . **{W}e find that AgriPure's financial statements provide the best available information to calculate surrogate financial ratios in these final results**.

*Fresh Garlic from China*, 78 Fed. Reg. 36,168, 36,170 (June 17, 2013) (final results), IDM Comment 9 (emphasis added) (footnotes omitted); *Freshwater Crawfish Tail Meat from China*, 78 Fed. Reg. 22,228 (Oct. 9, 2012) (final results), IDM at 2, 9-10 (Thai financial statements employed when the primary surrogate country was Indonesia).

Likewise, on this record, there are no reliable financial statements from the primary surrogate country, Malaysia. In contrast, JSC's financials from a secondary surrogate country affords the best available information because it contains discrete breakouts for all major cost elements thereby enabling accurate ratio computation. Therefore, the above precedent directly supports the choice of Russian JSC over Malaysian Bravo 2018.

Invoking similar reliability concerns, Commerce rejected financials from the primary surrogate country Thailand in favor of an Indonesian financial: "Although it is our practice to use a single surrogate country for all data, **it is also our practice to rely on a secondary surrogate country in instances where the primary surrogate country does not offer reliable data**. . . . {W}e find Aditya Birla's financial statements unreliable." *Citric Acid from China*, 80 Fed. Reg. 77,323, 77,325 (Dec. 14, 2015) (final results), IDM Comment 3 (emphasis added)

The CAFC has affirmed Commerce's practice in this regard based on superior data quality reported in financial statements from a secondary surrogate country (South Africa) compared to those from the primary surrogate country (Thailand):

> Commerce appropriately relied on the Oceana Report as preferable to the Thai Financial Statements. **Unlike the Thai Financial Statements, the Oceana Report enabled Commerce to use its "normal methodology" to calculate the manufacturing overhead ratio by including energy costs in the denominator of the calculation**. . . . Had Commerce not employed its normal methodology, it would not have been able to calculate surrogate values for the Chinese "{R}espondents' energy inputs" due to concerns of "double-counting energy costs" in the surrogate financial ratios.

*Weishan Hongda Aquatic Food Co. v. United States*, 917 F.3d 1353, 1366 (Fed. Cir. 2019) (emphasis added).

Applying this CAFC rationale, Bravo's overhead ratios are potentially distorted and unreliable because its basket category line item – "cost of goods sold" (used in the denominator for the overhead ratio computation) – likely includes a portion of manufacturing overhead. In contrast, double counting of the same cost is avoided in JSC's statement because it disaggregates the cost of raw materials, labor, and energy; thereby yielding accurate and reliable ratios. Thus, JSC affords the sole reliable option from the six identified potential surrogate countries.

### D.   The Romcarbon 2018 Statement Affords a Suitable Alternative Choice

Commerce also rejected the Romcarbon statements without addressing their merits. *See*

IDM at 31-34. Commerce's decision is contrary to its statutory obligation to select the "best available information" from an appropriate "market economy country." 19 U.S.C. § 1677b(c)(1). As set forth below, the 2018 Romcarbon financial statements meet all established criteria and afford an alternative suitable option to accurately value the financial ratios. Final SV Submission Exhibit 13H. Romcarbon's financials provide discrete breakouts for not only all of the significant cost elements – raw materials, energy, and labor – that are used in computing the ratios but also costs like truck freight that are excluded in order to avoid double counting. *Id*. at 6, 37 n.9. Further, unlike Bravo, Romcarbon provides several additional breakouts for overheads (such as consumables and cost of repairs), and SGA, which results in the computation of undistorted, accurate and reliable overhead and SGA ratios.

Therefore, in terms of data quality, Romcarbon is vastly superior to Bravo. Consequently, in contrast to Bravo's unreliable and potentially distorted ratios, Romcarbon yields reliable and accurate ratios.

Further, recent Commerce precedent favors selecting Romcarbon. In AR11 where Malaysia was the selected as the primary surrogate country, Commerce found Romcarbon superior to the Malaysian statements that were all rejected on account of data quality issues. AR11 DM at 16. Romcarbon was selected because, "although Commerce has a strong preference to value all FOPs in a single surrogate country, Commerce preliminarily determines that the audited 2017 financial statements from the Romanian company Romcarbon, are the only remaining financial statements on the record suitable for use in calculating surrogate financial ratios." *Id*., unchanged, *AR11 Final Results*, 84 Fed. Reg. 68,881.

Likewise, in the final results of the tenth administrative review, even after selecting Thailand as the primary surrogate country, Commerce determined that "Romcarbon's financial

statements are the best available information to calculate surrogate financial ratios." *Activated Carbon from China*, 83 Fed. Reg. 53,214 (Oct. 22, 2018) (final results), IDM Comment 6. Thus, Commerce has repeatedly assured itself in these proceedings that Romcarbon statements contain superior and undistorted data and afford a reliable source for valuing accurate financial ratios.

