## UNITED STATES COURT OF INTERNATIONAL TRADE

**BEFORE:  THE HONORABLE MARK A. BARNETT, CHIEF JUDGE**

| | |
|---|---|
| CARBON ACTIVATED TIANJIN CO., LTD., ) CARBON ACTIVATED CORPORATION, ) DATONG JUQIANG ACTIVATED CARBON ) CO., LTD., SHANXI INDUSTRY ) TECHNOLOGY TRADING CO., LTD., ) DATONG MUNICIPAL YUNGUANG ) ACTIVATED CARBON CO., LTD., and ) BEIJING PACIFIC ACTIVATED CARBON ) PRODUCTS CO., LTD., ) *Plaintiffs*, ) ) v. ) UNITED STATES, ) *Defendant*, ) and ) CALGON CARBON CORPORATION and ) CABOT NORIT AMERICAS, INC., ) *Defendant-Intervenors*. ) | Court No. 21-00131 |

## DEFENDANT'S RESPONSE TO PLAINTIFFS' <u>MOTION FOR JUDGMENT ON THE AGENCY RECORD</u>

BRIAN M. BOYNTON
Acting Assistant Attorney General

PATRICIA M. McCARTHY
Director

CLAUDIA BURKE
Assistant Director

<u>Of Counsel</u>:
ASHLANDE GELIN
Attorney
Office of the Chief Counsel
   for Trade Enforcement & Compliance
U.S. Department of Commerce

MOLLIE L. FINNAN
Senior Trial Counsel
U.S. Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480, Ben Franklin Station
Washington, DC 20044

December 15, 2021

*Attorneys for Defendant*

# TABLE OF CONTENTS

Page(s)

STATEMENT PURSUANT TO RULE 56.2 .................................................................... 2

I.    Administrative Determination Under Review .................................................... 2

II.   The Issues Presented for Review ....................................................................... 2

STATEMENT OF FACTS ............................................................................................... 4

I.    Initiation Of The Twelfth Administrative Review And Surrogate Value Selection.......... 4

II.   Preliminary Results .......................................................................................... 5

III.  Case And Rebuttal Briefs ................................................................................. 7

IV.  Final Results ...................................................................................................... 8

SUMMARY OF THE ARGUMENT ............................................................................... 8

ARGUMENT ..................................................................................................................... 9

I.    Standard Of Review ......................................................................................... 9

II.   Commerce's Surrogate Value Selections Are Supported By Substantial
Evidence And In Accordance With Law ........................................................ 10

     A.    Legal Framework For Surrogate Value Selection ............................... 10

     B.    Commerce Provided Reasoned Explanations For Selecting Malaysian
Import Data To Value Bituminous Coal, Anthracite Coal, Hydrochloric
Acid, Carbonized Materials, Liquid Caustic Soda, and Steam........................... 13

          1.    Surrogate Value For Bituminous Coal .................................... 13

          2.    Surrogate Value For Anthracite Coal ...................................... 18

          3.    Surrogate Value for Hydrochloric Acid .................................. 21

          4.    Surrogate Value for Carbonized Materials............................... 22

          5.    Surrogate Value for Liquid Caustic Soda................................. 27

          6.    Surrogate Value for Steam ....................................................... 30

III.  Commerce's Calculation of Carbon Activated's Surrogate Financial Ratios
Is Supported By Substantial Evidence And In Accordance With Law ........................ 32

CONCLUSION................................................................................................................. 37

## **TABLE OF AUTHORITIES**

**CASES**                                                                                    **PAGE(S)**

*Atl. Sugar, Ltd. v. United States*,
   744 F.2d 1556 (Fed. Cir. 1984) ................................................................. 9

*Bristol Metals L.P. v. United States*,
   703 F. Supp. 2d 1370 (Ct. Int'l Trade 2010) ........................................... 12

*Calgon Carbon Corp. v. United States*,
   190 F. Supp. 3d 1224 (Ct. Int'l Trade 2016)...................................... 14, 20

*Carbon Activated Tianjin Co. v. United States*,
   No. 20-00007, 2021 WL 4938131 (Ct. Int'l Trade Oct. 22, 2021) .......... 13, 17, 20, 29

*Clearon Corp. v. United States*,
   37 C.I.T. 220 (2013) ............................................................................ 19, 22

*Coalition for the Preservation of Am. Brake Drum and Rotor Aftermarket Mfr. v. United States*,
   44 F. Supp. 2d 229 (Ct. Int'l Trade 1999) ............................................... 13

*Consol. Edison Co. v. NLRB*,
   305 U.S. 197 (1938) .................................................................................. 9

*Consolo v. Fed. Mar. Comm'n*,
   383 U.S. 607 (1966) .................................................................................. 9

*Dorbest Ltd. v. United States*,
   604 F.3d 1363 (Fed. Cir. 2010) ............................................................... 33

*Fine Furniture (Shanghai) Ltd. v. United States*,
   353 F. Supp. 3d 1323 (Ct. Int'l Trade 2018).......................................... 31

*FMC Corp. v. United States*,
   27 C.I.T. 240 (2003), *aff'd*, 87 F. App'x 753 (Fed. Cir. 2004) .......... 13, 35

*Fujitsu Gen. Ltd. v. United States*,
   88 F.3d 1034 (Fed. Cir. 1996) ................................................................... 9

*Fuwei Films (Shandong) Co. v. United States*,
   36 C.I.T. 764 (2012)................................................................................ 29

*Globe Metallurgical, Inc. v. United States*,
   28 C.I.T. 1608 (2004) ............................................................................. 19

*Goldlink Indus. Co. v. United States*,
   431 F. Supp. 2d 1323 (Ct. Int'l Trade 2006) ......................................... 10

*Home Meridian Int'l. Inc. v. United States*,
   772 F.3d 1289 (Fed. Cir. 2014) .................................................................. 12

*INS v. Elias-Zacarias*,
   502 U.S. 478 (1992) ...................................................................................... 9

*Jacobi Carbons AB v. United States*,
   992 F. Supp. 2d 1360 (Ct. Int'l Trade 2014) ............................................ 27

*Jiaxing Bro. Fastener Co. v. United States*,
   11 F. Supp. 3d 1326 (Ct. Int'l Trade 2014) .............................................. 12

*Jiaxing Bro. Fastener Co., Ltd. v. United States*,
   822 F.3d 1289 (Fed. Cir. 2016) ........................................................ *passim*

*Marvin Furniture (Shanghai) Co. v. United States*,
   36 C.I.T. 1185 (2012) ................................................................................ 17

*Mukand, Ltd. v. United States*,
   767 F.3d 1300 (Fed. Cir. 2014) ................................................................ 17

*Nation Ford Chem. Co. v. United States*,
   166 F.3d 1373 (Fed. Cir. 1999) .......................................................... 11, 12

*Nucor Corp. v. United States*,
   612 F. Supp. 2d 1264 (Ct. Int'l Trade 2009) .............................................. 9

*Peer Bearing Co.-Changshan v. United States*,
   752 F. Supp. 2d 1353 (CIT 2011) ............................................................. 19

*Qingdao Sea-Line Trading Co., Ltd. v. United States*,
   766 F.3d 1378 (Fed. Cir. 2014) ................................................................ 25

*QVD Food Co. v. United States*,
   658 F.3d 1318 (Fed. Cir. 2011) ................................................................ 11

*Seah Steel Vina Corp. v. United States*,
   269 F. Supp. 3d 1335 (Ct. Int'l Trade 2017) ...................................... 35, 37

*Shandong Huarong Gen. Corp. v. United States*,
   159 F. Supp. 2d 714 (Ct. Int'l Trade 2001) .................................... 9, 16, 29

*SmithKline Beecham Corp. v. Apotex Corp.*,
   439 F.3d 1312 (Fed. Cir. 2006) ................................................................ 26

*SolarWorld Americas, Inc. v. United States*,
   962 F.3d 1351 (Fed. Cir. 2020) ................................................................ 23

*T. T. International v. United States,*
 439 F. Supp. 3d 1370 (Ct. Int'l Trade 2020) ............................................................. 33

*Timken Co. v. United States,*
 699 F. Supp. 300 (Ct. Int'l Trade 1988) ................................................................. 10

*Timken Co. v. United States,*
 968 F. Supp. 2d 1279 (Ct. Int'l Trade 2014) ..................................................... 36, 37

*Tr. Chem Co. v. United States,*
 35 C.I.T. 1012 (2011) .......................................................................................... 26

*United States v. Eurodif S.A.,*
 555 U.S. 305 (2009) .............................................................................................. 9

*United Steel & Fasteners, Inc. v. United States,*
 469 F. Supp. 3d 1390 (Ct. Int'l Trade 2020) ..................................................... 14, 20

*Writing Instrument Mfrs. Ass'n v. United States,*
 984 F. Supp. 629 (CIT 1997) ............................................................................... 20

*Yingqing v. United States,*
 195 F. Supp. 3d 1299 (Ct. Int'l Trade 2016) ..................................................... 15, 24

*Zenith Elecs. Corp. v. United States,*
 988 F.2d 1573 (Fed. Cir. 1993) ............................................................................ 31

*Zhejiang DunAn Hetian Metal Co. v. United States,*
 652 F.3d 1333 (Fed. Cir. 2011) ....................................................................... 29, 37

## STATUTES

19 U.S.C. § 1516a(b)(1)(B)(i) ................................................................................ 9
19 U.S.C. § 1673 ................................................................................................ 10
19 U.S.C. § 1677(18)(A) ........................................................................................ 4
19 U.S.C. § 1677b(a) ........................................................................................... 10
19 U.S.C. § 1677b(c) .................................................................................. 4, 11, 32
19 U.S.C. § 1677m(d) ............................................................................... 16, 17, 29

## REGULATIONS

19 C.F.R. § 351.408(c)(2) ............................................................................... 12, 19

## ADMINISTRATIVE DETERMINATION

*Certain Activated Carbon From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2011-2012*, 78 Fed. Reg. 70,533 (Dep't. of Commerce Nov. 20, 2013), and accompanying IDM at Comment 6 ............................................................................. 24

