**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE: THE HONORABLE MARK A. BARNETT, CHIEF JUDGE**

———————————————————————x
                                               :

|  |  |
|---|---|
| CARBON ACTIVATED TIANJIN CO., LTD., CARBON ACTIVATED CORPORATION, DATONG JUQIANG ACTIVATED CARBON CO., LTD., SHANXI INDUSTRY TECHNOLOGY TRADING CO., LTD., DATONG MUNICIPAL YUNGUANG ACTIVATED CARBON CO., LTD., and BEIJING PACIFIC ACTIVATED CARBON PRODUCTS CO., LTD., | : <br> : <br> : <br> : <br> : <br> : <br> : <br> : <br> : |
| Plaintiffs, | : |
| v. | : |
| UNITED STATES, | : |
| Defendant, | : |
| and | : |
| CALGON CARBON CORPORATION and CABOT NORIT AMERICAS, INC., | : |
| Defendant-Intervenors. | : |

**Court No. 21-00131**

**PUBLIC VERSION**

———————————————————————x

**PLAINTIFFS' REPLY TO DEFENDANT AND DEFENDANT-INTERVENORS'
RESPONSES TO PLAINTIFFS' RULE 56.2 MOTION
<u>FOR JUDGMENT ON THE AGENCY RECORD</u>**

Francis J. Sailer
Dharmendra N. Choudhary
Jordan C. Kahn

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP

1201 New York Ave., NW, Suite 650
Washington, DC 20005

*Counsel for Plaintiffs Carbon Activated Tianjin Co., Ltd., Carbon Activated Corporation, Datong Juqiang Activated Carbon Co., Ltd., Shanxi Industry Technology Trading Co., Ltd., Datong Municipal Yunguang Activated Carbon Co., Ltd., and Beijing Pacific Activated Carbon Products Co., Ltd.*

Dated: March 14, 2022

## <u>TABLE OF CONTENTS</u>

**TABLE OF CONTENTS** ........................................................................................ I

**TABLE OF AUTHORITIES** .................................................................. II

**I.     COMMERCE UNLAWFULLY VALUED BITUMINUOUS COAL** ........................ 1

**II.    COMMERCE UNLAWFULLY VALUED CARBONIZED MATERIAL** ................ 8

**III.   COMMERCE UNLAWFULLY VALUED LIQUID CAUSTIC SODA** .................. 13

**IV.    COMMERCE UNLAWFULLY VALUED HYDROCHLORIC ACID** .................. 14

**V.     COMMERCE UNLAWFULLY VALUED STEAM** ..................................... 18

**VI.    COMMERCE UNLAWFULLY VALUED ANTHRACITE COAL** ........................ 19

**VII.   COMMERCE UNLAWFULLY SELECTED MALAYSIAN BRAVO 2018
FINANCIAL STATEMENTS** ............................................................... 20

**CONCLUSION** ................................................................................... 23

i

# TABLE OF AUTHORITIES

**Cases**

*Bluescope Steel Ltd. v. United States*, 2021 WL 5822714 (Nov. 30, 2021) ................................. 14

*Calgon Carbon Corp. v. United States*, 190 F.Supp.3d 1224 (CIT 2016).................................... 2

*Carbon Activated Tianjin Co. v. United States*, 2021 WL 4938131 (CIT Oct. 22, 2021)... 5, 7, 13, 20

*Catfish Farmers of Am. v. United States*, 37 CIT 717 (2013) ................................. 10, 21

*CITIC Trading Co. v. United States*, 27 CIT 356 (2003) .................................................. 16

*CP Kelco US, Inc. v. United States,* 2016 WL 1403657 (CIT Apr. 8, 2016) .............................. 22

*Elkay Mfg. Co. v. United States*, 180 F.Supp.3d 1245 (CIT 2016)................................................. 17

*Hyundai Steel Co. v. United States*, 518 F.Supp.3d 1309 (CIT 2021)........................................... 14

*Jacobi Carbons AB v. United States*, 619 Fed. Appx. 992 (Fed. Cir. 2015) ................................. 9

*Jinan Yipin Corp. v. United States,* 800 F.Supp.2d 1226 (CIT 2011) .................................... 10, 22

*Lucent Techs., Inc. v. Gateway*, Inc., 580 F.3d 1301 (Fed. Cir. 2009) ......................................... 13

*Peer Bearing Co.-Changshan v. United States*, 752 F.Supp.2d 1353 (CIT 2011) ...................... 19

*SKF USA, Inc. v. United States*, 263 F.Supp.1369 (Fed. Cir. 2001)............................................. 15

*SolarWorld Americas, Inc. v. United States*, 962 F.3d 1351 (Fed. Cir. 2020) ..................... 11, 12

*Timken Co. v. United States*, 968 F.Supp.2d 1279 (CIT 2014) ................................................. 22

*Trust Chem Co. v. United States*, 35 CIT 1012 (CIT 2011) ......................................................... 11

*United Steel and Fasteners, Inc. v. United States*, 469 F.Supp.3d 1390 (CIT 2020) ........... 2, 3, 20

*Writing Instrument Mfrs. Ass'n v. United States*, 984 F.Supp.629 (CIT 1997), *aff'd*, 178 F.3d 1311 (Fed. Cir. 1998).................................................................................................................. 19

*Yantai Oriental Juice Co. v. United States*, 26 CIT 605 (2002) .................................................. 18

*Yingqing v. United States*, 195 F.Supp.3d 1299 (CIT 2016) ............................................... 4, 5, 12

**Statutes**

19 U.S.C. § 1677m................................................................................................................ 5, 13, 14

**Other Authorities**

DICTIONARY.COM ................................................................................................ 18

MERRIAM-WEBSTER.COM ................................................................................... 18

WEBSTER'S DICTIONARY ................................................................................... 18

**Rules**

Fed. Cir. R. 32.1(d) ............................................................................................ 9

**Administrative Decisions**

*Activated Carbon from China*, 84 Fed. Reg. 68,881 (Dec. 17, 2019) ....................................... 7, 8

*Activated Carbon from China*, 86 Fed. Reg. 10,539 (Feb. 22, 2021)....................................... 1, 23

*Activated Carbon from China*, 86 Fed. Reg. 73,731 (Dec. 28, 2021) ....................................... 7, 8

*Citric Acid and Certain Citrate Salts from China*, 80 Fed. Reg. 77,323 (Dec. 14, 2015)............ 21

*Crystalline Silicon Photovoltaic Cells from China*, 80 Fed. Reg. 40,998 (July 7, 2015)............. 18

*Helical Spring Lock Washers from China*, 73 Fed. Reg. 4175 (Jan. 15, 2008)........................... 14

