Slip Op. 22-89

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| CARBON ACTIVATED TIANJIN CO., LTD., CARBON ACTIVATED CORPORATION, DATONG JUQIANG ACTIVATED CARBON CO., LTD., SHANXI INDUSTRY TECHNOLOGY TRADING CO., LTD., DATONG MUNICIPAL YUNGUANG ACTIVATED CARBON CO., LTD. and BEIJING PACIFIC ACTIVATED CARBON PRODUCTS CO., LTD., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> and <br><br> CALGON CARBON CORPORATION and CABOT NORIT AMERICAS, INC., <br><br> Defendant-Intervenor. | Before: Mark A. Barnett, Chief Judge <br> Court No. 21-00131 |

## OPINION AND ORDER

[Sustaining in part and remanding in part the final results of the twelfth administrative review of the antidumping duty order on certain activated carbon from the People's Republic of China.]

Dated: August 8, 2022

Dharmendra N. Choudhary, Francis J. Sailer, and Jordan C. Kahn, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of Washington, DC, for Plaintiffs.

Mollie L. Finnan, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for Defendant United States.  With her on the brief were Brian M. Boynton, Acting Assistant Attorney General, Patricia M.

McCarthy, Director, and Claudia Burke, Assistant Director.  Of counsel on the brief was Ashlande Gelin, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

John M. Herrmann, R. Alan Luberda, and Melissa M. Brewer, Kelley Drye & Warren LLP, for Defendant-Intervenors Calgon Carbon Corporation and Cabot Norit Americas, Inc.

Barnett, Chief Judge: This matter is before the court following the U.S.

Department of Commerce's ("Commerce" or "the agency") final results in the twelfth

administrative review ("AR12") of the antidumping duty ("ADD") order on certain

activated carbon from the People's Republic of China ("China") for the period of review

("POR") April 1, 2018, through March 31, 2019.  *See Certain Activated Carbon From the*

*People's Republic of China*, 86 Fed. Reg. 10,539 (Dep't Commerce Feb. 22, 2021)

(final results of antidumping admin. review, final determination of no shipments, and

final rescission of admin. review, in part; 2018–2019) ("*Final Results*"), ECF No. 32-3,

and accompanying Issues and Decision Mem., A-570-904 (Feb. 12, 2021) ("I&D

Mem."), ECF No. 32-2.[1]

Plaintiffs Carbon Activated Tianjin Co., Ltd., Carbon Activated Corporation,

Datong Juqiang Activated Carbon Co., Ltd., Shanxi Sincere Industrial Co., Ltd., Datong

Municipal Yunguang Activated Carbon Co., Ltd., and Beijing Pacific Activated Carbon

---

[1] The administrative record filed in connection with the *Final Results* is divided into a Public Administrative Record ("PR"), ECF No. 32-4, and a Confidential Administrative Record ("CR"), ECF No. 32-5.  Parties filed joint appendices containing record documents cited in their briefs.  *See* Public J.A., ECF Nos. 44 (Vol. I; Tabs 1–11), 44-1 (Vol. II; Tab 12), 44-2 (Vol. III; Tabs 13–18), 44-3 (Vol. IV; Tab 19), 44-4 (Vol. V; Tabs 20–37); Confidential J.A. ("CJA"), ECF Nos. 43 (Vol. I; Tabs 1–12), 43-1 (Vol. II; Tabs 13–18), 43-2 (Vol. III; Tab 19), 43-3 (Vol. IV; Tabs 20-37).  Citations are to the confidential joint appendices unless stated otherwise.

Products Co., Ltd. (collectively, "Plaintiffs" or, in the administrative proceeding, "Respondents"), challenge Commerce's selection of surrogate values for bituminous coal, anthracite coal, hydrochloric acid, carbonized materials, caustic soda, and steam, along with the selection of surrogate financial ratios.  *See* Confidential Pls.' Mot. for J. on the Agency R. Pursuant to Rule 56.2, and accompanying Mem. of Law in Supp. of Pls.' Mot. for J. on the Agency R. Pursuant to USCIT Rule 56.2 ("MJAR"), ECF No. 36; Confidential Pls.' Reply to Def. and Def.-Int.'s Resps. to Pls.' Rule 56.2 Mot. for J. on the Agency R. ("Pls.' Reply"), ECF No. 41.

Defendant United States ("the Government") and Defendant-Intervenors Calgon Carbon Corporation and Cabot Norit Americas, Inc. (together, "Calgon" or, in the administrative proceeding, "Petitioners") filed response briefs in support of Commerce's determinations—with Calgon focused solely on the valuation of hydrochloric acid.  *See* Def.'s Resp. to Pls.' Mot. for J. on the Agency R. ("Def.'s Resp."), ECF No. 38; Confidential Def.-Ints.' Resp. in Opp'n to Pls.' Mot. for J. on the Agency R. ("Def.-Ints.' Resp."), ECF No. 39.

For the reasons discussed herein, the court sustains in part and remands in part the *Final Results*.

## BACKGROUND

### I.      Proceedings Before Commerce

In June 2019, Commerce initiated AR12 of the ADD order on activated carbon from China.  *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 84 Fed. Reg. 27,587, 27,589–90 (Dep't Commerce June 13, 2019), PR 151, CJA Tab

13.  In July 2019, Commerce selected Carbon Activated Tianjin Co., Ltd. ("Carbon

Activated") and Datong Juqiang Activated Carbon Co., Ltd. ("DJAC") as mandatory

respondents.  Selection of Respondents for Individual Review (July 1, 2019) at 1, PR

23, CJA Tab 1.  Carbon Activated and DJAC responded to the Department's ADD

questionnaires by reporting their factors of production[2] and provided surrogate value

information as well as information rebutting the surrogate value information provided by

Petitioners.  *See Certain Activated Carbon From the People's Republic of* China, 85

Fed. Reg. 23,947 (Dep't Commerce Apr. 30, 2020) (prelim. results of antidumping duty

admin. review, intent to rescind the review in part, and prelim. determination of no

shipments; 2018–2019) ("*Preliminary Results*"), PR 271, CJA Tab 28, and

accompanying Decision Mem. for the Prelim. Results at 2, A-570-904 (Apr. 24, 2020)

("Prelim. Mem."), PR 259, CJA Tab 26 (describing questionnaire process).

Because Commerce considers China to be a nonmarket-economy country for the

purposes of the unfair trade laws, the agency determines normal value by valuing the

factors of production used in producing the subject merchandise, general expenses,

profit, and "the cost of containers, coverings, and other expenses" in a surrogate market

economy country.  19 U.S.C. § 1677b(c)(1) (2018).[3]  In selecting these "surrogate

values," Commerce must, "to the extent possible," use data from a market economy

---

[2] The factors of production "include, but are not limited to--(A) hours of labor required, (B) quantities of raw materials employed, (C) amounts of energy and other utilities consumed, and (D) representative capital cost, including depreciation."  19 U.S.C. § 1677b(c)(3).

[3] Citations to the Tariff Act of 1930, as amended, are to Title 19 of the U.S. Code, and references to the U.S. Code are to the 2018 edition unless otherwise specified.

country that is at "a level of economic development comparable to that of the nonmarket economy country" and is a "significant producer[] of comparable merchandise." *Id.* § 1677b(c)(4).

In the underlying proceeding, Commerce identified six potential surrogate countries: Brazil, Bulgaria, Malaysia, Mexico, Russia, and Turkey.  Request for Cmts. Re: (1) Economic Development, (2) Surrogate Country and (3) Surrogate Value Information (Sept. 20, 2019), Attach. at 2, PR 104, CJA Tab 6.  Respondents and Petitioners submitted comments regarding the surrogate country selection process; Petitioners supported the choice of Malaysia or Mexico as the primary surrogate country, while Respondents advocated for the use of Mexico, Russia, or Brazil.  Pet'rs' Cmts. on Surrogate Country Selection at 6, PR 115, CJA Tab 8; Pet'rs' Submission of Surrogate Values at 2, PR 121–22, CJA Tab 10.

