# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

**BEFORE: THE HONORABLE MARK A. BARNETT, CHIEF JUDGE**

|  |  |
|---|---|
| CARBON ACTIVATED TIANJIN CO., LTD., CARBON ACTIVATED CORPORATION, DATONG JUQIANG ACTIVATED CARBON CO., LTD., SHANXI INDUSTRY TECHNOLOGY TRADING CO., LTD., DATONG MUNICIPAL YUNGUANG ACTIVATED CARBON CO., LTD. and BEIJING PACIFIC ACTIVATED CARBON PRODUCTS CO., LTD., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant; <br><br> and <br><br> CALGON CARBON CORPORATION and CABOT NORIT AMERICAS, INC., <br><br> Defendant-Intervenors. | Court No. 21-00131 |

## PLAINTIFFS' COMMENTS IN OPPOSITION TO REMAND REDETERMINATION

                                        Francis J. Sailer
                                      Dharmendra N. Choudhary
                                      Jordan C. Kahn

                                      GRUNFELD, DESIDERIO, LEBOWITZ, SILVERMAN & KLESTADT LLP
                                      1201 New York Ave., NW
                                      Suite 650
                                      Washington, DC 20005

*Counsel for Plaintiffs Carbon Activated Tianjin Co., Ltd., Carbon Activated Corporation, Datong Juqiang Activated Carbon Co., Ltd., Shanxi Industry Technology Trading Co., Ltd., Datong Municipal Yunguang Activated Carbon Co., Ltd., and Beijing Pacific Activated Carbon Products Co., Ltd.*

**TABLE OF CONTENTS**

I.   COMMERCE UNLAWFULLY VALUED CARBMAT ......................................................... 1

II.  COMMERCE UNLAWFULLY SELECTED FINANCIAL STATEMENTS ....................... 5

    A.   Commerce Unlawfully Rejected JSC and Romcarbon ...................................................... 7

    B.   JSC or Romcarbon Merit Selection over Bravo .............................................................. 10

# TABLE OF AUTHORITIES

**Cases**

*Calgon Carbon Corp. v. United States*, 443 F. Supp. 3d 1334 (CIT 2020) .............................. 9, 10
*Carbon Activated (Tianjin) Co. v. United States*, 586 F.Supp.3d 1360 (CIT 2022) ................... 1, 6
*Catfish Farmers of Am. v. United States*, 641 F. Supp. 2d 1362 (CIT 2009) .............................. 12
*CP Kelco US, Inc. v. United States*, 2015 WL 1544714 (CIT Mar. 31, 2015) ............................. 11
*Diamond Sawblades Mfgrs.' Coal. v. United States*, 219 F.Supp.3d 1368 (CIT 2017) ........... 7, 14
*Diamond Sawblades Mfgrs.' Coal. v. United States*, 299 F.Supp.3d 1374 (CIT 2018). .............. 14
*Jacobi Carbons AB v. United States*, 619 Fed.Appx. 992 (Fed. Cir. 2015) (nonprecedential)
 .................................................................................................................................. 2, 3, 4, 5
*Mid Continent Steel & Wire, Inc. v. United States*, 586 F.Supp.3d 1349 (CIT 2022) ............ 11, 12
*Mid Continent Steel & Wire, Inc. v. United States*, 941 F.3d 530, 544 (Fed. Cir. 2019) ....... 11, 12
*Nation Ford Chem Co. v. United States*, 166 F.3d 1373 (Fed. Cir. 1999) .................................. 11
*Peer Bearing Co. v. United States*, 22 CIT 472 (1998) ................................................................ 2
*Queen's Flowers de Colom. v. United States*, 21 CIT 968 (1997). ............................................. 10
*Save Domestic Oil, Inc. v. United States*, 357 F.3d 1278 (Fed. Cir. 2004) ................................. 10
*Vinh Hoan Corp. v. United States*, 179 F.Supp.3d 1208 (CIT 2016) .......................................... 13
*Weishan Hongda Aquatic Food Co. v. United States*, 917 F.3d 1353 (Fed. Cir. 2019) ......... 12, 13

**Regulations**

19 C.F.R. § 351.408 ....................................................................................................................... 6