In AR12 Romania was not identified by Commerce's Office of Policy ("OP") as economically comparable to China since its *per capita* gross national income ("GNI") was outside established bookends. Commerce Memorandum (Sept. 20, 2019), P.R. 104, Attachment ("OP List"). Yet Commerce is required by statute to select surrogate data from an economically comparable country only "to the extent possible." 19 U.S.C. § 1677b(c)(4); *Dorbest Ltd. v. United States*, 604 F.3d 1363, 1371-72 (Fed. Cir. 2010). Accordingly, Commerce may find that countries other than those identified are still comparable in terms of economic development. Romania's 2018 per capita GNI of USD 11,290 is proximate to the upper bookend of USD 10,460 (Malaysia) established for China (USD 9,470) in Commerce's OP List. Therefore, if Malaysia is deemed to be at the same level of economic development as China, Romania should at least be deemed to be comparable to China in terms of economic development.

Commerce precedent supports using Romcarbon because the Department has selected a country beyond those identified in its OP List not for superior quality SV data, but even for use as the primary surrogate country. And this result has been affirmed by this Court:

> Commerce found that "although Bangladesh's GNI is closer in absolute terms to Vietnam's than is Indonesia's GNI, . . . **data considerations outweigh the relatively modest differences in *per capita* GNI**." . . .  No party challenges the reasonableness of Commerce's weighing of data considerations concerning both fish and non-fish FOPs as they relate to surrogate country selection. Rather, VASEP challenges the very premise that Commerce may engage in such a weighing in light of the fact that Indonesia's 2011 GNI pushed it outside the range of GNIs on the OP List. . . .

VASEP and Binh An argue that Commerce ignored its practice for selecting a primary surrogate country by failing to work through the criteria sequentially to exclude Indonesia on economic comparability grounds before considering data concerns. . . . However, as already discussed, despite the presence of 2011 GNI data on the record, Commerce reasonably found Indonesia economically comparable to Vietnam and a significant producer of comparable merchandise. Commerce's practice permits it to select the country with the best factors data in such circumstances. . . . **Commerce weighed the relative economic comparability of Indonesia in light of its quality of data as compared to the other potential surrogate countries and reasonably selected Indonesia as the primary surrogate country.**

*Vinh Hoan Corp. v. United States*, 179 F. Supp. 3d 1208, 1220-21 (CIT 2016) (emphases added; citations & footnote omitted)

Given that Romcarbon's financial statements are qualitatively superior to Bravo's, and since there is only a small gap between the per capita GNI of Romania and Malaysia, *Vin Hoan* compels the use of Romcarbon to accurately calculate financial ratios.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request that this Court order remand for Commerce to recalculate the Plaintiffs' AD margins in accordance with the relief requested here.

Respectfully submitted,

 */s/ Dharmendra N. Choudhary*
Francis J. Sailer
Dharmendra N. Choudhary
Jordan C. Kahn

GRUNFELD, DESIDERIO, LEBOWITZ, SILVERMAN & KLESTADT LLP

1201 New York Ave., NW, Suite 650
Washington, DC 20005
(202) 783-6881

*Counsel for Plaintiffs Carbon Activated Tianjin Co., Ltd., Carbon Activated Corporation, Datong Juqiang Activated Carbon Co., Ltd., Shanxi Industry*

47

PUBLIC VERSION

*Technology Trading Co., Ltd., Datong Municipal Yunguang Activated Carbon Co., Ltd., and Beijing Pacific Activated Carbon Products Co., Ltd.*

Dated: September 16, 2021

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement.  The word count for Plaintiffs' Memorandum of Law In Support of its 56.2 Motion, as computed by Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt's word processing system Microsoft Word 2007, is 13,929 words, less than the 14,000 word limit.

                                                          _/s/ Dharmendra N. Choudhary_____
                                                          *Counsel to Plaintiffs Carbon Activated*
                                                          *Tianjin Co. Ltd., Carbon Activated*
                                                          *Corporation, and Datong Juqiang Activated*
                                                          *Carbon Co., Ltd., and Plaintiff-Intervenors*
                                                          *Beijing Pacific Activated Carbon Products*
                                                          *Co., Ltd., Ningxia Guanghua Cherishmet*
                                                          *Activated Carbon Co., Ltd., Ningxia Mineral*
                                                          *& Chemical Limited, and Shanxi Sincere*
                                                          *Industrial Co., Ltd.*

Dated: September 16, 2021