*Certain Activated Carbon From the People's Republic of China: Preliminary Results of Antidumping Duty Administrative Review, Intent To Rescind the Review, in Part, and Preliminary Determination of No Shipments*, 84 Fed. Reg. 23,947 (Dep't Commerce April 30, 2020) ............................................................. 5

*Certain Activated Carbon from the People's Republic of China: Final Results of Antidumping Duty Administrative Review, Final Determination of No Shipments, and Final Rescission of Administrative Review, in Part; 2018–2019*, 86 Fed. Reg. 10,539 (Dep't of Commerce Feb. 22, 2021) ........................................................... 2

*Certain Fabricated Structural Steel Final Affirmative Determination of Sales at Less Than Fair Value*, 85 Fed. Reg. 5376 (January 30, 2020) and accompanying at Comment 2 ............... 24

*Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 84 Fed. Reg. 27,587, 27,589-27,590 (Dep't Commerce July 13, 2019) ......................................... 4

**UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE:  THE HONORABLE MARK A. BARNETT, CHIEF JUDGE**

| | |
|---|---|
| CARBON ACTIVATED TIANJIN CO., LTD.,<br>CARBON ACTIVATED CORPORATION,<br>DATONG JUQIANG ACTIVATED CARBON<br>CO., LTD., SHANXI INDUSTRY<br>TECHNOLOGY TRADING CO., LTD.,<br>DATONG MUNICIPAL YUNGUANG<br>ACTIVATED CARBON CO., LTD., and<br>BEIJING PACIFIC ACTIVATED CARBON<br>PRODUCTS CO., LTD.,<br>          *Plaintiffs*,<br><br>          v.<br><br>UNITED STATES,<br>          *Defendant*,<br>          and<br><br>CALGON CARBON CORPORATION and<br>CABOT NORIT AMERICAS, INC.,<br>          *Defendant-Intervenors*. | Court No. 21-00131 |

**DEFENDANT'S RESPONSE TO PLAINTIFFS'
MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Pursuant to Rule 56.2 of the Court, defendant, the United States, respectfully responds to the motion for judgment on the agency record filed by plaintiffs, Carbon Activated Tianjin Co. Ltd., Carbon Activated Corporation, Datong Juqiang Activated Carbon Co., Ltd., Shanxi Sincere Industrial Co., Ltd., Datong Municipal Yunguang Activated Carbon Co., Ltd., and Beijing Pacific Activated Carbon Products Co., Ltd.  *See* Pl. Mem., Sept. 16, 2021, ECF Nos. 36 (Sealed), 37 (Public).

Plaintiffs challenge seven aspects of the United States Department of Commerce's *Final Results* of the 2018-2019 twelfth administrative review (AR12) of the antidumping duty order covering certain activated carbon from the People's Republic of China—specifically, the surrogate

valuations of bituminous coal, anthracite coal, hydrochloric acid, carbonized material, liquid

caustic soda, and steam, as well as the calculation of surrogate financial ratios.  As we demonstrate

below, the Court should deny plaintiffs' motion for judgment on the agency record because

Commerce's *Final Results* are supported by substantial evidence and in accordance with law.

## STATEMENT PURSUANT TO RULE 56.2

### I.      Administrative Determination Under Review

The administrative determination under review is the *Final Results* of the 2018-2019

twelfth administrative review of the antidumping duty order on certain activated carbon from

China.  *See Certain Activated Carbon from the People's Republic of China: Final Results of*

*Antidumping Duty Administrative Review, Final Determination of No Shipments, and Final*

*Rescission of Administrative Review, in Part; 2018–2019*, 86 Fed. Reg. 10,539 (Dep't of

Commerce Feb. 22, 2021) (*Final Results*), P.R. 316,[1] and the accompanying Issues and Decision

Memorandum (IDM), P.R. 304.  The period of review is April 1, 2018 through March 31, 2019.

### II.     The Issues Presented for Review

1.      Whether Commerce's valuation of bituminous coal, based on Malaysian import

data under the Harmonized Tariff Schedule (HTS or HS) heading 2701.12 (Bituminous Coal,

Not Agglomerated), rather than HTS heading 2701.12.9000 (Bituminous Coal: Other than

Coking coal) or HS 2701.19 (Other Coal), is supported by substantial evidence and in

accordance with law.

2.      Whether Commerce's valuation of anthracite coal, based on Malaysian import

data under HS 2701.11 (Anthracite Coal, Whether Or Not Pulverized, But Not Agglomerated),

---

[1]   Citations to public and confidential documents from the administrative record are
identified as "P.R. __" and "C.R.__," respectively.  Citations to the motion for judgment on the
agency record filed by Carbon Activated are referenced as "Pl. Mem."

rather than Russian data under HS 2701.11.1000 (Anthracite Coal, Whether Or Not Pulverized, But Not Agglomerated – with maximum yield of volatile substances), is supported by substantial evidence and in accordance with law.

3.      Whether Commerce's valuation of hydrochloric acid (HCl), based on Malaysian import data under HS 2806.10 (Hydrochloric Acid), rather than more specific aqueous HCl data provided under Brazilian HS 2806.10.20, or alternatively Turkish HS 2806.100.00.012, is supported by substantial evidence and in accordance with law.

4.      Whether Commerce's valuation of carbonized materials, based on Malaysian import data under HS 4402.90.1000 (coconut shell charcoal), rather than the more general HS 4402.90 (wood charcoal), encompassing HS 4402.90.1000 (coconut shell charcoal) and HTS 4402.90.9000 (other wood charcoal), is supported by substantial evidence and in accordance with law.

5.      Whether Commerce's valuation of liquid caustic soda, based on Malaysian import data under HS 2815.11 (Sodium Hydroxide (Caustic Soda), Solid), rather than HS 2815.12 ("which covers liquid sodium hydroxide"), is supported by substantial evidence and in accordance with law.

6.      Whether Commerce's valuation of steam, based on Malaysian import data under HS 2711.11 ("which covers natural gas in liquid form"), rather than HS 2711.21 ("which covers natural gas in gaseous form"), is supported by substantial evidence and in accordance with law.

7.      Whether Commerce's calculation of surrogate financial ratios is supported by substantial evidence and in accordance with law.

## STATEMENT OF FACTS

**I.** **Initiation Of The Twelfth Administrative Review And Surrogate Value Selection**

On June 13, 2019, Commerce initiated the administrative review of the antidumping duty order on active carbon from China, for the period of review of April 1, 2018 through March 31, 2019. *See Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 84 Fed. Reg. 27,587, 27,589 (Dep't Commerce July 13, 2019) (*Initiation Notice*), P.R. 151.  Commerce selected two mandatory respondents:  Carbon Activated Tianjin Co., Ltd. (Carbon Activated) and Datong Juqiang Activated Carbon Co., Ltd. (DJAC) (collectively, respondents).  P.R. 23.

Because Commerce continues to consider China a non-market economy, Commerce turned to the selection of one or more market-economy countries to act as surrogates in the valuation of respondents' factors of production.  *See* 19 U.S.C. §§ 1677(18)(A), 1677b(c). Commerce identified a non-exhaustive list of six potential market-economy surrogates at the same level of economic development as China during the period of review:  Brazil, Bulgaria, Malaysia, Mexico, Russia, and Turkey.  P.R. 104.  Commerce invited interested parties to comment on the surrogate country list, the selection of surrogate country, and surrogate value data.  *Id*.

In October 2019, petitioners (Calgon Carbon Corporation and Cabot Norit Americas Inc.) submitted comments on surrogate country selection in which they advocated for Commerce's selection of Malaysia or Mexico.  Petr. Surrogate Country (SC) Cmts., P.R. 115.  Mandatory respondents (Carbon Activated and DJAC) submitted rebuttal comments on surrogate country selection in which they objected to both Malaysia and Mexico but did not make an explicit recommendation of their own.  Resp. Rebuttal SC Cmts., P.R. 116.  In November 2019, petitioners submitted initial surrogate value comments that included Malaysian data to value all

factors of production.  Petr. SV Cmts., P.R. 121-22.  Respondents also submitted initial surrogate

value comments that included primarily Mexican data to value the factors of production, as well

as Russian import data for pitch tar, coal tar, and hydrochloric acid, and Brazilian import data for

carbonized material.  Resp. SV Cmts., P.R. 123-27, P.R. 158-59.  Petitioners responded with

rebuttal comments.  Petr. Rebuttal SV Cmts., P.R. 129-33.  In March 2020, petitioners submitted

their final surrogate value comments.  Petr. Final SV Cmts., P.R. 196.  Respondents did as well.

Resp. Final SV Cmts., P.R. 197-231.  On April 9, 2020, respondents also submitted final

surrogate value rebuttal comments.  C.R. 247; P.R. 241-43.

## II.   <u>Preliminary Results</u>

In late April 2020, Commerce published the preliminary results of its review.  *See*

*Certain Activated Carbon From the People's Republic of China: Preliminary Results of*

*Antidumping Duty Administrative Review, Intent To Rescind the Review, in Part, and*

*Preliminary Determination of No Shipments; 2018–2019*, 84 Fed. Reg. 23947 (Dep't of

Commerce Apr. 30, 2020) (*Preliminary Results*), P.R. 271, and accompanying Preliminary

Decision Memorandum (PDM), P.R. 259.  *See also* Prelim. SV Mem., P.R. 265-68.  Commerce

preliminarily determined that sales of certain activated carbon in the United States were made

below normal value during the period of review.  PDM at 1.

With respect to surrogate country selection, Commerce preliminarily determined that all

six of the countries on the surrogate country list were at the same level of economic development

as China.  *Id.* at 11, 13.  Commerce further determined that all six countries were significant

producers of comparable merchandise based on export volume under the primary Harmonized

Scheduled (HS) heading included in scope, *i.e.*, exports of HS number 3802.10.  *Id*. at 13-14.

Because Commerce determined multiple potential surrogate countries to be significant producers

of comparable merchandise, Commerce then turned to an analysis of the relative data availability and reliability on the record for each country, considering the data itself as well as the parties' arguments concerning that data.  *See generally* PDM.