*Wooden Bedroom Furniture from China*, 73 Fed. Reg. 49,162 (Aug. 20, 2008)........................ 17

Plaintiffs Carbon Activated Tianjin ("CA Tianjin"), Carbon Activated Corporation (collectively, "Carbon Activated"), Datong Juqiang Activated Carbon ("DJAC"), Shanxi Industry Technology Trading, Datong Municipal Yunguang Activated Carbon, and Beijing Pacific Activated Carbon Products (collectively, "Plaintiffs") reply to the Responses of Defendant United States (Dec. 15, 2021), ECF 38 ("Def. Br."), and Defendant Intervenors Calgon Carbon and Cabot Norit Americas (collectively, "Petitioners") (Jan. 31, 2022), ECF 39-40 ("Pet. Br."), opposing Plaintiffs' Motion for Judgment on the Administrative Record (Sept. 16, 2021), ECF 36-37 ("Pl. Br."). Plaintiffs established that the Department of Commerce ("Commerce" or "Department") erred in the twelfth administrative review ("AR12") of the antidumping duty ("AD") order on activated carbon from the People's Republic of China ("China"), having the period of review ("POR") April 1, 2018, through March 31 2019. *Activated Carbon from China*, 86 Fed. Reg. 10,539 (Feb. 22, 2021), P.R. 316 ("*Final Results*"). Such demonstrated Commerce error is not undermined by the arguments of Defendant and Petitioners, as detailed below.

## I.    <u>COMMERCE UNLAWFULLY VALUED BITUMINUOUS COAL</u>

Plaintiffs demonstrated that Commerce unlawfully valued their non-coking bituminous coal input of both higher ($\geq$ 5,833 Kcal/Kg) and lower heating values (< 5,833 Kcal/Kg) under the Malaysian 6-digit basket category Harmonized Tariff Schedule ("HTS" or "HS") 2701.12 (Bituminous Coal, Not Agglomerated), the data of which was distorted by the inclusion of coking coal. Pl. Br. at 5-16. Specifically, Commerce's rationale that no industry standards and test reports were provided differentiating coking coal from non-coking coal was impeached on procedural and substantive grounds. *Id.* at 11-14; IDM at 18. And Commerce's second rationale pertaining to alleged translation errors on Carbon Activated's supplier A documents was

demonstrated to be unsupported by substantial evidence. *Id.*

Defendant first argues that "there is nothing inherently unlawful or unreasonable in selecting data derived from a basket category" HTS 2701.12, citing *Calgon Carbon Corp. v. United States*, 190 F.Supp.3d 1224 (CIT 2016) ("*Calgon Carbon AR6*"), and *United Steel and Fasteners, Inc. v. United States*, 469 F.Supp.3d 1390 (CIT 2020) ("*US&F*"). Def. Br. at 14. However, *Calgon Carbon (AR6)* did not eliminate the product-specificity requirement in Commerce's selection of the best HTS heading:

> The mere fact that the Thai data are derived from a basket category, i.e., HTS code 2701.11 "Anthracite Coal, Not Agglomerated," on its own does not demonstrate that the Thai data are not specific. Indeed, as Commerce recognized, the flaw in Albemarle, Huahui, and Jacobi's argument is further underscored by the fact that all four of the POR6–contemporaneous GTA data sources considered by Commerce each derive from the same basket category. . . . (South Africa and Ukraine); . . . (Thailand and Colombia). Respondents, therefore, have failed to show that Commerce's determination regarding the specificity of the Thai data is unsupported by substantial evidence.

*Calgon Carbon AR6*, 190 F.Supp.3d at 1235-36.

This decision is distinguishable because first, there is no evidence that Thai HTS 2701.11 consisted of two disparate grades of anthracite coal like coking and non-coking grades of bituminous coal in HTS 2701.12. As such, unlike HTS 2701.12, no equivalent distortion was established in the scope of Thai HTS 2701.11. Pl. Br. at 10-11. Second, in contrast to all four secondary surrogate countries in *Calgon Carbon AR6* reporting the data for the same HTS 2701.11, the AR12 record disaggregates coking coal and non-coking coal imports in all six potential surrogate countries. Plaintiffs' Case Brief (July 20, 2020), C.R. 279, P.R. 285 ("Case Brief"), at 15-17. These data reveal that HTS 2701.12 average unit value ("AUV") is distorted by significantly higher coking coal prices.

PUBLIC VERSION

Likewise, *US&F* held that "the record fails to reflect how inclusion of cold-rolled, non-circular steel bar distorts the surrogate data in this case such that the surrogate data are not sufficiently specific." 469 F.Supp.3d at 1400-01. Consequently, this Court did not reject Commerce's selection of contemporaneous primary surrogate country basket category "Thai HTS 7228.20 over Indonesian HTS 7228.20.1100" and "over the non-contemporaneous and less voluminous data of Thai HTS 7228.20.1100." *Id*. at 1402-1403. Here, in contrast, the record evidences that coking coal in HTS 2701.12 distorts the resulting AUV applied to the non-coking coal input. Pl. Br. at 11-14.

Defendant's efforts to support the decision based on evidentiary grounds are unsupported by substantial evidence and not lawful. First, Defendant argues that Commerce's "conclusion was reasonable based on the unclear and conflicting evidence on the record," rehashing Commerce's rationale about Carbon Activated's supplier's allegedly incorrect English translations of purchase invoices. Def. Br. at 15. This rationale was already debunked, clarifying that "non-coking bituminous coal 1," "non-coking bituminous coal 2," and "bituminous coal 3" were not English translations; instead, they simply separated the same input from different suppliers. Pl. Br. at 14. Further, contrary to Defendant's assertion, the unambiguous record evidence establishes that the undisputedly accurate English translations – "semi-coke" or "washed coal" or "washed and fuel coal" – designated non-coking bituminous coal. *Id*. at 8-9. In addition, an incorrect English translation, "coking coal" was simply an inadvertent error; the correct translation was "non-coking coal." *Id*. at 14-15. Failing to rebut Plaintiffs' factual explanations, Defendant simply regurgitates Commerce's IDM. While Defendant cites *Yingqing v. United States* to support "Commerce's discretion to have selected a broader HS basket to value

a certain input when the respondent had proposed multiple, conflicting possibilities to value the input," *id*. at 15, that case is distinguishable:

> **Plaintiffs proposed multiple, conflicting possibilities** to value its paint. Confronted with this fog of confusion, Commerce reasonably selected a broader basket provision that covered Plaintiffs' paint. **Plaintiffs themselves did not know which surrogate value was appropriate for their paint**. On the one hand, Plaintiffs proposed Thai HS subheading 3209.10 covering paint in an aqueous medium, but Plaintiffs contradicted themselves by reporting that it used paint dissolved in a "non-aqueous medium." . . . . Plaintiffs also proposed subheading 3208.90.19.000, covering "varnishes (including lacquers) <u>exceeding</u> 100ºC heat resistance," and subheading 3208.90.29.00, covering "varnishes (including lacquers) <u>not exceeding</u> 100ºC heat resistance," but did not substantiate which of the two subheadings should apply by providing information about the heat resistance of their paint. (emphasis added). Commerce reasonably determined that "{r}ecord evidence {did} not demonstrate Yingqing used the paints classified under the more specific {subheadings}." . . . Commerce's choice of an HS basket provision that covers Plaintiffs' paint seems like a reasonable, if not correct, choice given the **confusing alternatives proposed by Plaintiffs**.