On April 30, 2020, Commerce published the preliminary results of AR12. *Preliminary Results*.  Therein, Commerce selected Malaysia as the primary surrogate country.  Prelim. Mem. at 17.

After addressing challenges to the preliminary calculations by Respondents and responses by Petitioners, Commerce finalized its ADD rates at $1.83/kilogram ("kg") for Carbon Activated, $0.38/kg for DJAC, and $0.65/kg for the non-examined separate rate respondents.  *Final Results*, 86 Fed. Reg. at 10,540.  Commerce continued to rely on Malaysia as the primary surrogate country for the valuation of all material inputs.  *See, e.g.*, I&D Mem. at 28 (identifying Malaysia as the primary surrogate country in the context of Commerce's valuation of anthracite coal).  The agency selected Malaysian

company Bravo Green Sdn. Bhd.'s ("Bravo Green") 2018 financial statements to use for calculating financial ratios.  *Id.* at 34.

Plaintiffs subsequently challenged the *Final Results* before this court.  *See* Compl., ECF No. 12.  In particular, Plaintiffs challenge Commerce's surrogate value selections for (1) bituminous coal; (2) anthracite coal; (3) hydrochloric acid; (4) caustic soda; (5) steam; (6) coal-based carbonized materials; and (7) financial ratios.  *See* MJAR at 1–3.

## II.    Legal Framework for Surrogate Country and Surrogate Value Selection

Commerce generally values all factors of production in a single surrogate country, referred to as the "primary surrogate country."  *See* 19 C.F.R. § 351.408(c)(2) (excepting labor); *Jiaxing Brother Fastener Co. v. United States* ("*Jiaxing II*"), 822 F.3d 1289, 1294 & n.3 (Fed. Cir. 2016).  *But see Antidumping Methodologies in Proceedings Involving Non-Market Economies: Valuing the Factor of Production: Labor*, 76 Fed. Reg. 36,092, 36,093–94 (Dep't Commerce June 21, 2011) (expressing a preference to value labor based on industry-specific labor values from the primary surrogate country).  The court has acknowledged this practice as a way "to minimize distortion."  *Tri Union Frozen Prods., Inc. v. United States*, 41 CIT __, __, 227 F. Supp. 3d 1387, 1400 (2017); *see also Carbon Activated Tianjin Co. v. United States*, 45 CIT __, __, 547 F. Supp. 3d 1310, 1318 (2021) (also discussing Commerce's preference to value all factors of production in a single surrogate country).

To select a primary surrogate country, Commerce has adopted a four-step approach:

> (1) the Office of Policy ("OP") assembles a list of potential surrogate countries that are at a comparable level of economic development to the [non-market economy] country; (2) Commerce identifies countries from the list with producers of comparable merchandise; (3) Commerce determines whether any of the countries which produce comparable merchandise are significant producers of that comparable merchandise; and (4) if more than one country satisfies steps (1)-(3), Commerce will select the country with the best factors data.

*Jiaxing II*, 822 F.3d at 1293 (explaining that the primary surrogate country is selected based on "the reliability and completeness of the data in the similarly-situated surrogate countries and [Commerce] generally selects the one with the best data as the primary surrogate country"); *see also* Import Admin., U.S. Dep't of Commerce, Non-Market Economy Surrogate Country Selection Process, Policy Bulletin 04.1 (2004), https://enforcement.trade.gov/policy/bull04-1.html (last visited August 8, 2022).

The agency will "only resort to a secondary surrogate country if data from the primary surrogate country are unavailable or unreliable." *Jiaxing Brother Fastener Co. v. United States* ("*Jiaxing I*"), 38 CIT 1404, 1412, 11 F. Supp. 3d 1326, 1332–33 (2014) (citations omitted), *aff'd*, *Jiaxing II*, 822 F.3d 1289.

As previously noted, in selecting surrogate values for the factors of production, Commerce must, "to the extent possible," use "the best available information" from a market economy country or countries that are economically comparable to the nonmarket economy country and are "significant producers of comparable merchandise." 19 U.S.C. § 1677b(c)(4). Commerce, in selecting surrogate values, "generally selects, to the extent practicable, surrogate values that are publicly available, are product-specific, reflect a broad market average, and are contemporaneous with the period of review." *Jiaxing II*, 822 F.3d at 1293 (citing *Qingdao Sea-Line Trading Co. v.*

*United States*, 766 F.3d 1378, 1386 (Fed. Cir. 2014)); 19 C.F.R. § 351.408(c)(1), (4) (directing Commerce to select "publicly available," "non-proprietary information" to value factors of production and "[m]anufacturing overhead, general expenses, and profit"). Commerce also prefers surrogate values that are input-specific and tax- and duty-exclusive.  *See* Policy Bulletin 04.1; *Jiaxing II*, 822 F.3d at 1293.

There is no hierarchy for applying the surrogate value selection criteria.  *See, e.g.*, *United Steel & Fasteners, Inc. v. United States*, 44 CIT __, __, 469 F. Supp. 3d 1390, 1398–99 (2020); *Hangzhou Spring Washer Co. v. United States*, 29 CIT 657, 672, 387 F. Supp. 2d 1236, 1250–51 (2005) (stating that the court "does not decide . . . whether contemporaneity should be valued over specificity").  Commerce therefore has discretion to choose which criteria to emphasize in selecting the "best available information" so long as it does so in conformity with the substantial evidence standard. *See QVD Food Co. v. United States*, 658 F.3d 1318, 1323 (Fed. Cir. 2011).  Commerce must articulate a "rational and reasonable relationship" between the surrogate value and the factor of production it represents.  *Globe Metallurgical Inc. v. United States*, 28 CIT 1608, 1622, 350 F. Supp. 2d 1148, 1160 (2004) (citing *Olympia Indus., Inc. v. United States*, 22 CIT 387, 390, 7 F. Supp. 2d 997, 1001 (1998)).  Due to the discretionary, fact-specific nature of Commerce's determination, the court does not address "whether the information Commerce used was the best available, but rather whether a reasonable mind could conclude that Commerce chose the best available information." *Jiaxing II*, 822 F.3d at 1300–01.

"The burden of creating an adequate record lies with the interested parties, not with Commerce."  *Qingdao Sea-Line Trading Co.,*766 F.3d at 1386.  Furthermore, the court has upheld Commerce's practice of requiring a party to establish on the record any claims for a particular surrogate value and establish on the record any argument that data are aberrational or unreliable.  *See, e.g.*, *Jinan Farmlady Trading Co. v. United States*, 41 CIT __, __, 228 F. Supp. 3d 1351, 1356–57 (2017).

JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to section 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) and 28 U.S.C. § 1581(c) (2018).  The court will uphold an agency determination that is supported by substantial evidence and otherwise in accordance with law.  19 U.S.C. § 1516a(b)(1)(B)(i).

DISCUSSION

For each factor of production, Commerce found that the data it selected was contemporaneous with the period of review, publicly available, product-specific, tax-exclusive, and representative of a broad market average.  I&D Mem. at 17–18, 23–24, 27, 36, 40, 43, 44, 47.  The agency also cited its "regulatory preference" to value all factors of production from a single surrogate country to support its choice of Malaysian data for each factor of production.  *Id.* at 40, 47.

Plaintiffs challenge Commerce's valuation of six factors of production and selection of the financial statements for the calculation of financial ratios as unsupported by substantial evidence and otherwise not in accordance with law.  *See generally* MJAR.  The Government contends that Commerce properly exercised its discretion by

choosing Malaysian data for each of the seven factors.  Def.'s Resp. at 13; *cf.* Def.-Ints.'

Resp. at 2–4 (discussing hydrochloric acid).

**I.      Bituminous Coal**

Commerce valued all bituminous coal using Malaysian import data under the

Harmonized System ("HS") heading 2701.12, which covers "bituminous coal, not

agglomerated," and constitutes a so-called "basket category" including both coking and

non-coking coal.  I&D Mem. at 16.