**Administrative Decisions**

*Activated Carbon from China*, 77 Fed.Reg. 67,337 (Nov. 9, 2012) (final results) ........................ 5
*Activated Carbon from China*, 83 Fed.Reg. 53,214 (Oct. 22, 2018) (final results) ....................... 6
*Activated Carbon from China*, 84 Fed.Reg. 68,881 (Dec. 17, 2019) (final results) ...................... 6
*Activated Carbon from China*, 84 Fed.Reg. 27,758 (June 14, 2019) (preliminary results) .......... 10
*Activated Carbon from China*, 86 Fed.Reg. 10,539 (Feb. 22, 2021) (final results) ............. 1, 2, 10
*Chlorinated Isocyanurates from China*, 75 Fed.Reg. 70,212 (Nov. 17, 2010) (final results) ........ 9
*Chlorinated Isocyanurates from China*, 80 Fed.Reg. 4539 (Jan. 28, 2015) (final results) .......... 12
*Diamond Sawblades from China*, 80 Fed.Reg. 32,344 (June 8, 2015) (final results) ................. 13
*Steel Nails from China*, 73 Fed.Reg. 33,977 (June 16, 2008) (final results) ............................ 8, 9

**Miscellaneous Authorities**

Commerce Policy Bulletin 04.1 (Mar. 1, 2004) .............................................................................. 6

Plaintiffs oppose Commerce's Final Redetermination (Nov. 30, 2021), ECF51-1/PRR9 ("Remand") responding to this Court's ruling in the twelfth review ("AR12") of the antidumping duty order on activated carbon from China. *Carbon Activated (Tianjin) Co. v. United States*, 586 F.Supp.3d 1360 (CIT 2022).

## I.     COMMERCE UNLAWFULLY VALUED CARBMAT

This Court invalidated Commerce's use of Malaysian HTS 4402.90.100 data as the surrogate value ("SV") for coal-based carbonized materials ("coal-carbmat"). *Id*. at 1378-79; IDM, PR304, at 42-43. Commerce reversed course in its Draft Redetermination (Sept. 29, 2022), PRR1 ("Draft Remand"):

> In the *AR12 Final Results* {PR316}, we explained that the record contained no evidence indicating that the mandatory respondents purchased or used wood charcoal in the production of the subject merchandise. **Upon further review of the record evidence, we find the record also contains no evidence that the mandatory respondents purchased or used coconut shell charcoal to produce activated carbon exported to the United States.**
>
> … the U.S. Court of Appeals for the Federal Circuit (CAFC) recognized that wood charcoal is a type of charcoal that can be used to create the subject merchandise and that **wood charcoal and coconut shell charcoal are comparable with coal-based carbmat**. **In {AR12}, there is no information on the record which demonstrates whether the subject merchandise produced by the mandatory respondents shares more similarities with wood-based charcoal or coconut shell charcoal. Nor does the record demonstrate that coconut shell activated carbon or wood activated carbon is more comparable over the other to coal-based activated carbon. …**
>
> Therefore, **because the record does not contain sufficient evidence to demonstrate that the mandatory respondents, or their suppliers, purchased or consumed coconut shell charcoal or wood charcoal to produce the subject merchandise or that one SV is more similar to coal-based carbmat, we find it is appropriate to use Malaysian imports under the 6-digit basket category HS 4402.90** ("Wood Charcoal (Including Shell or Nut Charcoal), Excluding That of Bamboo"), which encompasses both HS 4402.90.1000 ("coconut shell charcoal") and HS 4402.90.9000 ("other wood charcoal"), to value coal-based carbmat used to produce the subject merchandise.

*Id*. at 3-4 (emphases added); Final SV Submission (Mar. 30, 2020), PR197-230, Ex.2A.

Commerce reversed itself again to value coal-carbmat using HTS 4402.90.1000. Remand at 2-8. "Commerce is allowed flexibility to change its position from the preliminary determination . . . , as along as Commerce explains the basis for the change and the explanation is supported by substantial evidence." *Peer Bearing Co. v. United States*, 22 CIT 472, 481 (1998). Here, Commerce's rationale, with factual findings remaining unchanged, is unsupported by substantial evidence and contradicts precedent.