Commerce preliminarily determined to select Malaysia as the primary surrogate country. *Id.* at 15.  Commerce reasoned that the record contained complete, reliable, and usable surrogate value data from Malaysia for all reported factors of production.  *Id.*  Citing Commerce's strong preference to value all factors of production data in a single surrogate country, Commerce further explained that Malaysia was a better choice than Mexico, Russia, or Brazil, because the data on record for those countries permitted valuation of only some but not all factors of production.  *Id.*

In preliminarily selecting Malaysia as the primary surrogate country, Commerce addressed Carbon Activated's objection to the use of three 2017 Malaysian financial statements, which Commerce had rejected in the prior administrative review (AR11).  *Id.* at 16.  Commerce did not dispute that it had rejected these statements for use in AR11; however, Commerce explained, this was a different record.  *See id.*  The parties had placed four financial statements on the record in this AR12 review.  *Id.*  Three of those financial statements were from three Malaysian producers of identical or comparable merchandise (*i.e.*, Century Chemical Works Sendirian Berhad (Sdn. Bhd.); Tan Meng Keong Sdn. Bhd.; and Bravo Green Sdn. Bhd.).  *Id.* Although the Malaysian financial statements were not contemporaneous with the AR12 period of review, and not as detailed as Commerce would have preferred, Commerce reasoned that the three Malaysian financial statements nevertheless contained sufficient information to calculate surrogate ratios for factory overhead, selling, general and administrative (SG&A) expenses, and profit.  *Id.*  Commerce also noted its strong preference to value all factors of production from a single surrogate country that, on this record, was Malaysia.  *Id.*

The only other financial statement on the record was from a large Mexican company (*i.e.*, Mexichem), that had numerous subsidiaries and engaged in various activities not necessarily reflective of a manufacturer of activated carbon. *Id.* Although the Mexican financial statement was contemporaneous with the period of review, Commerce reasoned, there was no evidence on the record to demonstrate that the company produced any activated carbon. *Id.*

In sum, Commerce preliminarily determined to select Malaysia as the primary surrogate country, *id.* at 17, and to rely on Malaysian surrogate value data to value all factors of production for this administrative review including financial ratios, *id.* at 26-31.

### III.   Case And Rebuttal Briefs

In July and August, 2021, the parties submitted case and rebuttal briefs. In response to the *Preliminary Results*, the respondents contested, in relevant part, the surrogate valuation of six material inputs (bituminous coal, anthracite coal, hydrochloric acid, carbonized materials, liquid caustic soda, and steam) and financial ratios. *See* Resp. Case Br., at Table of Contents, P.R. 285; Resp. Rebuttal Br., at Table of Contents, P.R. 291.

Petitioners argued, in relevant part, that Commerce should continue the preliminary determinations and decline to make changes to surrogate valuations proposed by respondents. *See* Per. Case Br., at Table of Contents, P.R. 286; Petr. Rebuttal Br., at Table of Contents, P.R. 292. Petitioners further argued that Commerce should update surrogate valuation of financial ratios based on the 2018 financial statements for Malaysian company Bravo Green, which were added to the record after the *Preliminary Results* issued. *Id.*

**IV.**     <u>**Final Results**</u>

In February, 2021, following the *Preliminary Results*, and based on Commerce's analysis of the comments received, Commerce issued its *Final Results*, P.R. 316, and accompanying issues and decision memorandum, P.R. 304.  Commerce made certain changes to the margin calculations for respondents.  IDM at 1.  Commerce continued to rely on Malaysia, as the primary surrogate country, for the valuation of all material inputs.  *See generally* IDM. However, compared to the *Preliminary Results*, Commerce, in relevant part, revised the financial ratio surrogate values used in the calculation of normal value for respondents.  *Id.* at 3-4, 29-34; *see also* Final SV Mem., P.R. 306–07; Final Margin Calc., C.R. 283-86, 288-91, P.R. 308, 310.

<u>**SUMMARY OF THE ARGUMENT**</u>

Commerce's *Final Results* are supported by substantial evidence and in accordance with law.  Commerce selected Malaysia as the primary surrogate country based on a reasoned determination that, during the period of review, Malaysia was at a level of economic development comparable to China and a significant producer of comparable merchandise.  The record also contained complete and usable data to value all of respondents' factors of production—as relevant here, bituminous coal, anthracite coal, hydrochloric acid, carbonized materials, liquid caustic soda, and steam—as well as financial ratios.

Respondents do not challenge Commerce's selection of Malaysia as the primary surrogate country, but argue that Commerce should have resorted to alternate datasets for several of the input valuations and financial ratios.  As discussed below, respondents' arguments in favor of the alternative datasets are not supported by law or fact, or reflect a mere disagreement with Commerce's lawful exercise of discretion to weigh the evidence differently.  Commerce's reasoned analysis should be sustained and judgment entered in favor of the United States.

# ARGUMENT

## I.     Standard Of Review

"{T}he Court of International Trade must sustain 'any determination, finding or conclusion found' by Commerce unless it is 'unsupported by substantial evidence on the record, or otherwise not in accordance with the law.'" *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)(i)).

"The specific factual findings on which {Commerce} relies in applying its interpretation are conclusive unless unsupported by substantial evidence." *United States v. Eurodif S.A.*, 555 U.S. 305, 315 n.6 (2009).  Substantial evidence is "more than a mere scintilla" of relevant evidence.  *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).  But it is only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion . . . ." *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984) (internal quotations and citations omitted).  "{T}his is something less than the weight of the evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966) (citations omitted).

"{T}he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Id*. Rather, when Congress has entrusted an agency to administer a statute that demands inherently fact intensive inquiries—as in this administrative review—Commerce's conclusions may be set aside only if the record contains evidence "so compelling that no reasonable factfinder" could reach the same conclusion.  *See INS v. Elias-Zacarias*, 502 U.S. 478, 483-84 (1992); *accord Nucor Corp. v. United States*, 612 F. Supp. 2d 1264, 1287 (Ct. Int'l Trade 2009).

Thus, "the Court will not disturb an agency determination if its factual findings are reasonable and supported by the record as a whole, even if there is some evidence that detracts from the agency's conclusion." *Shandong Huarong Gen. Corp. v. United States*, 159 F. Supp. 2d

714, 718 (Ct. Int'l Trade 2001).  "{T}he Court may not substitute its judgment for that of the {agency} when the choice is between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo."  *Goldlink Indus. Co. v. United States*, 431 F. Supp. 2d 1323, 1326 (Ct. Int'l Trade 2006) (internal quotations and citations omitted).  "{I}t is not within the Court's domain either to weigh the adequate quality or quantity of the evidence for sufficiency or to reject a finding on grounds of a differing interpretation of the record."  *Timken Co. v. United States,* 699 F. Supp. 300, 306 (Ct. Int'l Trade 1988) (citations omitted).

## II.     Commerce's Surrogate Value Selections Are Supported By Substantial Evidence And In Accordance With Law

Plaintiffs challenge seven aspects of Commerce's *Final Results*: the surrogate valuation of six inputs (bituminous coal, anthracite coal, hydrochloric acid, carbonized material, liquid caustic soda, and steam) and the calculation of surrogate financial ratios.  For the reasons that follow, and as reflected in the law and the record, plaintiffs' challenges lack merit.  Commerce's surrogate value selections are supported by substantial evidence and in accordance with law.

### A.      Legal Framework For Surrogate Value Selection

Under the antidumping statute, Commerce is charged with determining if goods are being sold, or are likely to be sold, in the United States at a less than fair market value.  19 U.S.C. § 1677b(a).  Commerce compares the subject normal value (home market price) and export price (U.S. price).  *Id.*  An antidumping duty is "the amount by which the normal value exceeds the export price (or constructed export price) for the merchandise."  *Id.*  § 1673.

In proceedings involving a non-market economy country, such as China, Commerce determines the subject merchandise's normal value by relying on the "best available information" from a market economy country to derive surrogate valuations for the entity's

factors of production, including raw materials, labor, and utilities. *See id.* § 1677b(c). To those factors, Commerce also adds "an amount for general expenses and profit plus the cost of containers, coverings, and other expenses." *Id.* The statutory scheme "construct{s} a hypothetical market value" of the subject merchandise in the non-market economy. *See Nation Ford Chem. Co. v. United States*, 166 F.3d 1373, 1375 (Fed. Cir. 1999).

Commerce must, "to the extent possible," select surrogate value information from "one or more market economy countries that are—(A) at a level of economic development comparable to that of the nonmarket economy country, and (B) significant producers of comparable merchandise." 19 U.S.C. § 1677b(c)(4). If more than one market economy country is both economically comparable and a significant producer of comparable merchandise, then Commerce evaluates and compares the quality and completeness of the data on the record from each of those countries. *See* Import Admin., U.S. Dep't of Commerce, Non-Market Economy Surrogate Country Selection Process, Policy Bulletin 04.1 (2004) (Policy Bulletin 04.1), *available at http://enforcement.trade.gov/policy/bull04-1.html.*

Commerce ultimately strives to select the "best available information" on the record to value factors of production. *Jiaxing Bro. Fastener Co., Ltd. v. United States,* 822 F.3d 1289, 1294 (Fed. Cir. 2016) (*Jiaxing II*) (citing 19 U.S.C. § 1677b(c)(1)(B)). However, because the statute is silent regarding what constitutes the "best available information," Commerce has "broad discretion" to decide the record evidence that meets the criteria. *QVD Food Co. v. United States,* 658 F.3d 1318, 1323 (Fed. Cir. 2011); *Nation Ford Chem. Co v. United States*, 166 F.3d 1373, 1377 (1999) ("wide discretion in the valuation of factors of production"). In practice, Commerce selects, to the extent practicable, surrogate values that are product-specific, representative of a broad-market average, publicly available, contemporaneous with the period of

review, and tax and duty exclusive.  *See* Policy Bulletin 04.1; *Jiaxing II*, 822 F.3d at 1293 (discussing requirements).