*Yingqing*, 195 F.Supp.3d 1299, 1307 (CIT 2016) (emphases modified).

In contrast, Plaintiffs adhered to a consistent (and not "conflicting") description of their inputs as non-coking bituminous coal. The non-coking character of bituminous coal input was self-evident in Plaintiffs' reported CONNUMs in the sales databases, which was based on CARBONU of "02 = Bituminous coal, not metallurgical grade" – non-metallurgical grade coal being synonymous with non-coking bituminous coal. Pl. Br. at 5-6. Because the essential character of subject merchandise (including CARBONU of "02") is undisputed, Defendant's challenges to the non-coking character of bituminous coal input are moot. Further, Plaintiffs also specified the input's heating values: supplier A used > 5,833 Kcal/Kg, while [

]¹ and DJAC used < 5,833 Kcal/Kg. Pl. Br. at 9-

---

¹ In its Opening Brief and Case Brief, Plaintiffs inadvertently misstated that [     ] bituminous coal's calorific value was [          ] Kcal/Kg. Pl. Br. at 6; Pl. Case Brief at 12. The correct

PUBLIC VERSION

10. The HTS "alternatives proposed by Plaintiffs" – 2701.12.9000 and 2701.19 – are <u>not</u> "confusing" since they are in accordance with input descriptions/heating values. *Yingqing*, 195 F.Supp.3d at 1307. Defendant's arguments are therefore meritless because Plaintiffs "{knew} which surrogate value was appropriate for their {non-coking bituminous coal}." *Id*.

Second, Defendant echoes Commerce's assertion that "the record lacked . . . industry standards" to prove the non-coking nature of bituminous coal input. Def. Br. at 16. Defendant misplaces reliance on the preceding eleventh administrative review ("AR11") in attempting to rebut Plaintiffs' argument that Commerce was required by 19 U.S.C. § 1677m(d) to "inform" them "of the nature of the deficiency" arising from the absence of such standards: "as this Court held in AR11, section 1677m(d) does not apply to the submission of potential surrogate value information." *Id*. at 16-17. Defendant is wrong. The cited AR11 *dictum* was in the context of purely surrogate value ("SV") information:

> While Plaintiffs aver that the Romanian data they submitted were contemporaneous with the POR, . . . those data were presented to Commerce as covering the period "2016-2018." . . . Plaintiffs seek to clarify that, "the auto-generated heading was titled '2016-2018' because the data source is programmed to automatically download three years of data," but before the data was submitted to Commerce, "a 'macro' {was} used to filter POR-specific data." . . . This additional information is not part of the administrative record, which otherwise supports Commerce's finding that the Malaysian {SV} data is more contemporaneous with the POR than the Romanian data.

> The court also rejects Plaintiffs' argument that Commerce was required to give the respondent an opportunity to address any deficiency in the data. Potential surrogate value data is submitted to Commerce on a party's own initiative, not in response to a request by Commerce. . . . Thus, 19 U.S.C. § 1677m(d) is inapplicable here. . . . there was no apparent deficiency in the Romanian data; Commerce accepted the data as presented . . . .

---

calorific value is [          ] Kcal/Kg. DJAC Supplemental Section D Response (Mar. 20, 2020), C.R. 196-209, P.R. 192-95 ("DJAC SDQR"), at 37.

*Carbon Activated Tianjin Co. v. United States*, 2021 WL 4938131, *7-8 (CIT Oct. 22, 2021)
("*Carbon Activated AR11*").

By contrast, in AR12, there is no such deficiency in the contemporaneous SVs that
Plaintiffs provided under Malaysian HTS 2701.12.9000 and 2701.19. Defendant fails to
elaborate how technical standards are SV information since they are typically **not** "submitted to
Commerce on a party's own initiative, {but only} in response to a request by Commerce." *Id.*

In addition, ample unrebutted record evidence establishes a bright line distinction
between coking and non-coking coal. Moreover, the fact that coking coal is unusable to produce
subject merchandise is demonstrated by suppliers' sworn declarations. Pl. Br. at 12. Defendant
unpersuasively attempts to trivialize these declarations as "conclusory assertions," Def. Br. at 15,
overlooking that they were not challenged by Petitioners. If Commerce nonetheless required
additional documents, such as technical standards, which it had never previously requested,
section 1677m(d) mandates that it inform the Plaintiffs and afford them a chance to remedy the
deficiency. In sum, contrary to Defendant's assertion, preponderant record evidence proves that
DJAC, [   ] and CA's supplier A used non-coking bituminous coal.

Since bituminous coal input used by [   ] and supplier A had calorific value exceeding
5,833 Kcal/Kg, they were properly classifiable under the 6-digit HTS 2701.12. Further, given the
non-coking nature of the input coupled with the technical impossibility of using coking coal in
subject merchandise production, as well as the distortion in the AUV from the much higher
valued coking coal, HTS 2701.12.9000 is the only appropriate heading. Indeed, in the next
thirteenth administrative review ("AR13"), Commerce on an identical record rejected HTS
2701.12 and selected HTS 2701.12.9000 for higher heat value non-coking coal input.

We agree with the mandatory respondents' assertion that HTS 2701.12 is not
specific to noncoking bituminous coal. . . .

6

> HTS 2701.12 is a basket category containing both coking and non-coking bituminous coal under HTS 2701.12.1000 and HTS 2701.12.9000, respectively. As Datong Juqiang and its supplier only used non-coking bituminous coal, HTS 2701.12 is an overly broad category.

*Activated Carbon from China*, 86 Fed. Reg. 73,731 (Dec. 28, 2021) ("*AR13 Final Results*"), IDM Comment 4.