Respondents contended that only non-coking coal was used, and that

Commerce therefore should have selected two more-specific subheadings—

2701.12.9000, "bituminous coal: other than coking coal," and 2701.19, "other coal,"—

depending on the supplier or manufacturer.  *See id.* at 13–15.  Respondents argued

that their records indicated use of "Bituminous coal, *not* metallurgical grade," and that

record evidence further indicated that metallurgical grade coal is coking coal.  *Id.* at 13

(emphasis added).  While Respondents conceded that Carbon Activated's supplier

listed one of its inputs as "coking bituminous coal," they asserted that this was a

mistake, as confirmed by a signed declaration to that effect.  *Id.* at 13–14 & n.75 (citing

Case Br. of [DJAC], [Carbon Activated] and Carbon Activated Corp. (July 20, 2020) at 8,

PR 285, CJA Tab 29).

Respondents highlighted evidence describing the transactions, along with an

"independent article" explaining that semi-soft coking coal is not metallurgical coal;

"washed coal" is generally non-coking coal; and coking coal is not suitable for producing

the subject merchandise.  *Id.* at 14.  Respondents additionally noted that the record

showed that DJAC's supplier used coal with the same moisture, ash, and volatility content as Carbon Activated's supplier, which in their view indicated that coal from DJAC's supplier was also non-coking coal.  *Id.* at 14.  They argued that Commerce should have valued Carbon Activated's coal using HS 2701.12.9000 and DJAC's bituminous coal, with its calorific value of less than 5,833 kilocalories ("kcal")/kg, using HS 2701.19.  *Id.* at 15.

Commerce found that "the information on the record [was] insufficient to support the mandatory respondents' assertion that [the two more-specific subheadings were] more appropriate . . . to value their bituminous coal input."  *Id.* at 17.  Commerce also found that the "English translations on the purchase invoices only indicated 'non-coking bituminous coal 1,' 'non-coking bituminous coal 2,' and 'bituminous coal 3.'"  *Id.* at 18. Underscoring the ambiguity in the record due to invoice discrepancies and translation issues, Commerce stated that "because the record lacks sufficient evidence to support the selection of a more specific HS category within HS 2701.12 to value the bituminous coal used by [Carbon Activated's supplier] or [DJAC's] supplier, or [to] depart from our preliminary selection of HS 2701.12 to value [DJAC's] bituminous coal input, we continue to use HS 2701.12 to value the mandatory respondents' bituminous coal input."  *Id.* at 18.  Regarding DJAC's inputs, Commerce found the declaration from the general manager to be a "mere attestation" that "does not specify the calorific value of the bituminous coal used or any other specification of the coal used which provides distinguishing characteristics for [surrogate value] selection purposes."  *Id.* at 19.

### a. Parties' Contentions

Plaintiffs contend that because they did not consume coking coal, HS 2701.12 should not have been used to value their bituminous coal because it "fails to provide a product specific and accurate [surrogate value] for the specific non-coking bituminous coal input." MJAR at 11. Similarly, they assert that the values for HS 2701.12 are "distorted by coking coal," making it insufficiently specific to value Plaintiffs' inputs. *Id.* at 10–11; Pls. Reply at 3. Plaintiffs argue that the suppliers' coal inputs were non-coking coal and above the threshold calorific value necessary for valuation under HS 2701.12.9000, and that DJAC's additional coal input of less than the threshold calorific value was non-coking and should have been valued using HS 2701.19. MJAR at 11. Moreover, Plaintiffs contend that "[i]f Commerce required industry standards to value this [factor of production], it was required by statute to 'inform' Carbon Activated 'of the nature of the deficiency' and 'provide . . . an opportunity to remedy or explain the deficiency." *Id.* at 12 (citing 19 U.S.C. § 1677m(d)); *see also* Pls.' Reply at 3.

The Government contends that Commerce's use of the basket category was within the agency's discretion. Def.'s Resp. at 14. Specifically, the Government notes that the record evidence was insufficient to justify departing from the basket category due to translation issues, mis-labeling, lack of test results demonstrating the non-coking quality of the coal, and Respondents' failure to cite to industry standards to demonstrate the category of coal being used. *Id.* at 14–16 (citing I&D Mem. at 17–19). In response to Plaintiff's argument that Commerce was obligated to notify and provide an opportunity to remedy the deficiency in the record, the Government states that "section

1677m(d) does not apply to the submission of potential surrogate value information." *Id.* at 16–17.

In response to the Government's argument that Plaintiffs' evidence was unclear and inconsistent, Plaintiffs contend that their input descriptions were "consistent (and not 'conflicting')" such that the Government's concerns with that evidence are meritless. Pls.' Reply at 3–5. Plaintiffs assert that the sworn declarations "establishe[d] a bright line distinction between coking and non-coking coal" such that industry standards were unnecessary, but that if Commerce required additional documentation, it should have informed Plaintiffs of that requirement. *Id.* at 6. Lastly, Plaintiffs compare this review to previous and subsequent reviews to support their assertion that Commerce's valuation of bituminous coal was erroneous. *Id.* at 8.

### b. Commerce's Decision To Use the Basket Category Is Supported by Substantial Evidence

While Respondents characterized the record evidence as "imply[ing]" the use of "non-coking coal," I&D Mem. at 17, and Plaintiffs here likewise contend that the record is clear in this regard, MJAR at 11; Pls.' Reply at 6, Commerce examined the record evidence and found that it could not evaluate the appropriateness of a more-specific subheading, *see* I&D Mem. at 18. The discrepant translations of the purchase invoice descriptions led Commerce to conclude that the documents were unreliable. *Id.* (citations omitted). The court finds that Commerce sufficiently examined the invoice descriptions and translations and considered the reliability of their contents. The agency explained how it interpreted this information and provided reasoning for why the

invoices and their translations did not support Respondents' claims for a more-specific surrogate value.[4]

It is the respondents' responsibility to build the record to support their desired outcome, and they have failed to do so here.  *See QVD Food Co.*, 658 F.3d at 1324. While Respondents submitted sworn declarations attesting to the use of non-coking coal during production, Commerce found that these declarations "did not provide any specific standard which Commerce [could] use to determine the specificity of the HS subheading preferred by the mandatory respondents."  I&D Mem. at 18.  Thus, Commerce concluded that Respondents did not "fulfil[] their obligation to meet [their] burden [of constructing the record] because they have not provided sufficiently detailed translations . . . [or] provided industry standards differentiating coking quality coal from non-coking quality coal, along with test reports, to substantiate their claim" that they used only non-coking coal.  *Id.*  As to DJAC's inputs, Commerce found that the declarations submitted by DJAC's supplier and DJAC's general manager did not specify the calorific value of the bituminous coal or any other specification of the coal used which could have provided distinguishing characteristics for surrogate value selection purposes.  *Id.*

Plaintiffs' assertion that 19 U.S.C. § 1677m(d) required Commerce to request additional information is unavailing.  "[W]hen a party claims that a particular surrogate is

---

[4] Because the court finds that Commerce's choice of the basket category over a more-specific subheading was supported by substantial evidence, it need not address Plaintiffs' claims that the basket category was distorted by the inclusion of coking coal. *See* MJAR at 10–11, Pls.' Reply at 1.

not appropriate to value the [factor of production] in question, [Commerce] has

determined that the burden is on that party to prove the inadequacy of said [surrogate

value] or, alternatively, to show that another value is preferable." *Ad Hoc Shrimp Trade*

*Action Comm. v. United States*, 40 CIT __, __, 145 F. Supp. 3d 1349, 1363 (2016).  To

the extent the record did not support Respondents' preferred surrogate value for the

bituminous coal, the burden was on Respondents to provide such evidence.  Section

1677m(d) is inapposite to such a situation and does not obligate Commerce to request

additional information in support of Respondents' request.

      Commerce's determination that the record did not support the selection of the

more-specific subheadings, and its corresponding selection of the basket category, is

supported by substantial evidence.  Commerce weighed the evidence on the record and

exercised its discretion in determining the best information available.  *See* 19 U.S.C.