First, while conceding that coconut-charcoal was not used to produce activated carbon exported to the United States (correcting the *Final Results* finding focused solely on wood-charcoal's non-use), Remand at 4-5, Commerce nonetheless tries resurrecting coconut-charcoal and undermining wood-charcoal. Commerce downplays its concession: "Datong Juqiang's supplier used carbonized coconut shell in the production of activated carbon, {though} not sold to the United States as subject merchandise." *Id*. at 14. However, Commerce failed to articulate how coconut-charcoal's use to produce non-subject merchandise is relevant to value coal-carbmat – a different input for subject merchandise. Moreover, even where coconut-charcoal was used to produce subject merchandise in the fourth review ("AR4"), Commerce valued coal-carbmat with HTS 44.02. *Activated Carbon from China*, 77 Fed. Reg. 67,337 (Nov. 9, 2012) IDM Cmt.IC(C) ("Cherishmet uses both coconut charcoal and other carbonized materials {*i.e.*, coal-carbmat} as an input, as does Jacobi"). *Jacobi Carbons AB v. United States*, 619 Fed.Appx. 992, 999 (Fed. Cir. 2015) (nonprecedential).

Commerce erroneously reasons that "{t}here is a long, demonstrable history in this proceeding of using coconut-shell carbmat in the production of the subject merchandise, unlike wood carbmat, which has never been used to produce the subject merchandise." Remand at 5. This conflates the SV data used with the input being valued since in all three cited reviews – the

2

third, fifth and ninth – coconut-charcoal was *not* the input; instead, coconut-charcoal simply afforded a SV source to value coal-carbmat input. *Id*. n.23. Conversely, wood charcoal's use in the production of activated carbon has been affirmed. *Activated Carbon from China*, 78 Fed. Reg. 70,533 (Nov. 20, 2013), IDM Cmt.6 ("activated carbon may be manufactured from wood."); *Jacobi*, 619 Fed.Appx. at 999 ("Wood charcoal is also a type of charcoal and can also be used to create the subject merchandise").

     Second, Commerce disregards the absence of evidence demonstrating that, relative to wood-charcoal, coconut-charcoal was more comparable to coal-carbmat, instead holding "coconut-shell carbmat shares many similarities with coal-based carbmat." Remand at 5. However, the cited prior reviews – with different records – are not instructive because wood-charcoal SV was not a choice, obviating a three-way comparison of wood-charcoal, coconut-charcoal, and coal-carbmat. Commerce underscores an absence of "direct record evidence that coal-based charcoal, coconut-shell charcoal, and wood-based charcoal share similar physical or chemical properties," *id*. at 5, asserting that "the mandatory respondents have not provided any new evidence . . . to warrant a departure from Commerce's practice of selecting coconut-shell charcoal to value" carbmat. *Id*. at 7. However, Commerce's claim is contradicted by Plaintiffs' demonstration that, because carbonization constitutes a key step in the production of activated carbon, the choice of carbonized material (whether based on coal, coconut-shell, or wood) directly correlates with the performance of the end-product. Plaintiffs' Memorandum of Law (Sept. 16, 2021), ECF36-37 ("56.2 Brief"), at 18-19; Case Brief (June 20, 2020), CR279/PR285, at 18-24. Accordingly, the differences/similarities of key properties (micropore size, hardness level, iodine number) between different types of activated carbons evidenced in USITC reports

are correlated to the differences between the underlying carbonized or charcoal materials. 56.2 Brief at 18-20. Commerce disregards this undisputed key fact.

Commerce also rejects Plaintiffs' demonstration that coconut-shell activated carbon prices overlap with the higher-priced coal-based activated carbon, while wood-based activated carbon prices overlap with the lower-priced coal-based activated carbon, 56.2 Brief at 20-22 – supporting HTS 4402.90 because coconut-charcoal and wood-charcoal, averaged, encompass the full range of coal-carbmat input. Commerce conveniently rejects the independent "pricing information placed on the record by the respondents {a}s from a non-market economy (NME) company." Remand at 15. This overlooks that NME prices, while unusable as a SV source, are instructive to show that both lower-priced wood-charcoal and higher-priced coconut-charcoal prices must be included to obtain a reliable and representative coal-carbmat SV. The NME prices also reveal that HTS 4402.90.1000 alone is unrepresentative of a range of coal-carbmat and yields a distorted SV.