Commerce also has a regulatory preference to use as much data as possible from a single surrogate country.  19 C.F.R. § 351.408(c)(2); *Jiaxing II*, 822 F.3d at 1294 & n.3 (citing Policy Bulletin 04.1).  Commerce will "only resort to a secondary surrogate country if data from the primary surrogate country are unavailable or unreliable."  *See Jiaxing Bro. Fastener Co. v. United States*, 11 F. Supp. 3d 1326, 1332–33 (Ct. Int'l Trade 2014) (*Jiaxing I*) (citations omitted), *aff'd*, *Jiaxing II*, 822 F.3d 1289.

The data relied on need not be perfect.  *Jiaxing II*, 822 F.3d at 1301 (quoting *Home Meridian Int'l. Inc. v. United States*, 772 F.3d 1289, 1296 (Fed. Cir. 2014)).  Nor is Commerce required to duplicate the precise experience of the manufacturer in the non-market economy. *Nation Ford*, 166 F.3d at 1377.  Instead, Commerce seeks to identify and rely on the record data that "most accurately represents the fair market value" of the relevant factor of production.  *Id.*

Accordingly, given Commerce's discretion to determine the "best available information," and the fact-specific nature of this deferential case-by-case inquiry, the Court's review is concerned with "not whether the information Commerce used was the best available, but rather whether a reasonable mind could conclude that Commerce chose the best available information." *Jiaxing II*, 822 F.3d at 1301.  When Commerce provides a reasoned basis for its finding that the selected data satisfy its criteria and constitute better data than alternatives on the record, "the court is reluctant to 'substitute its own evidentiary evaluation for Commerce's, {} and to substitute its own judgment for the agency's in considering and weighing the relative importance of various criteria applied."  *Bristol Metals L.P. v. United States*, 703 F. Supp. 2d 1370, 1376 (Ct. Int'l Trade 2010).  Commerce "need not prove that its methodology was the only way or

even the best way to calculate surrogate values for factors of production as long as it was a

reasonable way." *Coalition for the Preservation of Am. Brake Drum and Rotor Aftermarket Mfr.*

*v. United States*, 44 F. Supp. 2d 229, 258 (Ct. Int'l Trade 1999).

> **B.** **Commerce Provided Reasoned Explanations For Selecting Malaysian Import Data To Value Bituminous Coal, Anthracite Coal, Hydrochloric Acid, Carbonized Materials, Liquid Caustic Soda, And Steam**

Commerce's selection of Malaysian import data to value respondents' factors of

production is supported by substantial evidence and represents a reasonable exercise of

Commerce's discretion, not contrary to law. "When Commerce is faced with the decision to

choose between two reasonable alternatives and one alternative is favored over the other in their

eyes, then they have the discretion to choose accordingly." *E.g., FMC Corp. v. United States*, 27

C.I.T. 240, 251 (2003), *aff'd*, 87 F. App'x 753 (Fed. Cir. 2004). Commerce exercised that

discretion here. The record contains complete, contemporaneous Malaysian data for each input

used by the respondents, including the material inputs now challenged by respondents—*i.e.*,

bituminous coal, anthracite coal, hydrochloric acid, carbonized materials, liquid caustic soda, and

steam. Plaintiffs' mere disagreement with how Commerce exercised its determination, without

more, is not sufficient. *See id. Cf. Carbon Activated Tianjin Co. v. United States,* No. 20-00007,

--- F. Supp. 3d ---, 2021 WL 4938131, at *7 (Ct. Int'l Trade Oct. 22, 2021) (*Carbon Activated*

*(AR11)*) (recognizing that plaintiffs must "identify any record evidence" in support of their

objection to Commerce's use of a particular dataset; it is not enough for plaintiffs to "simply

disagree with Commerce's use of such data").

> **1.** **Surrogate Value For Bituminous Coal**

Commerce relied on data under Malaysian HS 2701.12 (Bituminous Coal, Not

Agglomerated), which covers both coking and non-coking bituminous coal, to value

respondents' bituminous coal inputs. IDM at 16-19; Final SV Mem., P.R. 307; PDM at 26-31;

Prelim. SV Mem., P.R. 266, 268; *see also* Petr. SV Cmts., at Att. 1, P.R. 121.  Plaintiffs argue this was error because (i) Malaysian HS 2701.12 is a basket category that "fails to provide a product specific and accurate {surrogate value} for the specific non-coking bituminous coal input," and (ii) there is evidentiary support to suggest that producers used bituminous coal of a non-coking coal quality, differing only in terms of heat value.  *See* Pl. Mem. at 10-16.  Plaintiffs argue that Commerce should have instead relied on data under Malaysian (i) HS 2701.12.9000 (Bituminous coal:  Other than Coking coal), which covers non-coking coal with a calorific value equal to or exceeding 5,833 kcal/kg, for Carbon Activated's Supplier A and DJAC's supplier, and (ii) HS 2701.19 (Other Coal), which covers bituminous coal other than coking coal with a calorific value less than 5,833 kcal/kg, for DJAC.  *Id*.; *see* Resp. Final SV Cmts., at Ex. 4B, P.R. 197; Petr. SV Cmts., at Att. 1, P.R. 121.

Commerce was well within its discretion to select data under Malaysian HS 2701.12 to value respondents' bituminous coal input.  First, there is nothing inherently unlawful or unreasonable in selecting data derived from a basket category.  As this Court has explained, "{the} mere fact that . . . data {is} derived from a basket category, . . . on its own does not demonstrate that the . . . data {is} not specific." *Calgon Carbon Corp. v. United States*, 190 F. Supp. 3d 1224, 1235 (Ct. Int'l Trade 2016) (*Calgon Carbon (AR6))*; *United Steel & Fasteners, Inc. v. United States*, 469 F. Supp. 3d 1390, 1398-99 (Ct. Int'l Trade 2020) (sustaining Commerce's choice of a basket category over a more specific sub-heading based on Commerce's reasoned weighing of other factors, specifically contemporaneity).

Second, as Commerce explained, it found the record evidence insufficient to justify departing from the basket category, which encompassed both coking and non-coking bituminous coal.  IDM at 17-19.  The record simply did not contain sufficient evidence, Commerce

reasoned, to warrant reliance on one of the more specific HS codes unique to non-coking coal. This conclusion was reasonable based on the unclear and conflicting evidence on the record. Respondents had offered English translations of purchase invoices indicating "non-coking bituminous coal 1," "non-coking bituminous coal 2," and "bituminous coal 3." *Id.* at 18. Moreover, respondents had initially described the "bituminous coal 3" as coking coal, but then later sought to correct that representation to state that the input was instead non-coking coal. *Id.* In any event, the translations did not actually speak to the quality of the coal. *Id.* Nor did the translations necessarily support how mandatory respondents were describing their inputs in their case briefs—as semi-coke, washed coal, and washed and fuel coal. *Id.* Commerce further reasoned that when, as here, "a respondent introduce{s} translation inaccuracies, or incorrectly translated documents, such documents are not reliable." *Id.*; *see Yingqing v. United States*, 195 F. Supp. 3d 1299, 1307 (Ct. Int'l Trade 2016) (recognizing Commerce's discretion to have selected a broader HS basket to value a certain input when the respondent had proposed multiple, conflicting possibilities to value the input).

Third, Commerce reasonably concluded that the sworn declarations from respondents' suppliers, which attested to the use of only non-coking bituminous coal, were not dispositive of the nature of the input. IDM at 18. As with the translations, the conclusory assertions did "not provide any specific standard" upon which the assertions were based, such as "the calorific value of the bituminous coal used or any other specification of the coal used which provides distinguishing characteristics for {surrogate value} selection purposes." *Id.* at 18-19. The record also lacked any substantiating test results, which Commerce could have used to determine the non-coking input specificity respondents proposed for bituminous coal. *Id.* at 16.

Finally, Commerce also explained that the record lacked sufficient evidence, such as industry standards coupled with test reports, to substantiate the claim "that the bituminous coal used by {DJAC} is non-coking bituminous coal with a calorific value lower than 5,833 kcal/kg" and that Carbon Activated's suppliers used "the kind of coal that meets the standard for non-coking quality coal." *Id.* at 18.

In response, plaintiffs invite this Court to reweigh the evidence and substitute Commerce's view for plaintiffs' view of the best available information. *See* Pl. Mem. at 5-10, 12-13, 14-15 (arguing some elements in the record, the declarations, and counsel's understanding of what the translations were meant to accomplish, is more persuasive than other documentary evidence). This would not be appropriate. *See, e.g.*, *Shandong*, 159 F. Supp. 2d at 718. Commerce was within its discretion to find the evidence insufficient to justify departing from the basket category for a more specific HS category, as advocated by plaintiffs.

Plaintiffs further argue that Commerce failed to consider evidence that purportedly distracts from its conclusion. Pl. Mem. at 12. Contrary to plaintiffs' suggestion, Commerce did not ignore the record evidence that coking and non-coking coal are defined differently, or the assertion that coking coal is unsuitable for production of activated carbon. *See* Pl. Mem. at 12, 17-18. Rather, Commerce found the record lacking sufficient support for respondents' assertion that their coal input qualified as non-coking coal of a calorific value. IDM at 18.

Plaintiffs further contend that they should not be faulted for having failed to place industry standards on the record. Pl. Mem. at 11-12. They argue that "{i}f Commerce required industry standards to value this {factor of production}, it was required by statute to 'inform' Carbon Activated 'of the nature of the deficiency' and 'provide . . . to remedy or explain the deficiency." *Id.* at 12 (citing 19 U.S.C. § 1677m(d)). However, as this Court held in AR11,

section 1677m(d) does not apply to the submission of potential surrogate value information.  *See Carbon Activated (AR11)*, 2021 WL 4938131, at *8.  "While {Section 1677m(d)} allow{s} for a party to correct infirm filings, it applies to insufficient information that was submitted in 'response to a request for information.'"  *Marvin Furniture (Shanghai) Co. v. United States*, 867 F. Supp. 2d 1302, 1308 (Ct. Int'l Trade 2012), *aff'd*, 744 F.3d 1319, 1325 (Fed. Cir. 2014); *see generally Mukand, Ltd. v. United States*, 767 F.3d 1300, 1304–06 (Fed. Cir. 2014).