Regarding DJAC's non-coking bituminous coal input of [      ] kcal/kg, Defendant echoes Commerce that there is no evidence "to substantiate the claim 'that the bituminous coal used by {DJAC} is non-coking bituminous coal with a calorific value lower than 5,833 kcal/kg.'" Def. Br. at 16; IDM at 18. Defendant also attempts to distinguish Commerce's diametrically opposite AR11 remand findings by claiming that "in contrast, the record in this review, for AR12, includes a test report for DJAC that provides only the moisture, ash, volatile content, but not its calorific value . . . or a formula to link the moisture and ash content to heat value." Def. Br. at 17-18; *Carbon Activated (AR11)*, 2021 WL 4938131, *2-5. As already explained, the non-coking nature of DJAC's bituminous coal input is unrebutted. Regarding coal's heat value, contrary to Defendant's assertion, the AR11 record contains the following industry formula to obtain a <u>calculated</u> heat value:

> UHV kilocalories (kcal)/kg = 8900 – 138 * (ash percentage + moisture percentage).

*Activated Carbon from China*, 84 Fed. Reg. 68,881 (Dec. 17, 2019) ("*AR11 Final Results*"), IDM Comment 2.

Similarly, in AR13, respondents argued that

> The record contains the Useful Heat Value (UHV) formula: UHV kilocalories (kcal)/kg = 8900 - 138 (ash percentage + moisture percentage). Using this formula and the ash and moisture percentages from test reports from Datong Juqiang and its supplier yield bituminous coal heat values of less than 5,833 kcal/kg.

*AR13 Final Results*, 86 Fed. Reg. 73,731, IDM at 19. Commerce affirmed the formula as

follows:

> Commerce has used heat values derived using the UHV scale in its determinations
> in this proceeding. . . . we continue to rely on the information on the record and
> previous precedent in this proceeding, and **accept the calculated heat value** of
> {DJAC} and its supplier's bituminous coal input. . . .
>
> **As HTS 2701.19 is for heat values below 5,833 kcal/kg, it is necessarily more
> product-specific than HTS 2701.12.** As the bituminous coal used by Datong
> Juqiang and its supplier fit that singular criterion, we will use HTS 2701.19 to value
> the mandatory respondents' bituminous coal raw material input for the final results.

*Id*. at 22 (emphases added); *see AR11 Final Results*, 84 Fed. Reg. 68,881, IDM Comment 2.

Plugging the moisture ([     ]) and ash ([     ]) percentages from DJAC's coal test

certificate into the industry formula yields a heat value of [        ] Kcal/Kg. DJAC SDQR

Exhibit SD-10. As such, the AR11 remand and *AR13 Final Results* compel that Commerce value

DJAC's non-coking bituminous coal of less than 5,833 Kcal/Kg using Malaysian HTS 2701.19.

In sum, remand is warranted for Commerce to value the bituminous coal input by

applying HTS 2701.12.9000 for [   ] and supplier A, and HTS 2701.19 for DJAC.

## II.  COMMERCE UNLAWFULLY VALUED CARBONIZED MATERIAL

Plaintiffs established that Commerce unlawfully valued the coal-based carbonized

material input under HTS 4402.90.1000 ("coconut shell charcoal"), by demonstrating that

coconut shell charcoal was comparable to only a subset – higher grades – of coal-based based

carbonized material. Pl. Br. at 16-25. Conversely, Commerce unlawfully rejected HTS

4402.90.9000 covering wood charcoal, even though it was comparable, in terms of critical

properties and cost, with another subset comprising lower grades of coal-based carbonized

material. *Id*. at 17-22. Because as compared to wood-based charcoal, coconut shell charcoal was

not more comparable to coal-based carbonized materials, HTS 4402.90.1000 alone yielded a

distorted SV for the input.

First, Defendant echoes Commerce that there was "no evidence to support the mandatory respondents' assertion that they used wood-based charcoal." Def. Br. at 23 (quoting IDM at 43). This baseless argument regurgitates an unsubstantiated agency finding; Plaintiffs ***never*** reported that they used wood-based charcoal. *Compare* Case Brief at 18-24 *with* IDM Comment 8.

Second, Defendant takes shelter behind precedent from the third administrative review ("AR3"), arguing that Commerce there held that "the HS classification for coconut shell charcoal is a viable proxy to value coal-based carbonized material." Def. Br. at 25. However, the AR3 sparse record does not control the vastly more comprehensive AR12 record comprised of several independent technical reports – including International Trade Commission ("ITC") reports comparing activated carbons produced from coal charcoal, wood charcoal, and coconut charcoal. Pl. Br. at 18-21. These reports unambiguously establish that wood charcoal is an equally viable proxy to coal-based carbonized material. Moreover, AR3 is rendered inapposite by the fourth administrative review ("AR4"), approved by the Court of Appeals for the Federal Circuit ("CAFC"), wherein Commerce valued the input under HTS 4402 by averaging wood and coconut charcoal prices. Pl. Br. at 23-24. While Defendant minimizes the CAFC AR4 ruling as "non-precedential," Def. Br. at 27, such precedent provide highly "persuasive reasoning" as involving the same SV issue in a prior review of the same AD order. Fed. Cir. R. 32.1(d); *Jacobi Carbons AB v. United States*, 619 Fed. Appx. 992, 999 (Fed. Cir. 2015); Pl. Br. at 23-24.

Third, Plaintiffs demonstrated that the fifth administrative review relied upon by Commerce was distinguishable, *i.e.*, the AR12 record did not contain like evidence that the particular grades of subject merchandise produced by Plaintiffs could not have been produced using wood charcoal. Pl. Br. at 17-18. Defendant's retort is that "plaintiffs fail to acknowledge that the burden is on the interested parties, not Commerce, to create a record." Def Br. at 24-25.

Yet that is exactly what Plaintiffs did through copious technical literature and ITC reports, establishing that wood-based charcoal is used to produce subject merchandise. Neither did Petitioners counter, nor did Commerce find, that the specific grades of subject merchandise Plaintiffs produce could not technically have been produced from wood charcoal. Plaintiffs thereby met their burden by building a robust record conclusively supporting their argument, which was not rebutted by Petitioners or Commerce.

Fourth, Defendant argues that "Commerce was well-within its discretion to choose among imperfect datasets, and it would not be appropriate to substitute Commerce's decision-making for a reweighing based on plaintiffs' different view." Def. Br. at 26. Defendant is wrong. Commerce "is not free to simply choose at will between imperfect sets of data" but is required "to make a reasoned decision as to the source on which it chooses to rely, and to both adequately explain its rationale and support its decision by reference to substantial evidence in the record." *Jinan Yipin Corp. v. United States,* 800 F.Supp.2d 1226 (CIT 2011).