§ 1677b(c)(1), (4).  While there was some evidence on the record related to the

moisture, ash, and volatility contents of the coal, I&D Mem. at 17, Commerce also found

that the record did not include industry standards or accurate translations of the invoices

necessary to support the subheadings requested by Plaintiffs, *id.* at 18–19.  Plaintiffs fail

to identify any error in the agency's analysis.  Instead, they largely reassert the

arguments they made to the agency.  However, the court does not reweigh evidence.

*See Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1376–77 (Fed. Cir.

2015) (citing *Trent Tube Div., Crucible Materials Corp. v. Avesta Sandvik Tube AB*, 975

F.2d 807, 815 (Fed. Cir. 1992)).  Thus, the court will sustain Commerce's selection of

Malaysian HS 2701.12 to value inputs of bituminous coal.

II.      **Anthracite Coal**

Commerce valued anthracite coal using Malaysian import data under HS 2701.11, the basket category covering "Anthracite Coal, whether or not pulverized, but not agglomerated."  I&D Mem. at 27–29.

Respondents claimed that the anthracite coal used in the production of subject merchandise had a volatility content below ten percent.  *Id.* at 26.  Because the Russian tariff schedule includes a narrower category for anthracite coal characterized by "maximum yield of volatile substances of not more than ten percent mass fraction," Respondents requested that Commerce use Russian import data under HS 2701.11.1000 rather than the Malaysian basket category.  *Id.*  Respondents asserted that this Russian category indicates that Commerce should view volatility content as "one of the most significant product characteristics" and choose surrogate data for anthracite coal based on its volatility content.  *Id.* at 28.

Commerce found that Russia's sub-categorization based on volatility content was insufficient to consider volatility content one of the most important characteristics and it noted that "the Malaysian HS does not provide a tariff subheading for HS 2701.11 based on volatility content."  *Id.*  Commerce thus declined to "depart from [its] preliminary decision to rely on data from the primary surrogate country."  *Id.*

Commerce also found that the Malaysian data was reliable and available.  *Id.*  Commerce considered the representativeness of the Malaysian data by comparing the Malaysian values for HS 2701.11 to values for this subheading from Brazil, Bulgaria, Mexico, Russia, and Turkey.  *Id.* at 29.  Commerce found that the Malaysian data was

not "aberrational in comparison to the [average unit values ("AUVs")] from other

countries on the OP List."  *Id.* at 29.  Commerce also found that the Malaysian data

were "sufficiently representative of a broad market average."  *Id.*

   **a.  Parties' Contentions**

   Plaintiffs contend that Russian data for HS 2701.11.1000 provides the most

specific data source "from an approved country" and "specific to the input in question"

because Russia categorized anthracite coal based on volatility content.  MJAR at 35.

(citation and emphasis omitted); *see also* Pls.' Reply at 19.  Plaintiffs assert that

volatility content was sufficiently important to justify departing from the primary

surrogate country's data even absent evidence of aberrancy or unreliability of the

Malaysian data.  *See id.* at 35–37.

   The Government asserts that volatility content was neither the only criterion nor

the most important one.  Def.'s Resp. at 18 (citing I&D Mem. at 27).  Considering

Commerce's balancing of the various product characteristics and its comparison of the

potential datasets on the record, *see id.* at 19, the Government avers that Plaintiffs have

"failed to establish that volatility content should be the driving factor" in the selection of

the HS category, *id.* at 20.  As such, the Government contends, the record did not

support departure from the primary surrogate country in favor of Russian data.  *Id.* at

20–21.

   In their reply, Plaintiffs assert that the Russian data was superior to the

Malaysian data both because it subdivides based on volatility content but also because

the import quantity was far greater than the Malaysian data.  Pls.' Reply at 19.  Plaintiffs

argue that Commerce failed to address the superiority of the Russian data for the sole reason that Malaysia was the primary surrogate country.  *Id.*

### b. Commerce's Decision To Use Malaysian HS 2701.11 Data Is Supported by Substantial Evidence

Commerce substantiated its decision to use Malaysian data to value anthracite coal by comparing the Malaysian data with that of the alternative surrogate countries. *See* I&D Mem. at 29.  Commerce found that the volume of the Malaysian imports (484,415,312 kg) compared to other countries' import volumes was representative because it was within the range of volumes from the other surrogate country options: Brazil (1,681,143,359 kg); Bulgaria (350,489,586 kg); Mexico (46,535,076 kg); Russia (4,372,971,252 kg); and Turkey (940,396,419 kg).  *Id.*  Moreover, the Malaysian data, as noted by Commerce, falls within the range of AUVs for the six countries examined: the Malaysian AUV is $199.6 (in U.S. dollars per metric ton), compared to values of $119 (Brazil), $163.8 (Bulgaria), $250.3 (Mexico), $37.3 (Russia), and $130.3 (Turkey). *Id.*  Plaintiffs' attempt to establish the Russian data as superior is unconvincing when the record shows that the Russian AUV was an outlier as compared to the other AUVs, at roughly one-third of the next-lowest value, while the Malaysian data was "not aberrational" and was based on sufficient imports to be representative of a broad market average.  *Id.*  In sum, Commerce compared the Malaysian volume and value of imports to the other record data and substantiated its decision that the Malaysian data was sufficiently representative of a broad market average.

Commerce additionally considered Plaintiffs' arguments related to volatility content and found that the mere fact that Russian data includes a volatility-based subclassification was not enough to establish that volatility is an important characteristic.  *Id.* at 28.  Commerce thus considered the merits of prioritizing volatility content but found that Russia's use of this subclassification was an insufficient basis to diverge from the primary surrogate country, particularly when other countries, Malaysia included, do not disaggregate based on volatility.  *See id.*  Before this court, Plaintiffs identify no error by Commerce and simply seek to have the court reweigh evidence presented to Commerce.  This the court will not do.  *See Downhole Pipe*, 776 F.3d at 1376–77.

Based on the foregoing, the court finds that Commerce's valuation of anthracite coal is supported by substantial evidence and reasoned explanation, and it will be sustained.

**III.    Hydrochloric Acid**

To value hydrochloric acid, Commerce selected Malaysian import data for HS 2806.10, which covers "hydrogen chloride (hydrochloric acid)," and which constitutes a basket category including both anhydrous hydrogen chloride and aqueous hydrochloric acid.  I&D Mem. at 40.  "HCl" is the chemical formula for hydrogen chloride; the parties have used this term interchangeably with hydrochloric acid and hydrogen chloride, despite the distinctions in their form.

Respondents argued that they utilized aqueous hydrochloric acid in the production of subject merchandise, whereas the basket category selected by

Commerce, HS 2806.10, covers both aqueous and anhydrous hydrogen chloride and is not specific to their input.  *Id.* at 37–38.  Carbon Activated requested that Commerce instead value "HCl" using import data for aqueous HCl from Brazilian or Turkish HS classifications.  *Id.* at 38.  Respondents also contended that certain record documents describe hydrochloric acid and its composition and that these documents establish that they used aqueous HCl.  *Id.*

Commerce found that "the evidence on the record only demonstrates the purity level for HCl that [Carbon Activated] used in October 2018."  *Id.* at 40.  Commerce further found that the record did not contain specific information indicating whether the HCl that Respondents procured and consumed during the POR was aqueous or anhydrous.  *Id.* at 40–41.  Commerce considered the documents provided by Respondents and found that Respondents "failed to provide an explanation as to how these documents tie to the [surrogate value] and actual consumption of the HCl that they reported for the POR."  *Id.* at 41.

### a.  Parties' Contentions

Plaintiffs contend that record evidence establishes that they used aqueous HCl to produce subject merchandise and, as such, Commerce should have used a subheading specific to aqueous HCl.  MJAR at 29–30.  They assert that the evidence on the record regarding purity content necessarily means that the HCl is aqueous.  *Id.* at 29; *see also* Pls.' Reply at 14–15.   Plaintiffs assert that the Malaysian basket category does not provide adequate specificity, but that the Brazilian or Turkish data contain specific

classifications for aqueous HCl and Commerce should have selected data from one of those countries instead.  *Id.* at 30–31.