Third, Commerce contradicts the CAFC decision in AR4 affirming HTS 44.02 (average of wood-charcoal and coconut-charcoal) for valuing coal-carbmat based on the identical factual issue. *Jacobi*, 619 Fed.Appx. at 999. Both reviews evidencing the comparability of coconut-charcoal and wood-charcoal with coal-carbmat compels an identical conclusion in AR12 as the CAFC reached on a leaner AR4 record. Commerce unpersuasively attempts to distinguish AR4: "While the {CAFC} did not necessarily agree with our selection of the Philippine import data under HS 4402, it upheld our selection of the Philippine import data because that data best fulfilled our SV selection criteria because it was unclear whether the *Cocommunity* publication on that record represented a broad national market." Remand at 15. However, the CAFC supported HTS 44.02 over *Cocommunity* coconut-charcoal prices based principally on product-

4

specificity: "With regard to the carbonized material made of coal … there is no evidence on this record comparing wood charcoal and coconut shell charcoal {and}… no findings {or} record evidence that coconut shell charcoal is a better surrogate for coal-based carbonized material than wood charcoal {and therefore} there is no proof that coconut shell charcoal is a better surrogate." *Jacobi*, 619 Fed.Appx. at 999. Broad market average was a secondary consideration. *Id*.

Finally, Commerce claims that "because chemically activated carbon is generally made using wood, and the respondents reported only using steam activation during the POR, we find Malaysian HS 4402.90, which includes wood-based activated carbon, is not the best information to value the respondents' carbmat." Remand at 7. Commerce erroneously conflates wood-charcoal in HTS 4402.90 with chemically produced wood-based activated carbon, contradicting its AR4 findings that "evidence on the use of wood, and not wood charcoal, to produce chemically activated carbon is irrelevant to the use of wood feedstock {*i.e.*, wood-charcoal} for producing steam activated carbon." *Activated Carbon from China*, 77 Fed.Reg. 67,337 (Nov. 9, 2012), IDM Cmt.IC(C). Notably, the scope (which covers only steam-activated carbon) – read with the CONNUM Field 3.1 Physical Material, CARBONU, Codes 06 (wood) & 09 (char/charcoal) – unambiguously establishes that wood-charcoal can be steam-activated to produce subject merchandise. IDM at 2; DJAC Section C Questionnaire Response (Aug. 26, 2019), CR39-45/PR86-87, at 6. The record thereby confirms the impropriety of Commerce not using HTS 4402.90 – which averages the prices of coconut-charcoal (relatively superior-grade, costlier) and wood-charcoal (relatively inferior-grade, cheaper) – as a reliable, representative, and undistorted coal-carbmat SV.

    II.    **COMMERCE UNLAWFULLY SELECTED FINANCIAL STATEMENTS**

This Court invalidated Commerce's use of the 2018 Malaysian Bravo Green Sdn. Bhd. ("Bravo") financial over the 2018 financials from Romanian Romcarbon SA or Russian JSC

Sorbent ("JSC"). *Carbon*, 586 F.Supp.3d at 1379-82; IDM at 31-34. Bravo was improperly maintained on remand, Letter from GDLSK to Commerce (Oct. 6, 2022), PRR7; Remand at 8-12, given Commerce's admission of its inferior data quality as compared with JSC and Romcarbon – as this Court found:

> Commerce itself acknowledged that Bravo{}'s 2018 statements were "not as detailed as Commerce prefers,". . . **Commerce rejected the non-Malaysian data without considering its potential merits**, . . . **even though the data from the primary surrogate country was less disaggregated and detailed than preferred**. . . . . **Commerce did not consider JSC {} or Romcarbon for the sole reason that they were not from Malaysia but did not explain why association with the primary surrogate country outweighed other . . . criteria**.

*Carbon*, 586 F.Supp.3d at 1381 (emphases added).