Plaintiffs' further contention that Commerce has taken an inappropriately "diametrically opposite" position in this AR12 review, than the position taken by the agency in AR11, is a non-sequitur.  *See* Pl. Mem. at 13-14.  As plaintiffs' acknowledge elsewhere in their brief, "{e}ach administrative review is a separate exercise of Commerce's authority that allows for different conclusions based on different facts in the record."  *Id.* at 25 (quoting *Jiaxing II*, 822 F.3d at 1299 (other citations omitted)).  The record in AR11 justified the agency's choices in that review because, among other things, the record included Thai notes to HS subheading 2701.12 together with test reports showing the ash, moisture, and volatility content, as well as the calculated calorific value for some of the respondents' bituminous coal.  *See Carbon Activated (AR11)*, 2021 WL 4938131, at *2-5 (sustaining Commerce's discretion to value bituminous coal with unknown calorific value under HS 2701.12, and bituminous with a calorific value known to be below 5,833 kcal/kg under HS 2701.19).  In contrast, the record in this review, for AR12, includes a test report for DJAC that provides only the moisture, ash, volatile content, but not its calorific value.  Additionally, Carbon Activated's Supplier A only provided purchase orders.  Thus, respondents are demanding that Commerce draw the same conclusion in this review as the agency drew in AR11, but on a record that contains different information.  Specifically,

respondents failed to provide the calorific value of their input or a formula to link the moisture and ash content to heat value.

Without sufficient record evidence to substantiate plaintiffs' claims (*e.g.*, industry standards and other evidence of respondents' input), Commerce reasonably concluded that it could not determine that a more specific HS code (for non-coking coal) was appropriate in lieu of the basket category encompassing both coking and non-coking coal.  Commerce's selection of Malaysian HS 2701.12 to value Carbon Activated's bituminous coal is supported by substantial evidence and not contrary to law.

### 2.    Surrogate Value For Anthracite Coal

Commerce determined that Malaysian import data under HS 2701.11 are the best available information on the record to value anthracite coal.  IDM at 27-29; Final SV Mem., P.R. 307; PDM at 26-31; Prelim. SV Mem., P.R. 266, 268; *see* Petr. SV Cmts., at Att. 1, P.R. 121. This determination is supported by substantial evidence and not contrary to law.  As Commerce explained, the data are contemporaneous with the period of review, publicly available, product-specific, tax-exclusive, and representative of a broad market average.  PDM at 27.  Reliance on Malaysian import data was also consistent with Commerce's regulatory preference to value all factors of production in a single surrogate country, where possible.  *Id.* at 28.  Plaintiffs contend that Commerce should have relied, instead, on Russian data under HTS 2701.11.1000 because, they argue, it is more specific to respondents' input and more representative of a broad market average.  Pl. Mem. 34-37; *see* Resp. Final SV Cmts., at Ex. 3, P.R. 197.  However, as Commerce explained, and further discussed below, plaintiffs' contentions are unavailing.

First, Commerce's "preference is to satisfy the breadth of the aforementioned selection criteria, not one criteria alone."  IDM at 27.  Thus, contrary to plaintiffs' suggestion, product specificity is not the only criteria, or necessarily the leading or dispositive criteria.  *See* Pl. Mem.

at 35, 37.  Commerce balances product specificity with other characteristics such as contemporaneity, public availability, tax-exclusivity, and representativeness across a broad market average.  *See* Policy Bulletin 04.1.  It further balances its regulatory preference to value all factors of production from a single country, when possible.  19 C.F.R. § 351.408(c)(2); *see also Jiaxing II*, 822 F.3d at 1294 & n.3 (citing Policy Bulletin 04.1).  Although plaintiffs downplay that preference, the preference is directed by regulation and helps Commerce calculate an accurate dumping margin.  *See Clearon Corp. v. United States*, 37 C.I.T. 220, 228 (2013) (explaining "the preference is . . . reasonable because . . . deriving the surrogate data from one surrogate country limits the amount of distortion introduced into its calculations . . . .").

Second, there is no dispute that the regulatory preference, standing alone, "cannot suffice as adequate reasoning if it is the only factor that Commerce considers."  *Peer Bearing Co.-Changshan v. United States*, 752 F. Supp. 2d 1353, 1373 (Ct. Int'l Trade 2011).  "{T}he statute requires Commerce to compare the chosen data set with other data sets on the record . . . {to} determine the best available information."  *Id.*  However, the record reflects that Commerce engaged in that comparison in this review.

For example, Commerce explained that it will "resort to a secondary surrogate country if data from the primary surrogate country are unavailable or unreliable."  IDM at 27; *see also Globe Metallurgical, Inc. v. United States*, 350 F. Supp. 2d 1148, 1160 (Ct. Int'l Trade 2004) ("Commerce will disregard values from the primary surrogate country when it finds those values to be (1) unavailable; (2) not sufficiently contemporaneous; (3) of poor quality, or (4) otherwise unreliable, *i.e.*, aberrational.").  Plaintiffs, however, had failed to demonstrate that the Malaysian data were aberrational or unreliable.  IDM at 28-29.  Plaintiffs point to the fact that the Russian data on record reflects an average unit value (AUV) that is markedly lower ($37.3 USD/MT)

based on a higher volume of imports (4,372,971,252 kg) than the Malaysian AUV ($199.6

USD/MT) based on a lower volume of imports (484, 418,213 kg).  Pl. Mem. at 37.  But plaintiffs

fail to explain how this distinction, alone, is sufficient to render the Malaysian data unreliable.

*See id.*  The record further disputes that it is.  As Commerce observed, the Malaysian AUV under

HS category 2701.11, at $199.6 USD/MT, is neither the lowest nor the highest of the AUVs

under HS 27011.11 reported by other countries on the surrogate country list.  *See* IDM at 29.

Commerce further concluded that the Malaysian data, based on imports of 484,418,213 kg, was

"sufficiently representative of a broad market average."  *Id.*  Plaintiffs offer no response to this

larger contextual analysis of aberration, which is reasonable.

Commerce further disagreed with plaintiffs that the Russian data was necessarily more

product specific.  *Id.* at 28.  Specifically, plaintiffs had failed to establish that volatility content

should be the driving factor in selection if HS category.  Commerce reasoned:  "{T}he fact that

volatility was used as a basis for determining a Russian tariff subheading is not, alone, a

sufficient basis to support the mandatory respondents' contention that volatility content is one of

the most significant product characteristics of anthracite coal . . . ."  *Id.*  Furthermore, contrary to

plaintiffs' argument that precedent requires Commerce to select the more input-specific HS

category, the Court has previously "sustained Commerce's use of broader basket HS categories

for {surrogate values} as supported by substantial evidence."  *Writing Instrument Mfrs. Ass'n v.*

*United States*, 984 F. Supp. 629, 640 (Ct. Int'l Trade 1997), *aff'd*, 178 F.3d 1311 (Fed. Cir.

1998); *Carbon Activated (AR11)*, 2021 WL 4938131, at *5; *Calgon Carbon (AR6)*, 190 F. Supp.

3d at 1235; *United Steel & Fasteners*, 469 F. Supp. 3d at 1398-99.

In sum, Commerce was within its discretion in selecting Malaysian HS 2701.11, rather

than the Russian HS 2701.11.1000, to value respondents' anthracite coal because that selection is

supported by substantial evidence and not contrary to law.

### 3. Surrogate Value For Hydrochloric Acid

Commerce determined that Malaysian data under HS 2806.10 are the best available information on record to value respondents' hydrochloric acid (HCl) input.  IDM at 40-41; Final SV Mem., P.R. 307; PDM at 26-31; Prelim. SV Mem., P.R. 266, 268; *see* Petr. SV Cmts., at Att. 1, P.R. 121; Resp. SV Cmts., at Ex. 6A, P.R. 198.  This determination is supported by substantial evidence and not contrary to law.  As Commerce explained, the Malaysian data are contemporaneous with the period of review, publicly available, product-specific, tax-exclusive, and representative of a broad market average.  PDM at 27.  Additionally, reliance on the Malaysian data accords with Commerce's regulatory preference to value all factors of production from a single surrogate country, in this case Malaysia.  *Id.* at 28.  Plaintiffs contend that Commerce should have relied, instead, on more specific data for aqueous HCl provided in Brazilian data under HTS 2806.10.20, or alternatively Turkish data under HTS 2806.100.00.012.  *See* Pl. Mem. at 28-31; *see* Resp. Final SV Cmts., at Ex. 6A, P.R. 198.  However, as explained by Commerce on the record, and as discussed here, plaintiffs are not persuasive.

Plaintiffs argue that the Malaysian data is not specific enough to respondents' HCl inputs because the Malaysian data provides only a single HS classification covering both forms of HCl: "(1) anhydrous or liquid form (without added water); and (2) aqueous solution (with added water)."  Pl. Mem. at 30.  Plaintiffs assert that their input, in contrast, is HCl only in acqueous form.  Commerce provided a reasoned explanation for why it was not selecting the more specific Brazilian or Turkish data.  Namely, respondents had failed to substantiate their assertion that their HCl inputs were, in fact, in an aqueous state.  IDM at 40.

"{C}ontrary to the mandatory respondents' assertion . . . ," Commerce reasoned, "the evidence on the record only demonstrates the purity level for HCl that {Carbon Activated} used

in October 2018." *Id.* However, this information, standing alone, does not "indicat{e} whether the HCl that the mandatory respondents procured and consumed during the {period of review} was in a water solution, a concentrated liquid form, or a different state." IDM at 40-41. Respondents had also submitted on the record certain general information related to HCl published by PubChem and Woodman Hill Ltd.; "however," Commerce reasoned, this information was of no further help to respondents because "{respondents} fail to provide an explanation as to how these documents tie to the {surrogate value} and actual consumption of the HCl that they reported for the {period of review}." *Id.* at 41. Likewise, Commerce was not persuaded by respondents' citation to past practice. *See* Pl. Mem. at 29.