Commerce lacks discretion to ignore Plaintiffs' arguments and pertinent evidence demonstrating equivalence between wood charcoal and lower grades of coal-based carbonized materials, which, in turn, requires that wood charcoal prices be factored in the SV. *Catfish Farmers of Am. v. United States*, 37 CIT 717, 742 (2013) ("If information is 'available' in the record, the statute does not confer discretion to avoid addressing it. . . . The analysis is thus marred"). Since Commerce, through its cursory analysis, did not even attempt to weigh an equally "imperfect {wood charcoal} dataset{}," Defendant's "reweighing" argument is moot. Def. Br. at 26. As such, Defendant misplaces reliance on *Trust Chem Co. v. United States*:

> Plaintiff argues that the *Chemical Weekly* data is more specific to its nitric acid, because the ***Chemical Weekly* data is for nitric acid with a purity level of 60 percent**, a level that is known and thus more product-specific than the unknown purity level of the WTA data. . . .

Commerce noted, however, that although the **purity or concentration of the nitric acid included in the WTA data was unknown**, the *Chemical Weekly* prices were for 60 percent or "weak" strength nitric acid, as opposed to the "high" strength 98 percent nitric acid used in the production of Trust Chem's merchandise. Because a simple conversion based on concentrations would not provide an accurate value, Commerce found that the *Chemical Weekly* prices were not the best available information, but rather the WTA data was the best option. . . . Thus, **Commerce argues that the WTA data is the appropriate choice, as it is "more specific" than the *Chemical Weekly* data**. . . .

{A}s long as Commerce reasonably explains its choice between two appropriate but imperfect alternatives, the court will not reject the agency's determination, even if the court would have made a different one.

35 CIT 1012, 1016-17 (CIT 2011) (emphases added).

In *Trust Chem*, while WTA data of unknown concentration could "potentially" include 98% concentrated nitric acid input, the Chemical Weekly data for 60% concentration "definitely" excluded the input. As such, between the two imperfect options, the WTA data were relatively more specific as compared to the Chemical weekly data. In contrast, because both coconut charcoal and wood charcoal overlap only partially with the input, neither is "more specific" than the other. *Trust Chem* is therefore distinguishable and Commerce erred reversibly by rejecting wood charcoal, even though its price was representative of the values of lower grades of coal-based carbonized materials. Unlike *Trust Chem*, rejection of wood charcoal HTS 4402.90.9000 results in a distorted SV of the carbonized material input.

Finally, Defendant relies upon the CAFC precedent *SolarWorld Americas, Inc. v. United States* as "holding Commerce's rejection of a more general HS subheading" and arguing that "a more specific classification category is preferred if the record allows for it." Def. Br. at 23. However, *SolarWorld* does not support Defendant's arguments:

Yingli's backsheets are made primarily of polyethylene terephthalate ("PET"). Some of Trina's backsheets are made primarily from PET, and others primarily from ethylene-vinyl acetate ("EVA").

To value Yingli's backsheets and Trina's PET backsheets, Commerce used Thai HTS subheading 3920.62, which covers PET plates and sheets. To value Trina's EVA backsheets, Commerce used Thai HTS subheading 3920.10, which covers plates and sheets of polymers of ethylene (such as EVA). . . . To SolarWorld, Commerce should instead have used Thai HTS subheading 3920.99 (covering plates and sheets of "other" plastics, i.e., those not in any other subheading of 3920, such as 3920.10, 3920.62) for all of Yingli's and Trina's backsheets.

SolarWorld has not met its burden to show error. As Commerce found and SolarWorld does not dispute, there is no HTS number specific to solar-grade backsheets. Commerce explained that it chose HTS subheading 3920.62 for Yingli's backsheets and Trina's PET backsheets because this classification takes into account that the backsheets are comprised primarily of PET. Commerce similarly explained that it chose HTS subheading 3920.10 for Trina's EVA backsheets because this classification is specific to ethylene products (such as EVA). **Commerce rejected classification under HTS subheading 3920.99 because the subheading is not specific to the material**. Commerce's reasonable choice of the more specific HTS categories is supported by substantial evidence.

962 F.3d 1351, 1360-61 (Fed. Cir. 2020) (emphasis added).

In *SolarWorld*, Commerce rejected the non-specific HTS 3920.99, in favor of the more specific HTS 3920.62 (for PET backsheets) and 3920.10 (for EVA backsheets). However, unlike HTS 3920.99, HTS 4402.90.9000 is specific to about half of the input, *i.e.*, lower grades of coal-based carbonized materials. As such, *SolarWorld* impeaches Defendant's arguments and invalidates Commerce's decision to reject HTS 4402.90.9000.

Likewise, Defendant misplaces reliance on *Yingqing* as supporting "Commerce's discretion to have selected a broader HS basket to value a certain input when the respondent had proposed multiple, conflicting possibilities to value the input." Def. Br. at 23. Because the two HTS choices – HTS 4402.90.1000 and HTS 4402.90.9000 – are equivalent to two mutually exclusive subsets of carbonized material input – higher grades and lower grades – they offer "complementary," *not* "conflicting," possibilities. Indeed, under *Yingqing*, Plaintiffs' proposed HTS 4402.90 "choice of an HS basket provision that covers Plaintiffs' {carbonized material} seems like a reasonable" SV choice. 195 F.Supp.3d at 1307.

III.   **COMMERCE UNLAWFULLY VALUED LIQUID CAUSTIC SODA**

Plaintiffs demonstrated that Commerce unlawfully valued their reported **liquid** caustic soda as **solid** sodium hydroxide under HTS 2815.11. Pl. Br. at 26-28. Commerce based this decision on speculation that "something happens to the caustic soda input after its purchase because once the input is applied into the production process, the volume reported is larger than the volume purchased" – based on an improper comparison between purchased quantity and consumption quantity during the POR. *Id*. at 27; IDM at 45. While Defendant claims that "Commerce is not precluded from making inferences based on the evidence," Def. Br. at 29, there is no record support that solid sodium hydroxide was consumed in AR12. "It is well established that speculation does not constitute substantial evidence." *Lucent Techs., Inc. v. Gateway*, Inc., 580 F.3d 1301, 1327 (Fed. Cir. 2009). Beyond surmising that "something happens" based on a flawed comparison, the only proffered support is the reported purity range. IDM at 45; Def. Br. at 28. Such purity does not permit Commerce to disregard the nature of the reported factor of production ("FOP") and to presume – contrary to respondents' reported FOP – that the input was sourced in solid form. Pl. Br. at 28.