The Government contends that Plaintiffs failed to substantiate their claim that their inputs constituted aqueous HCl and that the Malaysian data was therefore appropriate.  Def.'s Resp. at 21.  The Government further contends that use of a purity level metric does not, "standing alone," indicate the state of the substance.  *Id.* (citing I&D Mem. at 40–41).  The Government argues that there is no "other reason to depart from what Commerce had determined to be available and reliable data from the primary surrogate country."  *Id.*

Calgon similarly contends that there was insufficient record evidence to conclude that Respondents purchased HCl in its aqueous form.  Def.-Ints.' Resp. at 2–4.  They note that the purity level evidence on the record not only does not clarify the state of the HCl, but also does not specify the form of the HCl at the time it was acquired, providing evidence only about the HCl used in production[5].  *Id.* at 3.  Calgon also points to additional evidence that water was consumed in addition to the HCl "in preparing the acid bath used to wash the subject merchandise," suggesting to Calgon that the HCl was diluted after it was purchased.  *Id.* at 4.

---

[5] Calgon also points to additional evidence that water was consumed in addition to the HCl "in preparing the acid bath used to wash the subject merchandise," suggesting that the HCl was diluted after it was purchased.  Def.-Ints.' Resp. at 2–4.  This argument is not addressed in the Issues & Decision Memorandum, and as such, it is not discussed further in the analysis.

### b. Commerce's Use of Malaysian Data under HS 2806.10 to Value Hydrochloric Acid Is Supported by Substantial Evidence

It is the respondents' burden to build the record that supports their desired outcome.  *QVD Food Co.*, 658 F.3d at 1324.  Here, Commerce reasonably found that Respondents had "only demonstrate[d] the purity level for HCl that it used in October 2018.  The record does not contain specific information indicating whether the HCl that the [ ] respondents procured and consumed during the [period of review] was in a water solution, a concentrated liquid form, or a different state."  I&D Mem. at 40–41.

In support of their assertion that they used aqueous HCl, Plaintiffs cite to a document that provided limited information, was not fully translated, and did not state that the HCl was dissolved in water.  MJAR at 28 (citing Carbon Activated Sec. D Suppl. Questionnaire Resp. (Part I) (Mar. 18, 2020), Ex. SD-1 ("October 2018 Test Report"), CR 171–79, PR 184–90, CJA Tab 16).  The document contains the description, "HCl Test Report for October 2018," and includes the terms "date," "purity," and "inspector." October 2018 Test Report.  Plaintiffs assert that a "purity level [of] less than 100 [percent] means that the HCl is necessarily in an aqueous solution – as confirmed by record evidence and Commerce practice."  MJAR at 29.  They further assert that "[t]he record confirms that HCl exists in two forms: '(1) anhydrous or liquid form (without added water); and (2) aqueous solution (with added water),'" where "the latter form is expressed with purity levels."  *Id.* (citing Final Surrogate Value Cmts. by DJAC and [Carbon Activated] Tianjin (Mar. 30, 2020) ("Final SV Cmts."), Ex. 6B, PR 179–231, CJA Tab 19).  In fact, the record indicates that hydrochloric acid is "the aqueous (water-

based) solution of hydrogen chloride gas," "a colorless watery liquid . . . [consisting] of

hydrogen chloride, a gas, dissolved in water"—but Plaintiffs fail to address how this

distinction between hydrochloric acid and hydrogen chloride applies when the test

report on the record only describes "HCl."  *See* Final Surrogate Value Cmts., Ex. 6B.

Commerce found that the referenced documents do not specifically describe the

connection between the substance at issue in this case (HCl with a purity level less than

100 percent) and the substance those documents described (aqueous hydrochloric

acid).  I&D Mem. at 41.  Indeed, the October 2018 Test Report on which Plaintiffs rely

states only "HCl Test Report for October 2018" and the translation for the term "purity,"

but it does not anywhere explain that the only contaminant was water such that its purity

level of less than 100 percent pure means that it is aqueous hydrochloric acid.  *See*

October 2018 Test Report.  Accordingly, Commerce reasonably assessed that the

evidence was insufficient to clearly define the HCl on the record as aqueous

hydrochloric acid or to depart from the Malaysian basket category in favor of the

narrower Brazilian or Turkish aqueous HCl data.  *See* I&D Mem. at 41.

Having reviewed the record evidence and Commerce's explanation, the court

finds that Commerce's decision to rely on the Malaysian basket category is based on

substantial evidence and in accordance with law; thus, it will be sustained.

## IV.    Caustic Soda

Commerce valued caustic soda using Malaysian import data under HS 2815.11,

which covers "solid sodium hydroxide."  I&D Mem. at 44.  Respondents requested that

Commerce instead value caustic soda using the subheading 2815.12, which covers

"liquid sodium hydroxide."  *Id.*  Parties refer interchangeably to "sodium hydroxide" and "caustic soda."

Commerce concluded that the record did not establish that Respondents purchased liquid caustic soda.  *Id.* at 44–45.  Commerce noted that the suppliers used "sodium hydroxide with purity in the range of 30.6 to 33.1 percent," which Commerce saw as insufficient to establish that the caustic soda was in liquid form.  *Id.* at 45. Commerce also noted that one of the respondents consumed more caustic soda than it purchased.  *Id.*  Although the record was unclear, from this evidence Commerce inferred that "Carbon Activated's suppliers [likely] purchased solid sodium hydroxide and created the liquid caustic solution themselves."  *Id.*  Based on this analysis of the record evidence, Commerce continued to use HS 2815.11 to determine the surrogate value for caustic soda.  *Id.*

### a.  Parties' Contentions

Plaintiffs contend that HS 2815.12 should be used to value caustic soda because it "was clearly reported as a liquid input with diluted purity."  MJAR at 26.  Plaintiffs assert that Commerce "impermissibly speculated that 'Carbon Activated's suppliers actually purchased solid sodium hydroxide and created liquid caustic themselves' as opposed to having purchased 'liquid sodium hydroxide in its diluted form.'"  *Id.* at 27 (quoting I&D Mem. at 45).  Plaintiffs also assert that Commerce was required to inform Carbon Activated about the deficiency of the record in this regard and provide Carbon

Activated with an opportunity to remedy or explain the deficiency.  *Id.* at 28 (citing 19

U.S.C. § 1677m(d)); *see also* Pls.' Reply at 13.

The Government contends that Commerce's choice of the solid caustic soda

subheading constituted an inference based on evidence, not mere speculation.  *See*

Def.'s Resp. at 28–29.  The Government further contends that Commerce was not

required to ask Respondents for clarification before drawing conclusions or inferences

because 19 U.S.C. § 1677m(d) "does not apply to the submission of potential surrogate

value information."  *Id.* at 29.

### b. Commerce's Use of Malaysian Data for Solid Sodium Hydroxide to Value Caustic Soda Is Supported by Substantial Evidence

While Plaintiffs contend that Commerce's caustic soda valuation was based on

speculation and not substantial evidence, Commerce's determination in fact constituted

an evidence-based inference.  Plaintiffs claim that they consumed liquid caustic soda in

their production of subject merchandise; however, Commerce noted that "the evidence

on the record only indicates that the suppliers used [caustic soda] with purity in the

range of 30.6 to 33.1 percent, as demonstrated by the test reports provided for October

2018."  I&D Mem. at 45.  Commerce also found that "something happen[ed] to the

caustic soda input after its purchase because once the input is applied into the

production process, the volume reported is larger than the volume purchased."[6]  *Id.*

This difference in volume, in Commerce's view, justified an "infer[ence]" that the input

---

[6] The details of the volumes of caustic soda purchased and used are business proprietary.  *See* Carbon Activated Resp. to Section D. of Questionnaire (Part I) (Sept. 19, 2019) at Ex. D-4, D-5, Attach. A, Ex. D-5, D-12.4, PR 102, CJA Tab 4,.

was solid caustic soda, and that the suppliers created the liquid caustic soda from a

purchased solid.  *Id.*  Commerce took the evidence it had on the record—a difference in

volume purchased and volume consumed—and drew a conclusion based thereon.