Yet Commerce, regurgitating its preference for financials from a single surrogate country and of a "manufacturer of identical merchandise," retained Bravo – while claiming that for Romcarbon and JSC, "there is no evidence that these potential surrogate companies have production comparable to the mandatory respondents." Remand at 9-10. Besides being factually inaccurate, neither the single country preference, 19 C.F.R. § 351.408, nor the superior comparable production rationale justifies selecting Bravo over JSC and Romcarbon because Commerce need follow the economic comparability and significant producer criteria "**only to the extent possible**." Commerce Policy Bulletin 04.1 (Mar. 1, 2004) (emphasis added). Indeed, Commerce routinely uses secondary surrogate country financials – including Romcarbon in the eleventh review ("AR11"), *Activated Carbon from China*, 84 Fed.Reg. 68,881 (Dec. 17, 2019), IDM Cmt.4; and tenth review ("AR10"), *Activated Carbon from China,* 83 Fed.Reg. 53,214 (Oct. 22, 2018), IDM Cmt.6.

Commerce failed to conduct the Court-instructed conjunctive comparative analysis of the data quality of the Bravo financials against those of JSC and Romcarbon, thereby abnegating precedent favoring data quality over single surrogate country or comparable production

preferences in selecting surrogate financials. *Diamond Sawblades Mfgrs.' Coal. v. United States*, 219 F.Supp.3d 1368, 1383 (CIT 2017) ("This 'preference,' however, carries the day only when it is used to 'support a choice of data as the best available information where the other available data upon a fair comparison, are otherwise seen to be fairly equal{;} . . . the preference on its own is not a sufficient reason to reject superior data'").

Commerce continues its disjunctive analysis alleging a lack of comparable production experience to reject the JSC and Romcarbon financials at the outset, disregarding this Court's directive to compare their data quality with Bravo's. These Remand findings are unsupported by substantial evidence and contradict applicable precedent.

### A. Commerce Unlawfully Rejected JSC and Romcarbon

Commerce acknowledges that "JSC . . . and Romcarbon produce activated carbons," yet claims they lack comparable production experiences because "we are unable to determine what proportion of JSC{}'s production activity is related to activated carbon" and "that activated carbon specifically represents an even smaller proportion of Romcarbon's 2018 sales." Remand at 10-11. This explanation replaces longstanding Commerce practice requiring that surrogate companies produce only some proportion of identical/comparable merchandise with a new rigid formula requiring an unspecified production level of the identical merchandise. Further, for both, Commerce speculates if JSC and Romcarbon are "producer{s} of *steam* activated carbon (the subject merchandise) or a producer of chemical activated carbon." *Id*. at 23-25.

Commerce fails to rebut that JSC's other products, respiratory personal protective equipment, coagulants and water treatment systems have similar end-uses of removing particulate and gaseous matter as activated carbon. Final SV Submission Ex.13E-F. PR197-231. JSC's Coagulants satisfy the physical characteristics (chemical) and end-use (adhesion-based purification) prongs of the three-part comparability test. *Id*. Ex.13F. Yet Commerce rejects this

7

comparability, citing the third prong: "whether the production process of these coagulants is similar to the production process of steam activated carbon." Remand at 24. However, Commerce does not explain how coagulant's production process, even if different, outweighed its similar physical characteristics and end-uses (resulting in similar selling, general, and administrative ("SGA") ratios). Notably, JSC has "more than 40 trademarks of activated carbon." Final SV Submission Ex.13F. Given JSC's overwhelming focus on producing identical merchandise, rejecting JSC merely because it lacks quantity/value data for activated carbon is untenable. Finally, that "coal raw materials, wood, coconut shells are used for production" of JSC's activated carbon proves these are steam-activated, not chemically-activated. *Id*. Therefore, JSC satisfies the comparable merchandise producer criterion.

Commerce likewise cannot find that Romcarbon fails comparable merchandise producer criterion, as it produces activated carbon, and similar end-use auto, industrial filters and chemical products in its CP1/2/3/4/5/6 workshops. *Id*. Ex.13H. Further, Romcarbon's "activated charcoal" production proves it produces steam activated carbon. *Id*. Note 3. Yet Commerce myopically underscores "no information regarding the production process of automotive and industrial filters." Remand at 24. This reasoning is unpersuasive given Romcarbon products' similar end-uses resulting in similar SGA ratios, and the absence of evidence that Romcarbon has disparate overhead ratios. Therefore, Commerce wrongly found that JSC and Romcarbon lack comparable production experience.