Finally, Commerce determined that plaintiffs had not established any other reason to depart from using what Commerce had determined to be available and reliable data from the primary surrogate country. As Commerce explained, "it is long-standing Commerce practice that a party arguing that data are unusable must provide sufficient evidence to support its argument here." IDM at 41. Respondents, however, had not established any other reason for valuing the Brazilian or Turkish data over Commerce's preference for the Malaysian data. *See id.* at 41; *Clearon*, 37 C.I.T. at 228 ("deriving the surrogate data from one surrogate country limits the amount of distortion introduced . . ."). In sum, Commerce provided a reasoned explanation for selecting Malaysian HS 2806.10, which is supported by substantial evidence and not contrary to law.

### 4.    Surrogate Value For Carbonized Materials

Commerce determined to value respondents' coal-based carbonized material input using Malaysian data for coconut shell charcoal under HS 4402.90.1000. IDM at 43; Final SV Mem., P.R. 307; PDM at 26-31; Prelim. SV Mem. at 266, 268; *see also* Petr. SV Cmts., at Att. 1, P.R. 121. Commerce determined that this data, like the rest of the Malaysian import statistics on

the record, was contemporaneous with the period of review, publicly available, product-specific, tax-exclusive, and representative of a broad market average.  PDM at 27.  Likewise, reliance on the Malaysian data to value carbonized materials was consistent with Commerce's regulatory preferences to value the factors of production from a single surrogate country.  *See id.* at 28.  Plaintiffs argue that Commerce should have relied, instead, on Malaysian data under the less specific HTS 4402.90 (Wood Charcoal), which encompasses both HTS 4402.90.1000 (coconut shell charcoal) and HTS 4402.90.9000 (other wood charcoal).  Pl. Mem. at 16-25; *see also* Resp. Final SV Cmts., at Ex. 1 & 2A, P.R. 197.  However, as explained by Commerce on the record, and discussed below, plaintiffs' arguments are not persuasive.

Commerce provided a reasoned explanation for selecting the coconut shell dataset as the best available information.  IDM at 43.  First, Commerce stated that there was no reason to resort to the basket category encompassing other wood charcoal (*i.e.*, wood or nut charcoal) because the record does not reflect that respondents used any carbonized materials made from wood, nuts, or any other non-coal charcoal.  IDM at 43.  Commerce further stated that even when respondents were asked to specify the type of carbonized material used, they reported only that their suppliers purchased coal-based carbonized material.  *Id.*  Further, "{f}or both Carbon Activated and DJAC's suppliers, the record only contains test reports demonstrating the moisture, ash, volatility content and particle size of the carbonized material purchased from its suppliers, but no evidence to support the mandatory respondents' assertion that they used wood-based charcoal."  IDM at 43.

Second, while the courts have sustained Commerce's reliance on basket categories when the record lacked evidence to justify a more specific HS heading classification, a more specific classification category is preferred if the record allows for it.  *See SolarWorld Americas, Inc. v.*

*United States*, 962 F.3d 1351, 1360-61 (Fed. Cir. 2020) (holding Commerce's rejection of a more general HS subheading because it was not specific to the material in question, was a reasonable exercise of discretion); *Yingqing*, 195 F. Supp. 3d at 1299 (recognizing Commerce's discretion to have selected a broader HS basket to value a certain input when the respondent had proposed multiple, conflicting possibilities to value the input).   Commerce selects surrogate values, to the extent practicable, that are input-specific, representative of a broad-market average, publicly available, contemporaneous with the POR, and exclusive of taxes and duties.   IDM at 43. Commerce also conducts an analysis, on a case-by-case basis, weighing the available information with respect to each input value before determining the best surrogate value for each input.   *Id*.

Third, Commerce reasoned that the more specific HS classification for coconut shell charcoal was appropriate based on this record.   *Id*.   Citing the fifth administrative review of activated carbon from China, Commerce acknowledged that it had previously found that "the use of wood charcoal or other non-coconut-shell carbonized materials would only be applicable had a respondent 'sold subject merchandise produced from wood or nut charcoals.'"   *Id*. (citing *Certain Activated Carbon From the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2011-2012*, 78 Fed. Reg. 70,533 (Dep't. of Commerce Nov. 20, 2013), and accompanying IDM at Comment 6).   Plaintiffs attempt to distinguish this precedent by explaining that the fifth administrative review "featured record evidence {*i.e*., certifications from industry experts} showing that the specific grade of activated carbon sold could not be produced from wood charcoal."   Pl. Mem. at 17-18.   Plaintiffs argue that because there is no record evidence showing that its specific grade of activated carbon could not have been produced from wood charcoal, that Commerce should include the wood-based charcoal reported in HS

4402.90.9000.  *Id*. at 18.  However, plaintiffs fail to acknowledge that the burden is on the

interested parties, not Commerce, to create a record.  *See Qingdao Sea-Line Trading Co., Ltd. v.*

*United States*, 766 F.3d 1378, 1386 (Fed. Cir. 2014) ("The burden of creating an adequate record

lies with the interested parties, not with Commerce.").  In this review, respondents had

nevertheless failed to provide record evidence demonstrating that its suppliers purchased

"carbonized material that was made from wood or nut charcoal so as to merit the inclusion of the

HS 4402.90.9000, other wood charcoal."  IDM at 43.  Commerce has broad discretion in

determining the best available information on the record and respondents have not provided

sufficient evidence to support their argument that Commerce erred in its reliance on the coconut

shell classification.  *Id.*  Further, the HS classification for coconut shell charcoal is a viable proxy

to value coal-based carbonized material, as stated in previous segments of the proceeding.  *See*

*Certain Act. Carbon from {China}:  Final Results and Partial Rescission of Third Antidumping*

*Duty Admin. Review*, 76 Fed. Reg. 67142 (Dep't. of Commerce, Oct. 31, 2011), and

accompanying IDM.

 Plaintiffs further argue that Commerce should have selected the basket category

encompassing wood- or nut-based charcoal because the coal-based charcoal used by respondents

was purportedly more closely related to wood- or nut-based charcoal than coconut-shell

charcoal.  *See* Pl. Mem. at 18-22.  Commerce impliedly rejected this argument in (i) taking a

different approach to dataset selection that required respondents establish their use of wood- or

nut-based charcoal in order to avail themselves of an HS classification encompassing it; and

(ii) citing to the fifth administrative review.  In any event, insofar as plaintiffs argue coal-based

charcoal shares some commonality with wood- and nut-based charcoal in terms of physical

characteristics and price, plaintiffs also concede that coal-based charcoal likewise shares some

commonality with coconut shell-based charcoal in terms of physical characteristics and price. *See* Pl. Mem. at 19-22. The coal-based charcoal used in respondents' production is, as plaintiffs would seem to admit, neither a perfect reflection of coconut-shell charcoal nor a perfect reflection of wood- or nut-based charcoal. Thus, Commerce was well-within its discretion to choose among imperfect datasets, and it would not be appropriate to substitute Commerce's decision-making for a reweighing based on plaintiffs' different view. *See Tr. Chem Co. v. United States*, 791 F. Supp. 2d 1257, 1263 (2011) ("As long as Commerce reasonably explains its choice between two appropriate but imperfect alternatives, the court will not reject the agency's determination, even if the court would have made a different one."). The question is only whether Commerce's exercise of discretion was reasonable and consistent with law, not whether other choices could have been made that might have been better or equally good.

Finally, plaintiffs claim that "judicial and agency precedent *compel* HTS 4402.90." Pl. Mem. at 22-25 (capitalization altered; italicization added). Notably, plaintiffs do not actually follow their assertion with any recognition, discussion, or application of the legal standard for invoking collateral estoppel or res judicata.[2] Instead, plaintiffs merely point to the fact that Commerce has, on occasion, relied on wood-based charcoal in past reviews, and the Federal Circuit has affirmed that reliance. *See* Pl. Mem. at 22-23. But plaintiffs do not actually reason why these past agency actions, or the court's decision, "compel" reliance solely on wood-based charcoal or an averaging of wood-based and coconut shell-based charcoal in this review.

In any event, plaintiffs admit that Commerce's decisions in prior reviews have reached varying conclusions. *See* Pl. Mem. at 22-23. As such, there is no single, consistent past

---

[2]   Plaintiffs may not correct this error by making any new arguments in their reply brief. *See SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1319 (Fed. Cir. 2006) (arguments raised for the first time in a reply are waived).

approach. *Id.* Plaintiffs also cannot deny that the court's decision simply does not impose any bright-line rule that would purport to require (i) Commerce rely on only wood-based charcoal, or (ii) average data from wood-based and coconut shell-based charcoal, or (iii) preclude Commerce from relying on coconut-shell charcoal, in all future reviews regardless of an individual record or other context. *See Jacobi Carbons AB v. United States*, No. 2014-1752 *et* al, 619 F. App'x 992, 999 (Fed. Cir. Aug. 3, 2015). Instead, the court stated: "There are no express findings or comparisons between wood charcoal and coconut shell charcoal, and this record does not establish any such conclusions." *Id.* "{T}he record does not compare coconut shell charcoal and wood charcoal." *Id.* "{We do not review Commerce's determinations de novo." *Id.* And, "{w}e cannot conclude on this record that Commerce's decision that both data sources were specific to the inputs in question was not supported by substantial evidence." *Id.* Plaintiffs further fail to acknowledge that the decision was non-precedential. Nor do plaintiffs reconcile their argument with the law. It is well-established that "{e}ach administrative review is a separate exercise of Commerce's authority that allows for different conclusions based on different facts in the record." *Jiaxing II*, 822 F.3d at 1327. Commerce provided a reasoned basis for selecting Malaysian HS 4402.90.10000 (coconut-shell charcoal) to value respondents' coal-based charcoal carbonized materials.