Commerce must give credence to the nature of the FOP as reported, unless substantial evidence establishes otherwise. By statute, if Commerce found the reporting of liquid caustic soda deficient, it was required to provide notice and an opportunity to cure. *Id*. at 28; 19 U.S.C. § 1677m(d). Defendant claims that "section 1677m(d) does not apply to the submission of potential {SV} information." Def. Br. at 29. Yet the liquid caustic FOP reporting clearly responded to Section D of the AD Questionnaire that constituted a "request for information," 19 U.S.C. § 1677m(d) – it was **not** "submitted to Commerce on a party's own initiative." *Carbon Activated AR11*, 2021 WL 4938131, *8. The statutory limitation therefore applies and was violated when Commerce: requested FOP information; accepted the reporting of liquid caustic

soda as the input; and then rejected the nature of the reported input and reclassified the FOP in the preliminary results without having provided the requisite notice and opportunity to cure. This Court recently reaffirmed that this statute prevents Commerce from taking adverse action based on Commerce's "perceived deficiencies" in questionnaire responses when – as with the **liquid** caustic soda reported in AR12 – the information provided was "understood . . . to be responsive to Commerce's request." *Bluescope Steel Ltd. v. United States*, 2021 WL 5822714, *9-10 (Nov. 30, 2021); *Hyundai Steel Co. v. United States*, 518 F.Supp.3d 1309, 1324-28 (CIT 2021).

In sum, respondents' reporting of liquid caustic soda as an input, pursuant to Commerce's request for information to provide FOPs, triggered statutory obligations under 19 U.S.C. § 1677m(d). Remand is warranted because Commerce unlawfully, without affording notice of deficiency, valued reported liquid caustic soda under HTS 2815.11 for solid sodium hydroxide.

## IV.   COMMERCE UNLAWFULLY VALUED HYDROCHLORIC ACID

Plaintiffs demonstrated that Commerce unlawfully valued the hydrochloric acid input consumed by Carbon Activated under HTS 2806.10 during the AR12 POR based on an incorrect finding that it was not in an aqueous form. Pl. Br. at 28-31. Defendant echoes the Commerce finding that "the record only demonstrates the purity level" as opposed to whether the input "was in a water solution, a concentrated liquid form, or a different state." Def. Br. at 21-22 (quoting IDM at 40-41). Yet, this finding is inconsistent with longstanding Commerce recognition of the fact that hydrochloric acid purity level inversely correlates to the percentage of "water." Pl. Br. at 29 (quoting *Helical Spring Lock Washers from China*, 73 Fed. Reg. 4175 (Jan. 15, 2008) (final results), IDM Comment 4). Accordingly, Commerce must treat the [                    ] concentrated hydrochloric acid input to have been prepared by adding [                ] water to the 100% pure hydrogen chloride ("HCl") – thereby resulting in an aqueous form of HCl, commercially known as hydrochloric acid. Pl. Br. at 29. Remand is warranted because Defendant

neglected to address this precedent or explain why more information was required to establish that HCl consumed in AR12 was in an aqueous form. *See* Def. Br. at 21-22; "it is well-established that 'an agency action is arbitrary when the agency offer{s} insufficient reasons for treating similar situations differently.'" *SKF USA, Inc. v. United States*, 263 F.Supp.1369, 1383 (Fed. Cir. 2001).

Remand is further warranted because Defendant failed to address evidence establishing that the hydrochloric acid input was in an aqueous form. Defendant regurgitates Commerce's rationale that "certain general information related to HCl published by PubChem . . . was of no further help to respondents because '{respondents} fail to provide an explanation as to how these documents tie to the {SV} and actual consumption of the HCl that they reported for the {POR}.'" Def. Br. at 22 (quoting IDM at 41). However, contrary to Defendant's arguments, PubChem confirms that HCl may exist in either a pure concentrated anhydrous form or in a diluted aqueous solution known as hydrochloric acid (which is expressed by its concentration levels). Pl. Br. at 29. Notably, PubChem confirms that "**hydrochloric acid is the aqueous (water-based) solution of hydrogen chloride gas (HCl)**." Final SV Comments by DJAC and CA Tianjin (Mar. 30, 2020), P.R. 197-230 ("Final SV Submission"), Exhibit 6B at 1/74 (emphasis added). PubChem further elucidates that **pure hydrogen chloride "upon contact with water**, . . . **forms hydrochloric acid**." *Id.* (emphasis added). Thus, PubChem refutes Defendant's contention and establishes that the [          ] concentrated hydrochloric acid input consumed in AR12 was purchased in an aqueous form.

Petitioners do not contest that the concentration or purity percentage of hydrochloric acid automatically means that it is in an aqueous form. Rather, they surmise that Plaintiffs did not purchase an aqueous form of hydrochloric acid, suggesting that the record allegedly evidences

"only the purity level for HCl used during production – and not the particular state or form of that HCl when it was acquired as an input." Pet. Br. at 3. And Petitioner further claims "that the HCL . . . underwent processing . . . after it was 'procured.'" *Id*. at 3-4. However, these claims should be outright rejected since they were not articulated by Commerce (despite having been raised by Petitioners). *See* IDM at 38-40. Moreover, by contrast with its hydrochloric acid finding based exclusively on purity levels, Commerce employed this exact "internal post-purchase processing" rationale to value liquid caustic soda. IDM at 45 ("something happens to the . . . input after its purchase because once the input is applied into the production process, the volume reported is larger than the volume purchased.") Petitioners' claimed record support for hydrochloric acid valuation should therefore be disregarded: "this court will not accept Defendant-Intervenors' *post hoc* rationale as a basis for upholding a final determination." *CITIC Trading Co. v. United States*, 27 CIT 356, 368 (2003).

Moreover, Petitioners' arguments are unsupported by record evidence. They fail to substantiate their claim that hydrochloric acid's purity level was based on "the October 2018 strength tests of HCl in its final strength *for application*, rather than the state in which Carbon Activated's supplier purchased the HCl." Pet. Br. at 3 (emphasis in original). Contrary to Petitioners' claim that "{t}he Department correctly concluded that this documentation was insufficient to establish that the HCl input that was 'procured and consumed' by the respondents' suppliers was necessarily in aqueous form – as opposed to solid form," *id*., Commerce simply reasoned that the purity level on the test report did not imply hydrochloric acid's aqueous form –  without doubting that Plaintiffs' purchased hydrochloric acid of [                    ] concentration.

Petitioners wrongly claim that "[      ] purchased [      ] metric tons of HCl, but consumed nearly [      ] that volume in the course of its production operations." *Id*. at 4. Record evidence shows that the total consumption of hydrochloric acid was [      ] metric tons – almost equal to its POR purchase. Carbon Activated Section D Questionnaire Response Part I (Sept. 19, 2019), C.R. 60-61, P.R. 102, Attachment A, Exhibit D-6.4. Consequently, this Court should reject Petitioners' speculative argument that "[      ] metric tons of water" was used to dilute HCl "thereby resulting in a reported consumption volume that is [          ] than the volume purchased." Pet. Br. at 4.