      While Plaintiffs maintain, and the court acknowledges, that there may be

additional explanations for the purchase-to-consumption difference other than the

inference drawn by Commerce—such as, Plaintiffs claim, purchases of caustic soda

outside of the POR, MJAR at 27—substantial evidence review requires the court to

determine whether Commerce's conclusion was reasonable, not whether the conclusion

was the only possible one, *see Jiaxing II*, 822 F.3d at 1301.  Plaintiffs' alternative

explanation was not exhausted below nor do Plaintiffs point to record evidence ignored

by Commerce when adopting its inference.  Because Plaintiffs did not raise their

alternative explanation for the volume discrepancy before Commerce, the agency drew

its own conclusion.  Direct evidence, or "evidentiary exactitude," need not support

Commerce's determination; insofar as Commerce's inference is logical under the

circumstances, the court finds that it is supported by substantial evidence.  *See, e.g.*,

*Fuwei Films (Shandong) Co. v. United States*, 36 CIT 764, 774–75, 837 F. Supp. 2d

1347, 1356 (2012) (finding that "the question [was] not whether Commerce engaged in

'conjecture' that fail[ed] to qualify as 'substantial evidence, . . . but simply whether

Commerce's findings and conclusions supporting its ultimate determination. . . [were]

reasonable given the circumstances presented by the record").

      Plaintiffs' contention that Commerce was required, pursuant to 19 U.S.C.

§ 1677m(d), to request clarification about the nature of the input fails for the same

reasons discussed above regarding bituminous coal, *supra* at 14–15.  As described,

Commerce found that it had enough information to find a surrogate value for caustic

soda.  *See* I&D Mem. at 45.  Plaintiffs were under an obligation to populate the record to

"prove the inadequacy of [Commerce's chosen surrogate value] or, alternatively, to

show that another value is preferable."  *Ad Hoc Shrimp*, 145 F. Supp. 3d at 1363.

Plaintiffs did not meet that burden here, and the court will not shift that burden to the

agency.

  Thus, Commerce's reliance on Malaysian import data under HS 2815.11 will be

sustained.

  **V.**  **Steam**

  Commerce valued steam using Malaysian import data under HS 2711.11, which

covers liquefied natural gas.  I&D Mem. at 47–48.  The agency "valued steam by

benchmarking the cost of steam from the cost of natural gas required to generate

steam" and then developed a "ratio to convert [the] cost of natural gas to the cost of

steam."  Mem. Surrogate Values for the Prelim. Results (Apr. 24, 2020) ("Prelim. SV

Mem.") at 6, Attach. 2 to Mem. Re: Calculation of the Margin for Respondents Not

Selected for Indiv. Examination (Apr. 24, 2020), PR 265–68, CJA Tab 27.

   Respondents challenged the liquefied natural gas price as unreliable and not

product-specific; they requested that Commerce instead use HS 2711.21, covering

"gaseous natural gas."  I&D Mem. at 45.  They also argued that because Malaysia did

not have any imports under HS 2711.21 during the POR, Commerce should have

selected data from the secondary surrogate country with the largest import volume,

Mexico, to value steam using HS 2711.21.  *Id.*  Respondents argued that Malaysian data for HS 2711.11 were unreliable because the domestic prices of natural gas during the POR were lower than the import prices of natural gas.  *Id.* at 45–46.

Commerce determined that Malaysian data existed for both HS 2711.21 and HS 2711.11, and, in this case, the data for 2711.11 was preferable.[7]  *Id.* at 48.  Commerce acknowledged that, in other reviews, it calculated the surrogate value for steam using import data under both HS 2711.21 and HS 2711.11.  *Id.* at 47–48 & nn.321–22 (citations omitted).  Here, the agency found that the Malaysian data for HS 2711.11 represented "a significantly larger volume of imports (i.e., 1,329,366,876 kg) from multiple countries (i.e., Singapore, Brunei, and Australia), covering nearly the entirety of the POR," as compared to the import data under HS 2711.21, which represented a "smaller volume of imports (i.e., 3,207,783 kg) from only one country (i.e., Brunei) covering only two months of the POR."  *Id.* at 48.  Commerce addressed Respondents' argument regarding domestic natural gas prices by explaining that the "domestic prices the . . . [R]espondents provide[d were] not supported by the underlying methodology used to derive those prices."  *Id.*  Consequently, Commerce found the Malaysian import data reliable and declined to "consider import data from a secondary surrogate country." *Id.*

---

[7] Contrary to Plaintiffs' assertion, Commerce found that Malaysia imported 3,207,783 kg of natural gas under HS 2711.21 during the POR.  I&D Mem. at 47.

### a. Parties' Contentions

Plaintiffs contend that Commerce should have used HS 2711.21 because Commerce typically selects the surrogate value for steam based "on whether the natural gas was purchased in gaseous or liquefied state," and the steam used by Respondents was gaseous.  MJAR at 31–32 (citation omitted) (asserting that because "Commerce never questioned the manner in which steam was reported," i.e., gaseous, "it should have been valued as natural gas in the same physical form, i.e., gaseous"); *see also* Pls.' Reply at 18.  Plaintiffs also contend that Malaysian import data under HS 2711.11 was unreliable because products under this subheading were sold at higher prices than in the domestic market, making it unlikely that Malaysian producers would have purchased imported natural gas.  MJAR at 33–34 (citing *Yantai Oriental Juice Co. v. United States*, 26 CIT 605, 617 (2002)); *see also* Pls.' Reply at 18.  Lastly, Plaintiffs contend that "Commerce improperly compared import volumes reported under two different [HS] subheadings covering distinct products," and that "Commerce failed to provide any precedent to support comparing the broad market average attributes of disparate [HS] subheadings."  *Id.* at 34.

The Government contends that if "there is nothing on the record regarding the specific composition [of an input]"—in this case, whether the natural gas used to create the steam was liquid or gaseous—then claims regarding the greater specificity of certain HS subheadings are unavailing.  Def.'s Resp. at 31 (quoting *Fine Furniture (Shanghai) Ltd. v. United States*, 42 CIT __, __, 353 F. Supp. 3d 1323, 1348 (2018)) (alteration in original)).  The Government further contends that Plaintiffs' argument regarding

unreliability lacks merit because Commerce could not determine how domestic prices were determined or evaluate the reliability of that data.  *Id.* (citing I&D Mem. at 48).  Thus, the Government contends, Commerce's choice of Malaysian import data under HS 2711.11 constituted a reasonable exercise of the agency's discretion to choose between imperfect datasets.  *Id.*

### b.  Commerce's Valuation of Steam using Malaysian HS 2711.11 Data Is Supported by Substantial Evidence

Plaintiffs' first argument, that steam should be valued using the HS subheading for natural gas that is consistent with the phase of matter in which the steam is in, *see* MJAR at 31–32, is nonsensical and inapposite.  While steam is certainly gaseous, it is created by using an energy source to heat water.  To that end, the energy source input need not be in the same phase (solid, liquid, gaseous) as the steam the energy creates.  The only question is whether the conversion factor is correlated to the value of the particular energy source selected as the surrogate value.  *See* Prelim. SV. Mem. at 6.  Commerce was not required to select gaseous natural gas simply because the steam was gaseous.  Indeed, Commerce declined to do so.  *See* I&D Mem. at 47–48.  Moreover, the court notes that Plaintiffs do not argue that the conversion factor Commerce used to convert the value of the liquified natural gas to a value for steam was inaccurate for that purpose.