Further, Commerce's rationale favoring Bravo over JSC and Romcarbon based on the latter's relatively smaller production volumes of identical merchandise, Remand at 11, contradicts precedent. *Steel Nails from China*, 73 Fed.Reg. 33,977 (June 16, 2008), IDM Cmt.11 ("We disagree with Petitioners' contention that, because Nasco's and Bandishar's respective

8

production of nails accounts for relatively small percentages of their overall production, their financial ratios are not representative of a producer of nails"). Commerce unpersuasively tries limiting this precedent: "in the *Nails from China Investigation*, the surrogate financial statements in question were from the *primary surrogate country* and were from the only surrogate companies which were producers of nails." Remand at 26. Yet because Commerce did not so circumscribe its conclusion, this precedent contradicts JSC and Romcarbon's disqualification based on small/unspecified production volumes of identical/comparable merchandise.

Commerce similarly misplaces reliance on *Nails from China AR2* to "determine{} whether a {surrogate} company is a producer of 'identical' or 'comparable' merchandise." Remand at 23. In either situation, Commerce is precluded from rejecting JSC and Romcarbon without comparing their data quality against Bravo's admittedly inferior data. Likewise, Commerce misplaces reliance on *Chlorinated Isocyanurates from China* to support Bravo since it "manufactures only activated carbon as do the mandatory respondents," *id*. at 26, because "the mere fact that SBP only accounts for a small percentage of Aditya's overall operations alone does not mean Aditya's financial statements are not representative of a producer of SBP." 75 Fed.Reg. 70,212 (Nov. 17, 2010), IDM Cmt.3. *Chlorinated Isocyanurates* supports JSC and Romcarbon because both produce some activated carbon.

Tellingly, Commerce in AR10 rejected identical rationale now articulated in the Remand and selected Romcarbon– through judicially affirmed findings:

> Commerce explained why the 2016 Romcarbon financial statement was an appropriate source . . . . Romcarbon financial statement is from a producer whose "principal manufacturing activities are polyethylene, polypropylene, polyvinyl chloride, polystyrene processing, filters, and protective materials," but found that "Romcarbon produces some activated carbon." . . . Calgon argues that "Romcarbon is not a significant producer of merchandise identical to or comparable to activated carbon." . . . But Calgon fails to identify a standard for determining the reliability of financial statements based on the level of production

9

of the same or comparable merchandise. Moreover, Commerce recognized that Romcarbon's principal manufacturing activities related to other types of materials, but that it produced some activated carbon.

*Calgon Carbon Corp. v. United State*s, 443 F.Supp.3d 1334, 1352 (CIT 2020).

AR11 contradicts the finding that "Commerce selected Romcarbon's 2016 financial statements as they were the only financial statements on the record from a country at the same level of economic development as China and that did not show evidence of countervailable subsidies." Remand at 27. Commerce there selected Romcarbon over "2017 financial statements for two Malaysian companies that produce identical or comparable merchandise . . . {but} lack usable financial data in that neither of them have separate line items breaking down the cost of raw materials and energy." *Activated Carbon from China*, 84 Fed.Reg. 27,758-60 (June 14, 2019), DM at 15-16, unchanged AR11 IDM Cmt.4. Moreover, it ignores the judicial endorsement of Romcarbon representing identical production experiences ("some activated carbon") and having superior quality data.

In AR12, the underlying facts are identical for Romcarbon and similar for JSC. Commerce was thereby required to either follow its court-approved practice or provide a "reasonable explanation" for deviation. *Save Domestic Oil, Inc. v. United States*, 357 F.3d 1278, 1283 (Fed. Cir. 2004). Otherwise, maintaining Bravo was unlawful: "an agency must either conform itself to its prior decisions or explain the reasons for its departure." *Queen's Flowers de Colom. v. United States*, 21 CIT 968, 976-77 (1997). On remand, "Commerce gave no explanation for its departure from its position . . . . Commerce did not acknowledge that an inconsistency exists between those cases and the determination here." *Id.*; *see* Remand at 9-11.