### 5. Surrogate Value For Liquid Caustic Soda

Commerce determined to value liquid caustic soda using Malaysian imports of solid sodium hydroxide under HS subheading 2815.11. IDM at 44-45; Final SV Mem., P.R. 307; PDM at 26-31; Prelim. SV Mem., P.R. 266, 268; *see also* Petr. SV Cmts., at Att. 1, P.R. 121. Commerce determined that this data was contemporaneous with the period of review, publicly available, product-specific, tax-exclusive, and representative of a broad market average. PDM at 27. Reliance on it was also consistent with Commerce's regulatory preference to value, when

possible, all of the factors of production from a single surrogate country, in this case Malaysia. *See id.* at 28.  Plaintiffs argue that Commerce should have relied, instead, on Malaysian data under HS 2815.12, which covers liquid sodium hydroxide, because respondents assert they only purchased the input in liquid not solid form.  Pl. Mem. at 26-28; *see also* Petr. SV Cmts., at Att. 1, P.R. 121.

Commerce reasonably concluded "the record {did} not contain sufficient evidence to demonstrate that the mandatory respondents, or their suppliers, purchased liquid caustic soda." IDM at 45.  As Commerce stated, "the evidence on the record only indicates that the suppliers used a sodium hydroxide with purity in the range of 30.6 to 22.1 percent, as demonstrated by the test results provided for October 2018.  *Id.*  This representation does not establish that the caustic soda, when purchased, was necessarily in liquid form.

It was also reasonable for Commerce to conclude, as it did, that data under HS 2815.11, covering solid sodium hydroxide, was the best available information.  *See* IDM at 45. Commerce reasoned:  "{T}he record demonstrates that something happens to the caustic soda input after its purchase because once the input is applied into the production process, the volume reported is larger than the volume purchase."  *Id.*  "As such, while the record does not specify whether Carbon Activated's suppliers actually purchased solid sodium hydroxide and created the liquid caustic solution themselves, or purchased liquid sodium hydroxide in its diluted form, we can infer from record evidence that it is most likely the former scenario that occurred."  *Id.*

Plaintiffs argue that Commerce "impermissibly speculated that 'Carbon Activated's suppliers actually purchased solid sodium hydroxide and created liquid caustic themselves.'"  Pl. Mem. at 27.  Plaintiffs further argue that Commerce "should use the {factor of production} in the form reported, unless evidence establishes otherwise."  *Id*.  Although plaintiffs support their

arguments by characterizing Commerce's determination as speculation not amounting to substantial evidence, Commerce is not precluded from making inferences based on the evidence presented on the record. *See Fuwei Films (Shandong) Co. v. United States*, 837 F. Supp. 2d 1347, 1351 (Ct. Int'l Trade 2012) (explaining that "Commerce's surrogate value decision or data choice is not rendered unreasonable because an alternative inference or conclusion could be drawn from the administrative record."). It is well-established that the Court "will upset Commerce's surrogate valuation only if no reasonable mind could conclude that Commerce chose the best available information." *Id.* (quoting *Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333, 1340 (Fed. Cir. 2011)). Again, the burden is on the interested parties, not Commerce, to create the record. Yet respondents failed to substantiate that their suppliers consumed liquid caustic soda, or that liquid sodium hydroxide should instead be used as a surrogate value. *Id.*

Plaintiffs further contend that Commerce was required to ask, but failed to ask, respondents for clarification on the nature of their input before Commerce could draw any conclusions or inferences based on the record already supplied. Pl. Mem. at 28 (citing 19 U.S.C. § 1677m(d)). But, as already discussed, section 1677m(d) does not apply to the submission of potential surrogate value information. *See Carbon Activated (AR11)*, 2021 WL 4938131, at *8. Section 1677m(d) ensures a respondent the opportunity to remedy or explain a deficiency before Commerce resorts to adverse facts available. *Mukand*, 767 F.3d at 1304. It is did not apply in this context. Based on the record evidence, Commerce acted reasonably in selecting the Malaysian dataset encompassing solid sodium hydroxide.

6.     **Surrogate Value For Steam**

Commerce determined to value steam using Malaysian data under HS 2711.11 (liquefied natural gas).  IDM at 47-48; Final SV Mem., P.R. 307; PDM at 26-31; Prelim. SV Mem., P.R. 266, 268; *see also* Petr. SV Cmts., at Att. 1, P.R. 121.  Commerce determined that this data was contemporaneous with the period of review, publicly available, product-specific, tax-exclusive, and representative of a broad market average.  IDM at 48; PDM at 27.  Reliance on it was also consistent with Commerce's regulatory preference to value, when possible, all of the factors of production from a single surrogate country, in this case Malaysia.  *See id.* at 28.  Plaintiffs argue that Commerce should have relied, instead, on Malaysian data under HS 2711.21, which covers natural gas in its gaseous state, because respondents assert this data is more product specific and the data otherwise relied upon under HS 2711.11 were unreliable.  Pl. Mem. at 31-34; *see also* Resp. Final SV Cmts., at Att. 8B, P.R. 197.

With respect to specificity, plaintiffs argue that "{b}ecause Commerce never questioned the manner in which steam was reported {*i.e.*, as "steam"}, it should have been valued as natural gas in the same physical form—*i.e.*, gaseous state {HS 2711.21}."  Pl. Mem. at 32.  However, plaintiffs' citation to the dictionary definition of "steam" is a facially inadequate resource to definitively establish whether the "steam" reported by respondents on this record is more appropriately classified as natural gas in liquid form or gaseous state within the rubric of the Harmonized Schedule.  "Steam" would appear to straddle the line between liquid and gas, depending on its particular state at a given moment.  Dictionary.com defined "steam" as "water in the form of an invisible gas or vapor" and "water changed to this form by boiling . . ."  Webster's dictionary more completely defines "steam" to also include "the mist formed when the gas or vapor from boiling water condenses in the air."  Webster's Dictionary (1989).  Respondents may have reported "steam" on the record, but they do not appear to have added to

30

the record such other information as would have required Commerce to then value that steam under the HS subheading for natural gas in its gaseous state rather than its liquid state.  As with many of the other inputs, Commerce was within its discretion to choose from imperfect datasets. *See*, *e.g.*, *Fine Furniture (Shanghai) Ltd. v. United States*, 353 F. Supp. 3d 1323, 1348 (Ct. Int'l Trade 2018) (emphasizing that when "there is nothing on the record regarding the specific composition {of an input}. . . any claims of greater specificity of the HTS subheadings that can be applied to them are immaterial" (internal quotations omitted)); *Zenith Elecs. Corp. v. United States*, 988 F.2d 1573, 1583 (Fed. Cir. 1993) ("The burden of production should belong to the party in possession of the necessary information.").

With respect to reliability, plaintiffs characterize the data under Malaysian HS 2711.11 (natural gas in liquid form) as unreliable because "the domestic prices of natural gas during the {period of review} were lower than the import prices of natural gas."  Pl. Mem. at 33.  However, Commerce found plaintiffs' assertion lacked merit because "the domestic prices the mandatory respondents provide{d} {were} not supported by the underlying methodology used to derive those prices."  IDM at 48.  Commerce's reasoning is supported by the record.  In respondents' case brief, they stated that "the average Malaysian domestic pipeline natural gas price reported during the {period of review} by the Malaysian Energy Commission was only 1.55 RM/kg." Resp. Case Br., at 47-48, P.R. 285.  However, respondents failed to support their assertion with the methodology used to derive that value in a manner that would enable Commerce to determine whether it was appropriately usable.  *See id.*  Plaintiffs now attempt to provide that methodology in litigation, *see* Pl. Mem at 33, but such post-hoc explanation is untimely.  The fact remains that the domestic prices respondents provided on the record were "not supported by the underlying methodology used to derive those prices."  IDM at 48.

31

In further support of Commerce's reliance on HS 2711.11, in lieu of HS 2711.21, Commerce also points out that it has, in the past, used import data under both HS subheadings depending on the record in each review and Commerce's case-by-case analysis. *Id.* Commerce further explained that it favored Malaysian data under HS 2711.11 because it "represent{ed} a significantly larger volume of imports (*i.e.*, 1,329,366,876 kg) from multiple countries (*i.e.*, Singapore, Brunei, and Australia), covering nearly the entirety of the {period of review,} . . . {whereas} the import data under HS 2711.21 represent{ed} a smaller volume of imports (*i.e.*, 3,207,783 kg) from only one country (i.e., Brunei) covering only two months of the POR." *Id.* Accordingly, because "HS 2711.11 represents a broader market average and a larger import volume than Malaysian HS 2711.21, HS 2711.11 is the best available information to value the SV for steam." *Id.*

In response, plaintiffs assert that Commerce should not have compared the relative breadth and volume of imports under different sub-headings. They cite no law for this premise and their assertion that the comparison is factually improper is conclusory. As such, plaintiffs fail to carry their burden to establish any error in Commerce's exercise of its wide discretion to weigh different and often imperfect datasets to determine what is the best available information. Commerce reasonably selected data under Malaysian HS 2711.11, encompassing natural gas in its liquid form, to value respondents' steam input.

## III. Commerce's Calculation of Surrogate Financial Ratios Is Supported By Substantial Evidence And In Accordance With Law

In a non-market economy antidumping proceeding, Commerce determines normal value on the basis of factors of production used to produce subject merchandise valued in a surrogate country or countries. *See* 19 U.S.C. § 1677b(c)(1). After calculating the total value of the factors of production, Commerce adds "an amount for general expenses and profit plus the cost

of containers, coverings, and other expenses." *Id*. Commerce does this by calculating surrogate

financial ratios that it "derives from the financial statements of one or more companies that

produce identical or comparable merchandise, preferably in the primary surrogate country." *See*

*T. T. International v. United States*, 439 F. Supp. 3d 1370, 1382 (Ct. Int'l Trade 2020) (citing

*Dorbest Ltd. v. United States*, 604 F.3d 1363, 1368 (Fed. Cir. 2010)).

The administrative record contained eight financial statements:  five from Malaysia, one

from Romania, one from Mexico, and one from Russia.  IDM at 33-34 (citing record).  Prior to

the *Preliminary Results*, the record had only three Malaysian statements, which Commerce relied

on as the best available information (*i.e.*, Century Chemical, Tan Meng, and Bravo Green Sdn.