Plaintiffs demonstrated that Malaysian "single HTS classification – 2806100000 for 'Hydrogen Chloride (Hydrochloric Acid); Chlorosulphuric acid' – . . . covers both forms of HCl: (1) anhydrous or liquid form (without added water); and (2) aqueous solution (with added water)" and is **also distorted by chlorosulphuric acid**. Pl. Br. at 30. Accordingly, Plaintiffs established the threshold precondition for using the product-specific HTS data covering the exact input, aqueous form of HCl – *i.e.*, hydrochloric acid – reported from a secondary surrogate country, Brazil, in accordance with longstanding Department practice where such data are not available or unreliable in the primary surrogate country. Pl. Br. at 30 (citing *Elkay Mfg. Co. v. United States*, 180 F.Supp.3d 1245, 1253 (CIT 2016); *Wooden Bedroom Furniture from China*, 73 Fed. Reg. 49,162 (Aug. 20, 2008) (final results), IDM Comment 12). Accordingly, despite Defendant's protestations, Plaintiffs in fact "established a{} . . . reason to depart from using . . . data from the primary surrogate country." Def. Br. at 22.

Therefore, remand is warranted because Commerce unlawfully selected a basket category and distorted Malaysian HTS 2806.10 ("Hydrogen Chloride (Hydrochloric Acid); Chlorosulphuric acid") instead of the product-specific Brazilian HTS 2806.10.20 ("Hydrogen

Chloride (Hydrochloric Acid), in aqueous solution") to value aqueous hydrochloric acid.

## V.     **COMMERCE UNLAWFULLY VALUED STEAM**

Plaintiffs demonstrated that Commerce unlawfully valued their reported steam as liquefied gas under HTS 2711.11, as it should have been valued "{i}n a gaseous state" under HTS 2711.21." Pl. Br. at 31-34. In an attempt to rebut Plaintiffs' demonstration that steam is defined as gas, Defendant reinforces this point by providing additional dictionary definitions of steam as "an invisible gas or vapor" as well as "mist." Def. Br. at 30 (quoting DICTIONARY.COM; WEBSTER'S DICTIONARY). In turn, "vapor" is defined as "**a substance in a gaseous state** as distinguished from the liquified or solid state," and "mist" is defined as "a suspension of a finely divided liquid **in a gas**." MERRIAM-WEBSTER.COM (emphases added). With steam being universally defined as gas, there is no support for Defendant's claim that "'steam' would appear to straddle the line between liquid and gas." Def. Br. at 30. Commerce therefore should have valued the steam consumed in AR12 under HTS 2711.21, in accordance with Department practice. *Crystalline Silicon Photovoltaic Cells from China*, 80 Fed. Reg. 40,998 (July 7, 2015) (final results), IDM Comment 19; Final SV Submission Exhibit 8B.

Plaintiffs further demonstrated that Commerce, beyond improperly using the non-specific Malaysian HTS 2711.11, failed to address the reliability concerns with those data. Pl. Br. at 32-33. Because the domestic prices of natural gas during the POR were shown to be lower than the import prices of natural gas, such import data are unreliable – as this Court has long recognized. *Id*. at 33-34; *Yantai Oriental Juice Co. v. United States*, 26 CIT 605, 617 (2002). Rather, Commerce merely decreed that "the domestic prices . . . are not supported by the underlying methodology." IDM at 33. Defendant now claims that "respondents failed to support the methodology" and claims that Plaintiffs' "post-hoc explanation is untimely." Def. Br. at 31. Yet Plaintiffs merely informed this Court that the domestic price calculation was "based on {}

authoritative . . . and publicly available . . . information" with citations to record evidence;
Plaintiffs did not provide a new methodological explanation as Defendant claims. Pl. Br. at 33.
Remand is warranted because Commerce improperly failed to identify any methodological flaws
or otherwise engage Plaintiffs' demonstration that domestic price data rendered HTS 2711.11
unreliable, which, in turn, rendered its valuation of steam unsupported by substantial evidence.

## VI.   COMMERCE UNLAWFULLY VALUED ANTHRACITE COAL

Plaintiffs demonstrated that Commerce unlawfully valued their anthracite coal under
Malaysian HTS 27011.11 rather than the more specific Russian HTS 2701.11.1000, which
provided data that were more representative of a broad market average. Pl. Br. at 34-37. It is
undisputed that only Russian data capture the volatility content of Plaintiffs' anthracite coal;
Commerce merely questions whether it "is one of the most significant product characteristics."
IDM at 28. Nor does Commerce dispute that the Russian import quantity was substantially
greater, claiming only that the Malaysian data are "sufficiently representative." *Id*. at 29.
Accordingly, it cannot be said that the datasets are "fairly equal" – precluding Commerce from
resorting to its preference to value all inputs from a single country." *Peer Bearing Co.-
Changshan v. United States*, 752 F.Supp.2d 1353, 1373 (CIT 2011). Indeed, as Defendant
acknowledges, this "regulatory preference, standing alone, 'cannot suffice as adequate reasoning
if it is the only factor that Commerce considers.'" *Id*.; Def. Br. at 19. Yet that is essentially what
Commerce did in AR12 by recognizing the superiority of Russian data to value anthracite coal
but nonetheless using inferior Malaysian data through repeated emphasis on its "well-established
practice . . . to rely upon the primary surrogate country for all SVs." IDM at 27-28.

Defendant further misplaces reliance on the red herring claim that Commerce may
employ broader basket HTS subheadings in its surrogate valuation. Def. Br. at 20. The cases
cited by Defendant involve instances where the more specific data were:

- "aberrational and unreliable." *Writing Instrument Mfrs. Ass'n v. United States*, 984 F.Supp.629, 640 (CIT 1997), *aff'd*, 178 F.3d 1311 (Fed. Cir. 1998);

- inapplicable because "the record lacks evidence regarding" the criterion for which greater specificity was offered. *Carbon Activated ARI1*, 2021 WL 4938131, *4; and

- not selected because the less specific data offered greater "contemporaneity." *US&F*, 469 F.Supp.3d at 1398-99.

By contrast, the perfectly viable Russian anthracite coal data should have been used in AR12 because they alone cover Plaintiffs' input's volatility content, whereas the Malaysian data are inferior in all respects.