Turning to Commerce's choice of HS 2711.11, Commerce explained that the data under HS 2711.11 "represent a significantly larger volume of imports . . . from multiple countries . . . , covering nearly the entirety of the POR" as compared to "the

import data under HS 2711.21," which "represent a smaller volume of imports . . . from only one country . . . covering only two months of the POR."  I&D Mem. at 48.

The agency also noted that the domestic price data, which Respondents used to argue that the HS 2711.11 data were unreliable, were themselves of undetermined reliability because Respondents had not provided Commerce with the underlying methodology used to derive those prices.  *Id.*  Plaintiffs cite to *Yantai Oriental Juice Co*., 26 CIT at 617, to support their argument that Commerce was required to select HS 2711.21 in part because the Malaysian imported natural gas prices under HS 2711.11 were significantly higher than the domestic prices of the same product.  However, in that case, "Commerce nowhere explain[ed] how the use of seemingly more expensive imported coal data [was] the best available information," *id.* at 617, whereas here, Commerce found that the domestic price data was unreliable *and* found that the HS 2711.11 data were better due to the volume and contemporaneity of the import data under that subheading, I&D Mem. at 48.

As noted above, Commerce has discretion to choose which criteria to prioritize, especially when there is "nothing on the record regarding the specific composition" of the plaintiff's product such that "claims of greater specificity . . . are immaterial."  *Fine Furniture (Shanghai) Ltd. v. United States*, 353 F. Supp. 3d at 1348.  Like in *Fine Furniture*, here, the agency found that there was no way to determine which surrogate value was most appropriate due to lack of evidence regarding the state of the natural gas used to generate the steam.  I&D Mem. at 48.  While Commerce did not use a basket category—in fact, no basket category has been proposed—Commerce selected

what it deemed to be the best available information by examining differences between the two datasets and explaining why it preferred HS 2711.11 over HS 2711.21.  *See id.*

The court declines to interfere with Commerce's exercise of its discretion in selecting among potential surrogate values because the agency adequately explained its choice and supported its choice with substantial evidence.  Thus, Commerce's determination as to the valuation of steam will be sustained.

## VI.    Carbonized Materials

Commerce valued coal-based carbonized material using Malaysian data for HS 4402.90.1000, which covers "coconut shell charcoal."  I&D Mem. at 43.  Respondents requested that Commerce instead use HS 4402.90, which covers "wood charcoal (including shell or nut charcoal), excluding that of bamboo," and which is the basket category inclusive of HS 4402.90.1000 and HS 4402.90.9000, covering "other wood charcoal."  *Id.* at 41, 43.  According to Commerce, there was no record evidence "indicating that the mandatory respondents produced subject merchandise from wood, nuts, or any other non-coal charcoal."  *Id.* at 43.  Commerce noted that, "when asked to specify the type of carbonized material used to produce subject merchandise, Carbon Activated reported that its suppliers purchased coal-based carbonized material."  *Id.*  Commerce further stated that "[f]or both [DJAC's] and Carbon Activated's suppliers, the record only contains test reports demonstrating the moisture, ash, volatility content and

particle size of the carbonized material purchased from its suppliers, but no evidence to

support the mandatory respondents' assertion that they used wood-based charcoal."  *Id.*

### a.  Parties' Contentions

Plaintiffs contend that Commerce unlawfully rejected HS 4402.90.9000 for the

valuation of carbonized materials because "Commerce failed to demonstrate that coal-

based carbonized material was identical to coconut shell charcoal."  MJAR at 17.

Plaintiffs highlight evidence indicating that the wood-based charcoal in HS

4402.90.9000 "is comparable to coal-based carbonized materials in terms of key

properties and cost," and that "Commerce's failure to address this critical point . . .

invalidates" its choice of HS 4402.90.1000.  *Id.*  Plaintiffs also assert that Commerce's

citation to the fifth administrative review of the order on certain activated carbon from

China ("AR5"), in which the agency found that wood and non-coconut-shell carbonized

material would only be applicable if a respondent had sold subject merchandise

produced from these types of charcoal, was inappropriate.  *Id.* (citing *Certain Activated

Carbon From the People's Republic of China*, 78 Fed. Reg. 70,533, 70,533 (Dep't

Commerce Nov. 6, 2013) ("*AR5 Final Results*"), and accompanying Issues and Decision

Mem., A-570-904 (Nov. 20, 2013) ("AR5 I&D Mem.")).  Plaintiffs explain that there is no

record evidence here establishing that the subject merchandise could not have been

produced from wood charcoal, which distinguishes this review from AR5.  *Id.* at 17–18

(citations omitted).  Plaintiffs accordingly contend that Commerce should have selected

the basket category HS 4402.90.  *Id.* at 18–19.

The Government contends that that there is "no reason to resort to the basket category" for carbonized material because the record does not demonstrate that Respondents "used any carbonized materials made from wood, nuts, or any other non-coal charcoal." Def.'s Resp. at 23 (citing I&D Mem. at 43). Thus, the Government contends, consistent with AR5, Commerce could not select HS 4402.90.9000 because there was no evidence of the use of wood charcoal. *Id.* at 24–25. The Government asserts that Commerce was "well-within its discretion to choose among imperfect datasets" in selecting HS 4402.90.1000. *Id.* at 26.

Plaintiffs in their reply assert that record evidence establishes that "wood charcoal is an equally viable proxy to coal-based carbonized material" compared to coconut shell charcoal. Pls.' Reply at 9. Plaintiffs also reiterate their argument that the AR5 findings were inapposite, and they reiterate that even if the choice between "imperfect alternatives" is discretionary, Commerce must still explain its decision with reference to substantial evidence on the record. *Id.* at 9–10.

### b. Commerce's Valuation of Carbonized Materials Is Unsupported by Substantial Evidence

The court finds that Commerce's selection of Malaysian data for HS 4402.90.1000 to value carbonized material is unsupported by substantial evidence and remands the selection to the agency for further explanation or reconsideration. In particular, the agency's choice of a specific subcategory over a basket category in the valuation of carbonized material is not supported by Commerce's explanation.

While Commerce found it "clear that Carbon Activated's suppliers did not

purchase carbonized material that was made from wood or nut charcoal so as to merit

the inclusion of HS 4402.90.9000, 'other wood charcoal,' as part of the [surrogate value]

valuation," Commerce made no analogous finding as to whether Carbon Activated's

suppliers purchased carbonized material made from coconut shell charcoal.  I&D Mem.

at 43.  Thus, the problem Commerce identified with respect to wood-based charcoal

also appears to apply to coconut shell charcoal.  Absent evidence that Respondents

used coconut shell charcoal, Commerce's selection of one subheading (coconut shell

charcoal) over another (other wood charcoal) is unsupported by substantial evidence

and reasoned explanation.

Commerce's reliance on its findings in AR5 is unavailing because Commerce did

not explain the relevance of that finding to Commerce's determination in this review.

*See id.*  As noted in *Qingdao*, "[e]ach administrative review is a separate exercise of

Commerce's authority that allows for different conclusions based on different facts in the

record."  766 F.3d at 1387; *see also Jiaxing II*, 822 F.3d at 1299 (quoting *Qingdao*, 766

F.3d at 1387).  AR5 involved a specific type of activated carbon that could not have

been produced using wood charcoal.  *See* AR5 I&D Mem. at 36.  Commerce has not

established or indicated that such is the case in the present review.

Commerce is within its discretion to choose among imperfect datasets; however,

Commerce's decision-making must take into account the facts on the record and reflect

a well-reasoned application of its methodology to the situation.[8]  *See Seah Steel Vina*

*Corp. v. United States*, 41 CIT __, __, 269 F. Supp. 3d 1335, 1344 (2017); *Tr. Chem*

*Co. v. United States*, 35 CIT 1012, 1017, 791 F. Supp. 2d 1257, 1263 (2011).  Here,

Commerce has failed to explain its choice between two imperfect datasets and the court

remands that selection for further explanation or reconsideration.