### B. JSC or Romcarbon Merit Selection over Bravo

Commerce maintains Bravo by reiterating its *Final Results* finding that, although Bravo does "not break out expenses related to energy, labor, or specific SG&A expenses," it

10

nonetheless is "sufficiently detailed to calculate the surrogate financial ratios." Remand at 20. For its "sufficiently detailed" assertion, Commerce claims that Bravo "provide{s} a cost of sales and depreciation expenses related to equipment and machinery . . . to derive an overhead surrogate ratio, SG&A expenses . . . to derive a surrogate SG&A ratio, and a profit . . . to calculate a profit ratio." *Id*. This championing of Bravo's basket category line items contradicts precedent rejecting such statements in favor of disaggregated statements. Yet Commerce minimizes Bravo's ratios as having merely "potential" distortions, *id*. at 21, and avoids addressing its critical tell-tale deficiencies that distort overhead, SGA, and profit ratios.

Conversely, Commerce only cursorily analyzes the data quality of JSC and sidesteps Romcarbon – both of which Plaintiffs demonstrated resulted in undistorted and reliable financial ratios. Commerce's summary dismissal alleging "greater distortions," without this Court's directed comparative-data analysis, is contradicted by record evidence. *Id*.

Commerce instead simply harkened back to Bravo's superior comparable production experience, which is hardly the most important criteria, since surrogate companies need not "duplicate the exact production experience of the Chinese manufacturer." *Nation Ford Chem. Co. v. United States*, 166 F.3d 1373, 1377 (Fed. Cir. 1999).

Moreover, assuming JSC and Romcarbon's relatively lesser comparable production experiences compared with Bravo, Commerce does not explain how this factor alone outweighs the overwhelming data superiority of both over Bravo. Judicial precedent requires that "when presented with multiple imperfect potential surrogate-data sources, Commerce must faithfully compare the strengths and weaknesses of each before deciding which to use." *CP Kelco US, Inc. v. United States*, 2015 WL 1544714, *7 (CIT Mar. 31, 2015). Indeed, "consideration of 'comparative deficiencies' is an important part of Commerce's selection of financial statements."

11

*Mid Continent Steel & Wire, Inc. v. United States*, 586 F.Supp.3d 1349, 1356 (CIT 2022) (quoting *Mid Continent*, 941 F.3d 530, 544 (Fed. Cir. 2019)).

A conjunctive comparative analysis of Bravo against JSC/Romcarbon reveals that – unlike Bravo's basket-category expenses and distorted financial ratios – JSC and Romcarbon provide disaggregated breakouts, yielding undistorted and reliable ratios. Since Bravo's "cost of sales" potentially includes a portion of non-depreciation manufacturing overheads, 56.2 Brief at 39, its overhead ratio is potentially distorted. Lacking itemization of transportation and packing cost, Bravo's "Operating expenses" potentially include such excludable expenses, *id*., distorting its SGA ratio, cascading into a distorted profit ratio.

Therefore, Bravo's insufficiently disaggregated expenses yield potentially distorted ratios and Commerce's selection contradicts precedent. *See Catfish Farmers of Am. v. United States*, 37 CIT 717, 742 (2013); *Chlorinated Isocyanurates from China*, 80 Fed.Reg. 4539 (Jan. 28, 2015), IDM Cmt.2. Commerce's retort that the "mandatory respondents assume potential distortions in the financial ratios, they point to no evidence on the record," Remand at 21, is meritless and amounts to an impermissible reversal of the burden of proof as respondents established potential distortions being triggered by basket-category line items, which Commerce failed to rebut. 56.2 Brief at 38-42.

Unlike Bravo's basket "Cost of Sales" and "Operating expenses, JSC and Romcarbon " – breakout all major expenses (raw materials, labor, energy, traded goods). 56.2 Brief at 42-47. Romcarbon also breaks out excludible expenses, avoiding double-counting. *Id*. Yet Commerce omits addressing Romcarbon's disaggregated expenses yielding accurate ratios, while only cursorily addressing a similar JSC statement – despite precedent favoring both over the anemic Bravo. 56.2 Brief at 42-47 (citing *Weishan Hongda Aquatic Food Co. v. United States*, 917 F.3d

12

1353, 1366 (Fed. Cir. 2019)). Commerce only raises a subsidiary issue that exclusion of "JSC{}'s administrative expenses (*i.e.*, 281,338) reported on its P&L statement … is inconsistent with Commerce's well-established methodology for calculating the {SGA} ratio." Remand at 21-22. This errs because under Plaintiffs' proposed methodology, all profit and loss ("PL") expenses (totaling 2,191,583) were fully captured under Note 6 (2,116,738) and Residual expenses (74,845) and allocated to raw materials, labor, energy, overhead, Traded goods, and SGA. Notably, "Other costs" (242,170) were allocated to SGA. Final SV Submission Ex.13D-E. Because including administrative expenses (*i.e.*, 281,338) reported on PL under SGA would have double-counted administrative expenses, JSC's proposed ratios are accurate and undistorted. *Id*.