Bhd.).  PDM at 16.  Commerce explained that although the three statements were not

contemporaneous with the period of review and did not provide separate line-item breakdowns

for raw material, labor and energy, the three Malaysian statements nevertheless provided

sufficient information to calculate surrogate financial ratios (*i.e.*, factory overhead, selling,

general and administrative (SG&A) expenses, and profit).  *Id*.  Commerce reasoned that the three

Malaysian financial statements were the best available information on the record to value

respondents' financial ratios because each of the three companies are manufacturers of activated

carbon, an identical merchandise; their financial statements were audited, complete, publicly

available, and did not show evidence of countervailable subsidies.  *Id*.  The entities themselves

were also based in Malaysia, the primary surrogate country.  *Id.*

Following the *Preliminary Results*, Commerce was presented with additional financial

statements from two Malaysian entities.  IDM at 31-33; *see* Petr. Final SV Cmts., Att. SV2-4,

P.R. 196.  Although the petitioners argued that all of the Malaysian statements now on the record

were sufficiently contemporaneous, Commerce determined that only the new financial

statements from Bravo Green (the 2018 Bravo Green financial statements) were

"contemporaneous with the {period of review} and reflect{ed} the experience of a producer of

merchandise identical to the subject merchandise."  IDM at 34.  Therefore, in the *Final Results*,

Commerce determined Bravo Green's 2018 financial statements were the best available

information to value respondents' financial ratios.  *Id.*

        Plaintiffs argue that Bravo Green's 2018 financial statements from Malaysia are

insufficiently disaggregated and unreliable and that Commerce should instead use the 2018 Joint

Stock Company (JSC Sorbent) financial statements from Russia or, alternatively, the 2018

Romcarbon financial statements from Romania.  Pl. Mem. at 42, 45.  Although plaintiffs appear

to acknowledge that Commerce generally only resorts to using a secondary surrogate country if

data, including financial statements, from the primary surrogate country are unavailable or

unreliable, they fail to demonstrate that the Malaysian financial statements on record are

unreliable.  *See* Pl. Mem. at 38.

        As Commerce explained in the *Preliminary Results*, although the Malaysian financial

statements were not ideal insofar as they did not provide line-item break downs, the Malaysian

financial statements nevertheless did "provide sufficient information to calculate surrogate ratios

for factory overhead costs, SG&A expenses, and profit."  PDM at 16.  Commerce reasoned that

the Malaysian financial statements were "from companies that are producers of identical or

comparable merchandise, and from a country at the same level of economic development as

China, are audited, complete, publicly available, and do not show evidence of countervailable

subsidies."  IDM at 33.  With Bravo Green's 2018 financial statements subsequently added to the

record, Commerce was also able to ultimately rely on financial statements that were also

contemporaneous and from the primary surrogate country (*i.e.*, Malaysia).  *Id.* at 32-34.

As already discussed, Commerce has a series of preferences when it comes to selecting the best available information on the record.  *See* IDM at 34.  Moreover, courts have acknowledged these preferences are a legitimate part of Commerce's broad discretion in selecting surrogate values.  *See FMC Corp.*, 27 C.I.T. at 251 (holding that Commerce can exercise discretion in choosing between reasonable alternatives).  Important here, Commerce prefers to select financial statements from companies with a production experience similar to the mandatory respondents' production experience, and that are not distorted or otherwise unreliable. *See Seah Steel Vina Corp. v. United States*, 269 F. Supp. 3d 1335, 1348 (Ct. Int'l Trade 2017) ("{A}dditionally, in selecting surrogate producers, Commerce may also consider the representativeness of the production experience of the surrogate producers in relation to the nonmarket economy producer's own experience.").  Here, Bravo Green's 2018 financial statements were contemporaneous with the period of review, came from the primary surrogate country, and reflected the experience of a producer of merchandise identical to the subject merchandise produced by Carbon Activated.  IDM at 33.

In addition, although the Bravo Green financial statements were not ideal, the statements do itemize "Cost of sales" into six cost elements:  (i) raw materials; (ii) labor; (iii) energy; (iv) manufacturing overheads; (v) change in finished goods inventory; and (vi) traded goods. Commerce determined that this information was sufficient to calculate the financial ratios.  *See* IDM at 33.  Commerce acknowledged that, as a general matter, "when {it} is unable to segregate expenses in the calculation of the surrogate financial ratios that would otherwise be included in the normal value calculation, it is Commerce's practice to disregard these expenses in the calculation of normal value in order to avoid double-counting costs."  PDM at 31.  In this review, however, it determined that it did not have to disregard energy or labor in the normal value

calculation because the Malaysian financial statements still separated overhead expenses (*i.e.*, depreciation) from the rest of the cost of manufacture (*i.e.*, material, labor, and energy expenses). *Id*.  Thereafter, in support of the *Final Results*, Commerce reaffirmed its determination to use Malaysian financial statements to value respondents' financial ratios because the 2018 Bravo Green statements provided sufficient information to calculate surrogate ratios for factory overhead, SG&A and profit.  IDM at 33.

Plaintiffs further contend that Commerce's reliance on the 2018 Bravo Green statements reflect a departure from the agency's practice in prior reviews, without adequate explanation. *See* Pl. Mem. at 41-42.  Commerce conducts its analysis of valuing factors on a case-by-case basis, however, and "is not required to justify its determination in terms of past alternatives, as long as it acts reasonably."  *See Timken Co. v. United States*, 968 F. Supp. 2d 1279, 1290 (Ct. Int'l Trade 2014), *aff'd*, 589 F. App'x 995 (Fed. Cir. 2015) (internal quotations omitted).

Commerce has provided a reasoned explanation for its exercise of discretion to choose between alternative imperfect datasets.  *See* IDM at 31-33.  Commerce explained that Bravo Green's 2018 financial statements were contemporaneous with the period of review, from the primary surrogate country, and reflect the experience of a producer of merchandise identical to Carbon Activated.  *Id*.  Commerce also explained that the statements provided sufficient information to segregate and calculate surrogate ratios for factory overhead, SG&A and profit. *Id*.; *see also Certain Fabricated Structural Steel Final Affirmative Determination of Sales at Less Than Fair Value*. 85 Fed. Reg. 5376 (January 30, 2020) and accompanying IDM at Comment 2 ("Commerce has previously used financial statements that were not able to break out labor or energy where there were no other useable financial statements on the record.").  Given Commerce's discretion to determine what information is the "best available information," and

the fact-specific nature of this selection, a review of Commerce's determination should consider "not whether the information Commerce used was the best available, but rather whether a reasonable mind could conclude that Commerce chose the best available information." *Jiaxing II*, 822 F.3d at 1301 (citing *Zhejiang*, 652 F.3d at 1341).

Plaintiffs' disagreement with that exercise of discretion is not sufficient to overturn the decision-making. *See Timken Co.*, 968 F. Supp. 2d at 1290 ("Commerce's prior practice did not preclude it from engaging in a sufficiency determination as part of its exercise of discretionary authority."); *Seah Steel Vina Corp.*, 269 F. Supp. 3d at 1344 ("When Commerce is faced with the choice of selecting from among imperfect alternatives, it has the discretion to select the best available information for a surrogate value in determining normal value of nonmarket economy (NME) merchandise in order to calculate antidumping duties, so long as Commerce's decision is reasonable.").

## CONCLUSION

For these reasons, we respectfully request that the Court deny plaintiffs' motion for judgment on the agency record and sustain Commerce's *Final Results* in its entirety.

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

PATRICIA M. McCARTHY
Director

*/s/Claudia Burke*
CLAUDIA BURKE
Assistant Director

Of Counsel:                         */s/Mollie L. Finnan*
ASHLANDE GELIN                MOLLIE L. FINNAN
Attorney                            Senior Trial Counsel
Office of the Chief Counsel    U.S. Department of Justice

for Trade Enforcement & Compliance
U.S. Department of Commerce

Civil Division
Commercial Litigation Branch
P.O. Box 480, Ben Franklin Station
Washington, DC 20044
Tel: 202-353-0897
Email: mollie.l.finnan@usdoj.gov

December 15, 2021

*Attorneys for Defendant*

## CERTIFICATE OF COMPLIANCE

Pursuant to Standard Chambers Procedure ¶ 2(B)(2), I hereby certify that "Defendant's Response To Plaintiffs' Rule 56.2 Motion For Judgment On The Agency Record" complies with the word-count limitation set forth in Standard Chambers Procedure ¶ 2(B)(1).  In making this certification, I have relied upon the word count function of the Microsoft Word processing system used to prepare this brief.  According to the word count, this brief contains 11,050 words.

*/s/Mollie L. Finnan*
MOLLIE L. FINNAN

December 15, 2021

## UNITED STATES COURT OF INTERNATIONAL TRADE

### BEFORE:  THE HONORABLE MARK A. BARNETT, CHIEF JUDGE

| | |
|---|---|
| CARBON ACTIVATED TIANJIN CO., LTD., CARBON ACTIVATED CORPORATION, DATONG JUQIANG ACTIVATED CARBON CO., LTD., SHANXI INDUSTRY TECHNOLOGY TRADING CO., LTD., DATONG MUNICIPAL YUNGUANG ACTIVATED CARBON CO., LTD., and BEIJING PACIFIC ACTIVATED CARBON PRODUCTS CO., LTD., *Plaintiffs*, v. UNITED STATES, *Defendant*, and CALGON CARBON CORPORATION and CABOT NORIT AMERICAS, INC., *Defendant-Intervenors*. | Court No. 21-00131 |

<u>ORDER</u>

Upon consideration of plaintiffs' Rule 56.2 motion for judgment on the agency record, defendant's response, plaintiffs' reply, and all other pertinent papers, it is hereby

ORDERED that plaintiffs' motion is denied, and it is further

ORDERED that the final results of the United States Department of Commerce are sustained in their entirety, and it is further

ORDERED that final judgment shall enter in favor of the United States.


Dated _____
    New York, N.Y.                                    _____
                                         Judge