## VII. COMMERCE UNLAWFULLY SELECTED MALAYSIAN BRAVO 2018 FINANCIAL STATEMENTS

Plaintiffs demonstrated that Commerce unlawfully selected an insufficiently disaggregated and unreliable 2018 Malaysian Bravo Green Sdn. Bhd. ("Bravo") financial statements that yielded distorted financial ratios. Pl. Br. at 37-47. Conversely, Commerce improperly rejected qualitatively superior 2018 financial statements of Russian JSC Sorbent ("JSC") and Romanian Romcarbon, which both yield undistorted and reliable ratios. *Id*.

First, Defendant claims that Plaintiffs "fail to demonstrate that {the Bravo 2018 statements are} unreliable" and regurgitates Commerce's conclusory finding that while it "did not provide line-item break downs, . . . {it} nevertheless did 'provide sufficient information to calculate surrogate ratios.'" Def. Br. at 34 (citation omitted). Contrary to Defendant's assertion, Plaintiffs demonstrated that Bravo's basket "cost of sales" together with its anemic expense breakouts resulted in potentially distorted overhead, selling, general, and administrative expenses ("SG&A"), and profit ratios. Pl. Br. at 38-42. Defendant's argument is impeached by settled agency precedent with respect to financial statements such as those of Bravo:

PUBLIC VERSION

> Petitioners categorized the total cost of sales amount, other than depreciation, entirely under total materials, labor, and energy expenses, which is the denominator used to calculate the manufacturing overhead ratio. However, we find that **it is possible that a portion of this cost of sales amount, other than depreciation, may pertain to manufacturing overhead or change in traded/finished goods**. . . . The Department classifies manufacturing overhead and change in traded/finished goods in the denominator used to calculate the SG&A ratio. . . . the manufacturing overhead and change in finished goods amounts that would otherwise be included in the denominator to calculate the SG&A ratio are instead being assigned to the denominator to calculate the overhead ratio. We find that this approach creates distortive financial ratios.

*Citric Acid and Certain Citrate Salts from China*, 80 Fed. Reg. 77,323 (Dec. 14, 2015) (final results), IDM Comment 4 (emphasis added). Neither Commerce, in its IDM, nor Defendant explains how the similar Bravo financial statements with a basket "cost of sales" nonetheless yield reliable overhead and SG&A ratios.

Second, in support of Commerce's "sufficient information" rationale, Defendant makes an extraordinary claim that Bravo's "statements do itemize 'Cost of sales' into six cost elements: (i) raw materials; (ii) labor; (iii) energy; (iv) manufacturing overheads; (v) change in finished goods inventory; and (vi) traded goods." Def. Br. at 35. This claim is directly contrary to record evidence showing a single basket category line item – "cost of sales" – in Bravo's statements, allocated entirely to raw materials. Commerce Final Surrogate Values Memorandum (Feb. 12, 2021), P.R. 306-07, Excel workbook tab: "Bravo2018."

Third, Defendant argues that Commerce's decision was properly based on its "preferences" and "broad discretion." Def. Br. at 35. However, Commerce is not afforded discretion to avoid addressing Plaintiffs' arguments regarding Bravo's tell-tale data flaws resulting in distorted ratios, and, conversely, the vastly superior financial statements of JSC and Romcarbon affording reliable ratios. *See Catfish Farmers*, 37 CIT at 742.

Fourth, Commerce failed to reconcile its selection of Bravo with its diametrically opposite findings in AR11 for similar Malaysian financial statements. Pl. Br. at 41-42. Defendant misplaces reliance on *Timken Co. v. United States*, 968 F.Supp.2d 1279, 1290 (CIT 2014), in claiming that Commerce "'is not required to justify its determination in terms of past alternatives, as long as it acts reasonably.'" Def. Br. at 36. *Timken* does not support Defendant since Commerce failed to articulate how it acted reasonably in selecting flawed Bravo statements, rejecting superior alternatives, and contradicting settled precedent.

Fifth, Defendant wrongly claims that "Commerce has provided a reasoned explanation for its exercise of discretion to choose between alternative imperfect datasets." Def. Br. at 36. This assertion is directly contrary to the record, showing Commerce resorted to a disjunctive analysis – selecting qualitatively inferior and distorted Bravo statements based simply on its single surrogate country preference, entirely bypassing the qualitatively superior alternatives from Russia and Romania – rather than the judicially mandated conjunctive side-by-side comparative analysis of the available data choices. *CP Kelco US, Inc. v. United States,* 2016 WL 1403657, *2 (CIT Apr. 8, 2016) ("Commerce, by bifurcating its analysis into two steps, end-ran its obligation to base its decision in substantial evidence. . . . Given that both sets of financial statements had different flaws, Commerce "should have compared the two side-by-side").

Since Commerce provided no "reasoned explanation" to support the unreliable Bravo statements over reliable alternative statements from approved secondary surrogate countries, Defendant's reference to Commerce's discretionary authority is moot and unavailing. *See Jinan Yipin Corp.,* 800 F.Supp.2d 1226. Finally, Defendant misplaces reliance on Commerce's *Fabricated Structural Steel* investigation because, unlike that proceeding, in this case there are "other useable financial statements on the record" that Commerce simply ignored. Def. Br. at 36.

PUBLIC VERSION

In sum, remand is warranted because Commerce unlawfully selected the inferior and distorted Malaysian Bravo statements, entirely overlooking the superior statements of Russian JSC and Romanian Romcarbon.

## **CONCLUSION**

For the foregoing reasons and those in their Opening Brief, Plaintiffs respectfully request that this Court remand the *Final Results* for Commerce's reconsideration.

Respectfully submitted,

*/s/ Dharmendra N. Choudhary*
Francis J. Sailer
Dharmendra N. Choudhary
Jordan C. Kahn

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP
1201 New York Ave., NW, Suite 650
Washington, DC 20005

*Counsel to Plaintiffs Carbon Activated Tianjin Co. Ltd., Carbon Activated Corporation, and Datong Juqiang Activated Carbon Co., Ltd., and Plaintiff-Intervenors Beijing Pacific Activated Carbon Products Co., Ltd., Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd., Ningxia Mineral & Chemical Limited, and Shanxi Sincere Industrial Co., Ltd.*

Dated: March 14, 2022

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement. The word count for Plaintiffs' Reply Brief, as computed by Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt's word processing system Microsoft Word 2007, is 6,989 words, less than the 7,000 word limit.

*/s/ Jordan C. Kahn*

*Counsel to Plaintiffs Carbon Activated Tianjin Co. Ltd., Carbon Activated Corporation, and Datong Juqiang Activated Carbon Co., Ltd., and Plaintiff-Intervenors Beijing Pacific Activated Carbon Products Co., Ltd., Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd., Ningxia Mineral & Chemical Limited, and Shanxi Sincere Industrial Co., Ltd.*

Dated: March 14, 2022