## VII.    Financial Ratios

Commerce selected the 2018 financial statements of "Bravo Green, a Malaysian

producer of granulated carbon and steam activated carbon," to determine the surrogate

financial ratios.  I&D Mem. at 32–33.  In addition to valuing the factors of production,

Commerce is required to add an amount for other expenses, including profit, using

surrogate financial ratios.  *See* 19 C.F.R. § 351.408(c)(4); *Dorbest Ltd. v. United States*,

604 F.3d 1363, 1368 (Fed. Cir. 2010); *TT Int'l v. United States*, 44 CIT __, __, 439 F.

Supp. 3d 1370, 1382 (2020).

Respondents advocated for the use of 2018 financial statements from either Joint

Stock Company Sorbent ("JSC Sorbent"), a Russian producer of respiratory personal

protective equipment, activated carbons, coagulants, and water treatment systems, or

S.C. Romcarbon S.A. ("Romcarbon"), a Romanian producer of filters, polyethylene

packaging, charcoal, and other chemical products.  I&D Mem. at 30, 33.  Respondents

---

[8] Plaintiffs contend that record evidence established the comparability of HS 4402.90.9000, "other wood charcoal," to coal-based carbonized materials, suggesting that HS 4402.90.9000 should have been used in lieu of HS 4402.90.1000.  *See* MJAR at 18–19.  On remand, Commerce should address the relevance of such evidence to its surrogate value selection.

argued that JSC Sorbent's 2018 financial statements were from a significant producer of comparable merchandise, were contemporaneous with the period of review, and better disaggregated the company's costs.  *Id.* at 30.  Respondents also contended that Romcarbon's financial statements met all of the criteria for selection of its financial ratios.  *Id.*

Commerce selected Bravo Green's 2018 financial statements based on its preference for using a financial statement from the primary surrogate country unless such data is unavailable or unreliable.  *Id.* at 31–32.  Commerce emphasized its preference for using contemporaneous statements from profitable companies that are not distorted or otherwise unreliable, and that do not indicate that the company received subsidies.  *Id.* at 32.  These considerations led the agency to select Bravo Green's 2018 statements, rather than any of the three Malaysian financial statements from 2017 that had been used for the *Preliminary Results* or the Russian and Romanian alternatives argued for by Respondents.  *Id.* at 33–34.  Commerce acknowledged, however, that Bravo Green's financial statements were "not as detailed as Commerce prefers."  *Id.* at 33.

### a.  Parties' Contentions

Plaintiffs contend that Bravo Green's 2018 financial statements were insufficiently disaggregated to be used for calculating financial ratios.  MJAR at 38–42. Plaintiffs indicate that these statements do not itemize raw materials, labor, or energy costs but instead "itemize a basket category" titled "Cost of sales," which Plaintiffs assert could have included a portion of manufacturing overhead and therefore have

distorted the profit ratios Commerce used. *Id.* at 38–39; Pls.' Reply at 21. Plaintiffs

argue that JSC Sorbent's 2018 financial ratios should have been used because they

separately itemized raw materials, labor, and energy. MJAR at 42. In the alternative,

Plaintiffs argue that the financial statements of Romcarbon are preferable to Bravo

Green's because they included breakouts for all cost elements, and Romania, while not

on the OP list, was economically comparable to China. *Id.* at 44–46.

 The Government contends that Bravo Green's 2018 financial statements met

Commerce's selection criteria and were sufficient to calculate the financial ratios. Def.'s

Resp. at 33–34. The Government argues that the burden is on Plaintiffs to demonstrate

the unreliability or unavailability of financial statements from the primary surrogate

country and Plaintiffs have not made that showing here. *Id.* at 34.

 In response to the Government's argument that Commerce's broad discretion

justifies the choice of Bravo Green over JSC Sorbent or Romcarbon, Plaintiffs note that

this is an insufficient explanation when there are such "tell-tale data flaws resulting in

distorted ratios" from Commerce's chosen financial statements. Pls.' Reply at 21.

Plaintiffs also assert that "Commerce resorted to a disjunctive analysis—selecting

qualitatively inferior and distorted Bravo [Green] statements based simply on its single

surrogate country preference, entirely bypassing the qualitatively superior alternatives

from Russia and Romania." *Id.* at 22 (citing *CP Kelco US, Inc. v. United States*, Slip

Op. 16–36, 2016 WL 1403657, at *2 (CIT Apr. 8, 2016)).

### b. Commerce's Choice of Bravo Green's 2018 Financial Statements is not Supported by Substantial Evidence

Commerce explained that, of the Malaysian financial statements, four were "from producers of identical or comparable merchandise." I&D Mem. at 33. Commerce then considered whether to use all four of them—three from 2017 and one from 2018—and determined to use only Bravo Green's 2018 financial statements because this was the only option that was "contemporaneous with the POR and reflect[ed] the experience of a producer of merchandise identical to the subject merchandise." *Id.* at 34. The agency acknowledged that it generally prefers to use multiple companies' financial statements where practicable, but explained that in this case it prioritized contemporaneity and therefore narrowed its selection to the 2018 Bravo Green statements. *Id.*

Commerce's choice of Bravo Green's 2018 financial statements over the non-Malaysian alternatives was conclusory, however. Commerce itself acknowledged that Bravo Green's 2018 statements were "not as detailed as Commerce prefers," I&D Mem. at 33, but did not explain why the less-than-ideal Bravo Green statements were better than the alternatives proposed by Respondents. *See Mid Continent Steel & Wire, Inc. v. United States*, 45 CIT __, 551 F. Supp. 3d 1360 (2021) (remanding for failure to fully compare two imperfect sets of financial statements for calculation of surrogate value profit); *CP Kelco US, Inc.*, 2016 WL 1403657, at *2;[9] *Catfish Farmers of Am. v. United*

---

[9] A subsequent appeal from this case held that if Commerce made a specific finding that certain financial statements were unusable, then the agency was not required to compare side-by-side the different options on the record. *CP Kelco US Inc. v. United States*, 949 F.3d 1348, 1359 (Fed. Cir. 2020). That is not the case here, where

*States*, 37 CIT 717, 742 (2013).  Commerce rejected the non-Malaysian data without

considering its potential merits, in favor of data from the primary surrogate country—

even though the data from the primary surrogate country was less disaggregated and

detailed than preferred.  *See* I&D Mem. at 33.  The agency's entire answer to

Respondents' argument that JSC Sorbent or Romcarbon's statements should be used

was: "We disagree. The record contains five financial statements from the primary

surrogate country, Malaysia.  Of the five financial statements, four are from producers of

identical or comparable merchandise . . . ."  It appears that Commerce did not consider

JSC Sorbent or Romcarbon for the sole reason that they were not from Malaysia but did

not explain why association with the primary surrogate country outweighed other

considerations or criteria.

The court remands this issue to Commerce.  In so doing, the court does not

require Commerce to choose any particular financial statement or reject Bravo Green's

2018 financial statements.  Commerce must, however, fairly weigh the available options

and explain its decision in light of its selection criteria, addressing any shortcomings.

---

Commerce merely found that Bravo Green's financial statements were preferable, not
that the others were unusable.

Court No. 21-00131                                                    Page 41

### Conclusion and Order

In accordance with the foregoing, it is hereby

**ORDERED** that Commerce's *Final Results* are sustained with respect to the

selection of surrogate values for bituminous coal, anthracite coal, hydrogen chloride,

sodium hydroxide, and steam; it is further

**ORDERED** that Commerce's *Final Results* are remanded for reconsideration or

further explanation with respect to the selection of the surrogate value for carbonized

materials and the financial statement selection for determining surrogate financial ratios;

it is further

**ORDERED** that Commerce shall file its remand redetermination on or before

November 7, 2022; it is further

**ORDERED** that subsequent proceedings shall be governed by USCIT Rule

56.2(h); and it is further

**ORDERED** that any comments or responsive comments must not exceed 4000

words.

                                              /s/      Mark A. Barnett____
                                              Mark A. Barnett, Chief Judge


Dated:  August 8, 2022_____
        New York, New York