Plaintiffs also established that settled precedent supports the choice of superior financial statements from a secondary surrogate country – even if not on the Office of Policy ("OP") list – over inferior financial statements from the primary surrogate country. 56.2 Brief at 43-47; *Vinh Hoan Corp. v. United States*, 179 F.Supp.3d 1208, 1220-21 (CIT 2016). Thus, a conjunctive comparative analysis of Bravo against JSC/Romcarbon compels selecting either of them.

Additional support disfavoring Bravo comes from *Diamond Sawblades from China*, 80 Fed.Reg. 32,344 (June 8, 2015), IDM Cmt.5D. Commerce there used the financials of Trigger in the Philippines, a secondary surrogate country not on the OP-list – notwithstanding its relatively lesser comparable production compared to the competing financials from the primary surrogate country. Countering that "subsequently on remand, Commerce obtained and used the financial{s} . . . from the primary surrogate country, which the CIT affirmed," Commerce takes an absolutist position "that financial statements from the primary surrogate country should be used, provided {they} contain sufficient information." Remand at 28. This proposition should be rejected as inconsistent with extensive precedent. 56.2 Brief at 43-47.

13

Moreover, Commerce on remand dropped Trigger due to uniquely serious concerns arising from overwhelming captive production wherein "99 percent of Trigger sales are to the parent company," its use of prison labor and unusual tax liabilities affecting its profits. *Diamond*, 219 F.Supp.3d at 1385. Commerce then reopened the record, "solicited additional financial statement information for countries on the OP List," and reasoned that "its selection of Thai Gulf's financial statements mooted the concerns with respect to Trigger's financial statements." *Diamond*, 299 F.Supp.3d 1374, 1379-80 (CIT 2018). In contrast, neither JSC nor Romcarbon are afflicted by similar concerns while Bravo lacks "sufficient information." Remand at 28.

In sum, settled precedent contradicts Commerce's choice of Bravo's inferior data quality. Commerce was instead required to select either JSC or Romcarbon (the former from an OP-List country), based on their overwhelmingly superior data quality and notwithstanding their lesser comparable production.

*   *   *

Respectfully submitted,

*/s/ Dharmendra Choudhary*
Francis J. Sailer
Dharmendra Choudhary
Jordan C. Kahn

GRUNFELD, DESIDERIO, LEBOWITZ,
SILVERMAN & KLESTADT LLP
1201 New York Ave., NW, Suite 650
Washington, DC 20005

*Counsel for Plaintiffs Carbon Activated Tianjin Co., Ltd., Carbon Activated Corporation, Datong Juqiang Activated Carbon Co., Ltd., Shanxi Industry Technology Trading Co., Ltd., Datong Municipal Yunguang Activated Carbon Co., Ltd., and Beijing Pacific Activated Carbon Products Co., Ltd.*

Dated: January 9, 2023

# CERTIFICATE OF COMPLIANCE

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this filing complies with the word limitation requirement. The word count for Consolidated Plaintiffs' Comments in Opposition to Final Results of Remand Redetermination Pursuant to Court Order, as computed by Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP's word processing system Microsoft Word 2007, is 4,000 words, within the 4,000 word limit set by the Court in Slip Op. 22-89 (Aug. 8, 2022).

/s/ Jordan C. Kahn
Jordan C. Kahn

*Counsel for Plaintiffs/ Plaintiff-Intervenors Carbon Activated Tianjin Co. Ltd., Carbon Activated Corporation, Datong Juqiang Activated Carbon Co., Ltd., Beijing Pacific Activated Carbon Products Co., Ltd., Ningxia Guanghua Cherishmet Activated Carbon Co., Ltd., Ningxia Mineral & Chemical Limited, and Shanxi Sincere Industrial Co., Ltd.*

12010532_1