Slip Op. 23-66

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| CARBON ACTIVATED TIANJIN CO., LTD., ET AL., <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> and <br><br> CALGON CARBON CORPORATION AND CABOT NORIT AMERICAS, INC., <br><br> Defendant-Intervenors. | Before: Mark A. Barnett, Chief Judge <br> Court No. 21-00131 |

## <u>OPINION</u>

[Sustaining the U.S. Department of Commerce's remand results in the twelfth administrative review of the antidumping duty order on certain activated carbon from the People's Republic of China.]

Dated: April 28, 2023

<u>Francis J. Sailer</u>, <u>Dharmendra N. Choudhary</u>, and <u>Jordan C. Kahn</u>, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of Washington, DC, for Plaintiffs.

<u>Antonia R. Soares</u>, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for Defendant United States.  With her on the brief were <u>Brian M. Boynton</u>, Principal Deputy Assistant Attorney General, <u>Patricia M. McCarthy</u>, Director, and <u>Claudia Burke</u>, Assistant Director.  Of counsel on the brief was <u>Ashlande Gelin</u>, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, DC.

<u>John M. Herrmann</u>, <u>R. Alan Luberda</u>, <u>Melissa M. Brewer</u>, and <u>Julia A. Kuelzow</u>, Kelley Drye & Warren LLP, of Washington DC, for Defendant Intervenors Calgon Carbon Corporation and Cabot Norit Americas, Inc.

Barnett, Chief Judge:  This matter is before the court following the U.S.

Department of Commerce's ("Commerce" or "the agency") redetermination upon

remand in this case.  *See* Final Results of Redetermination Pursuant to Ct. Remand

("Remand Results"), ECF No. 50-1.  Plaintiffs[1] (referred to in the administrative

proceeding as "Respondents") commenced this case challenging aspects of

Commerce's final results in the twelfth administrative review ("AR12") of the

antidumping duty order on certain activated carbon from the People's Republic of China

("China") for the period of review April 1, 2018, through March 31, 2019.  *See Certain*

*Activated Carbon From the People's Republic of China*, 86 Fed. Reg. 10,539 (Dep't

Commerce Feb. 22, 2021) (final results of antidumping duty admin. review, final

determination of no shipments, and final rescission of admin. review, in part; 2018-

2019) ("*Final Results*"), ECF No. 32-3, and accompanying Issues and Decision Mem.,

A-570-904 (Feb. 12, 2021) ("I&D Mem."), ECF No. 32-2.[2]  Plaintiffs challenged

Commerce's selection of surrogate values for bituminous coal, anthracite coal,

hydrochloric acid, carbonized materials, caustic soda, and steam, along with the

---

[1] The Plaintiffs are Carbon Activated Tianjin Co., Ltd., Carbon Activated Corporation, Datong Juqiang Activated Carbon Co., Ltd., Shanxi Sincere Industrial Co., Ltd., Datong Municipal Yunguang Activated Carbon Co., Ltd., and Beijing Pacific Activated Carbon Products Co., Ltd.

[2] The administrative record filed in connection with the Remand Results is divided into a Public Remand Record ("PRR"), ECF No. 51-2, and a Confidential Remand Record ("CRR"), ECF No. 51-3.  Parties filed joint appendices containing record documents cited in their briefs.  *See* Public Remand J.A., ECF No. 58; Confid. Remand J.A. ("CRJA"), ECF No. 57.  Citations are to the CRJA unless stated otherwise.

selection of surrogate financial ratios.  *See Carbon Activated Tianjin Co. v. United States* ("*Carbon Activated I*"), 46 CIT __, __, 586 F. Supp. 3d 1360, 1364 (2022).[3]

        In *Carbon Activated I*, the court sustained in part and remanded in part the *Final Results*.  *Id*. at 1381–82.  The court remanded the *Final Results* to Commerce for reconsideration or further explanation of its selection of the surrogate value for carbonized materials and its selection of financial statements for determining surrogate financial ratios.  *Id*. at 1382.  On November 17, 2022, Commerce filed its Remand Results.  Therein, Commerce further explained its selection of a surrogate value for carbonized materials and selection of surrogate financial statements.  *See* Remand Results at 3–12.

        Plaintiffs filed comments opposing Commerce's selection of Malaysian import data under Harmonized System ("HS") subheading 4402.90.1000 as the surrogate value for carbonized materials and Commerce's calculation of surrogate financial ratios using the 2018 financial statements of the Malaysian company, Bravo Green Sdn. Bhd. ("Bravo Green").  *See* Pls.' Cmts. in Opp'n to Remand Redetermination ("Pls.' Opp'n Cmts."), ECF No. 54.  Defendant United States ("the Government") and Defendant-Intervenors Calgon Carbon Corporation and Cabot Norit Americas, Inc. (together, "Calgon") filed comments in support of the Remand Results.  *See* Def.'s Reply in Supp. of the Dep't of Commerce's Remand Redetermination ("Def.'s Supp. Cmts."), ECF No.

---

[3] The court's opinion in *Carbon Activated I* presents background information on this case, familiarity with which is presumed.

56; Def.-Ints.' Cmts. in Supp. of Remand Redetermination ("Calgon's Supp. Cmts."),

ECF No. 55.

### JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction pursuant to section 516A(a)(2)(B)(iii) of the Tariff Act of

1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(iii) (2018)[4] and 28 U.S.C. § 1581(c).

The court will uphold an agency determination that is supported by substantial evidence

and otherwise in accordance with law.  19 U.S.C. § 1516a(b)(1)(B)(i).

### DISCUSSION

### I.    Legal Framework

An antidumping duty is "the amount by which the normal value exceeds the

export price (or the constructed export price) for the merchandise," 19 U.S.C. § 1673.

As discussed in *Carbon Activated I*, 586 F. Supp. 3d at 1365–67, when an antidumping

duty proceeding involves a nonmarket economy country, Commerce determines normal

value by valuing the factors of production[5] in a surrogate country, *see* 19 U.S.C. §

1677b(c)(1), and those values are referred to as "surrogate values."   In selecting

surrogate values, Commerce must, "to the extent possible," use "the best available

information" from a market economy country or countries that are economically

---

[4] Citations to the Tariff Act of 1930, as amended, are to Title 19 of the U.S. Code, and references to the U.S. Code are to the 2018 edition unless otherwise specified.

[5] The factors of production include but are not limited to: "(A) hours of labor required, (B) quantities of raw materials employed, (C) amounts of energy and other utilities consumed, and (D) representative capital cost, including depreciation."  19 U.S.C. § 1677b(c)(3).

comparable to the nonmarket economy country and are "significant producers of

comparable merchandise."  *Id*. § 1677b(c)(1), (4).

      Commerce generally values all factors of production in a single surrogate

country, referred to as the "primary surrogate country."  *See* 19 C.F.R. § 351.408(c)(2)

(excepting labor); *Jiaxing Brother Fastener Co. v. United States* ("*Jiaxing II*"), 822 F.3d

1289, 1294 & n.3 (Fed. Cir. 2016).  Commerce, in selecting surrogate values, "generally

selects, to the extent practicable, surrogate values that are publicly available, are

product-specific, reflect a broad market average, and are contemporaneous with the

period of review."  *Jiaxing II*, 822 F.3d at 1293 (citing *Qingdao Sea-Line Trading Co. v.

United States*, 766 F.3d 1378, 1386 (Fed. Cir. 2014)); *see also* 19 C.F.R.

§ 351.408(c)(1), (4).  Commerce will "only resort to a secondary surrogate country if

data from the primary surrogate country are unavailable or unreliable."  *Jiaxing Brother

Fastener Co. v. United States*, 38 CIT 1404, 1412, 11 F. Supp. 3d 1326, 1332–33

(2014) (citations omitted), *aff'd*, *Jiaxing II*, 822 F.3d 1289.

    **II.**   **Surrogate Value for Carbonized Materials**

      **a.**  **Background**

      For the *Final Results*, Commerce valued coal-based carbonized material using

Malaysian import data under HS 4402.90.1000, which covers "coconut shell charcoal."

I&D Mem. at 43.  Commerce selected coconut shell charcoal after finding that

Respondents' proposed surrogate, HS 4402.90, which covers "wood charcoal (including

shell or nut charcoal), excluding that of bamboo," was not an appropriate surrogate.  *Id.*

Commerce explained that HS 4402.90, a basket category inclusive of both coconut shell

charcoal and HS 4402.90.9000, covering "other wood charcoal," was not the best

information available on the record to value carbonized material because "there [was]

no evidence on the record indicating that [Respondents] produced subject merchandise

from wood, nuts, or any other non-coal charcoal."  *Id.*

In *Carbon Activated I*, the court remanded Commerce's selection because the

record lacked evidence that Respondents used coconut shell charcoal in the

manufacture of the subject merchandise and, thus, the agency's selection between two

imperfect datasets was unsupported by substantial evidence.  586 F. Supp. 3d at 1379.

In the draft redetermination, Commerce valued carbonized materials using

Malaysian imports under HS 4402.90, finding that the record contained no evidence that

Respondents purchased or used coconut shell charcoal to produce activated carbon

exported to the United States, and that the record did not demonstrate whether coconut

shell charcoal or wood charcoal was more similar to coal-based carbonized material.

Draft Results of Redetermination Pursuant to Ct. Remand (Sept. 29, 2022) at 3–5, PRR

1, CRJA Tab 1.

Commerce reversed course in the Remand Results, selecting HS 4402.90.1000

as the best available information to value coal-based carbonized material, as it had for

the *Final Results*.  Remand Results at 3, 14.  Commerce explained that, in this

administrative review, there was no evidence that wood-based carbonized materials

had been used to produce activated carbon; however, historically, coconut shell

charcoal had been used to manufacture activated carbon.  *Id*. at 5.  Commerce further

explained that coconut shell charcoal shares similarities with coal-based carbonized

material.  *Id*.  Commerce also noted that Respondents produced only steam activated

carbon whereas wood charcoal is usually used to produce activated carbon through

chemical activation.  *Id*. at 6–7.

### b.  Parties' Contentions

Plaintiffs contend that Commerce's selection of coconut shell charcoal to value

carbonized material is unsupported by substantial evidence.  Pls.' Opp'n Cmts. at 1–5.

Plaintiffs argue that the record does not support Commerce's finding that coconut shell

charcoal has been used to produce activated carbon.  *See id*. at 2–3.  Plaintiffs argue

there was no evidence demonstrating that coconut shell charcoal was more comparable

to coal-based carbonized material than wood charcoal, *id*. at 3, and that precedent

compels Commerce to select HS 4402.90 as the surrogate value, *id*. at 4–5.  Plaintiffs

also contend that wood charcoal can be used to manufacture activated carbon through

steam activation.  *Id*. at 5.[6]

Defendant contends that substantial evidence supports Commerce's selection of

coconut shell charcoal as the surrogate value for carbonized material.  *See* Def.'s Supp.

Cmts. at 3–7.  Defendant argues that because Respondents only reported the

---

[6] Plaintiffs also contend that pricing information on the record indicates that using
coconut shell charcoal alone to value carbonized material would be "unrepresentative"
and "yield[] a distorted [surrogate value]."  Pls.' Opp'n Cmts. at 4.  In the Remand
Results, Commerce explained that "it is unclear how this information supports the use of
a wood-based [surrogate value] without further evidence or explanation."  Remand
Results at 15.  Even if the price of coal-based activated carbon overlaps with coconut
shell-based activated carbon and wood-based activated carbon, it does not detract from
Commerce's selection of coconut shell charcoal based on the activation process
Respondents use to produce the subject merchandise and Commerce's historical
practice of using coconut shell charcoal as a surrogate value.

production of steam activated carbon, and because chemically activated carbon is generally made using wood, wood-based carbonized material was not the best information to use as a surrogate value.  *Id*. at 4–6.

Calgon contends that the underlying record and Commerce's findings in prior reviews support Commerce's determination that coconut shell charcoal shares many similarities with coal-based carbonized material and is therefore an appropriate surrogate value.  *See* Calgon's Supp. Cmts. at 2–7.

### c.  Analysis

The court finds that Commerce's selection of Malaysian data for HS 4402.90.1000 to value carbonized material is supported by substantial evidence.  While a reasonable case might also be made for the use of Malaysian HS 4402.90, the basket category that includes other wood charcoal, the court is mindful of the standard of review with respect to challenges to Commerce's selection of surrogate values in cases involving nonmarket economy countries.  In particular, Commerce has significant discretion to choose "the best available information" to value the factors of production, so long as it does so in conformity with the substantial evidence standard.  *See QVD Food Co. v. United States*, 658 F.3d 1318, 1323 (Fed. Cir. 2011).  Commerce must articulate "a rational and reasonable relationship" between the surrogate value and "the factor of production it represents."  *Globe Metallurgical, Inc. v. United States*, 28 CIT 1608, 1622, 350 F. Supp. 2d 1148, 1160 (2004) (citing *Olympia Indus., Inc. v. United States*, 22 CIT 387, 390, 7 F. Supp. 2d 997, 1001 (1998)).  Consistent with the court's standard of review and the discretionary, fact-specific nature of Commerce's

determination, the role of the court is not to determine "whether the information Commerce used was the best available, but rather whether a reasonable mind could conclude that Commerce chose the best available information." *Jiaxing II*, 822 F.3d at 1300–01.

On remand, Commerce selected between two alternative data points to value carbonized material—Malaysian HS 4402.90, the basket category that includes other wood charcoal, and Malaysian HS 4402.90.1000, a more precise category within the basket that is limited to coconut shell charcoal. Remand Results at 2–3. In evaluating those two categories, Commerce explained that chemically activated carbon is generally made using wood-based carbonized materials. *See id*. at 7. While this does not mean that steam activated carbon, the subject merchandise produced by Plaintiffs, is not or cannot be produced with wood-based charcoal, Commerce's analysis did not stop there.

In choosing between the two possible surrogate values, Commerce considered the history of this antidumping duty order. *Id*. at 5. Specifically, Commerce explained that there is "a long, demonstrable history in this proceeding of using coconut-shell carbmat[7] in the production of the subject merchandise, unlike wood carbmat, which has never been used to produce the subject merchandise." *Id*. (footnote with citations omitted).[8] While it is true that each review is separate and based on the record

---

[7] "Carbmat" is shorthand for "carbonized material."
[8] In light of the different possible production processes, this finding is not inconsistent with Commerce's prior recognition that wood-based charcoal may be used to produce

developed before the agency in that review, that legal truism does not prevent

Commerce from acting in accord with prior reviews when the record of the present

review does not contain new or additional facts warranting a departure from the

agency's prior practice.  To that end, Commerce concluded that Respondents "have not

provided any new evidence in this review to warrant a departure from Commerce's

practice of selecting coconut-shell charcoal to value [Respondents'] carbmat in this

proceeding," *id.* at 7 (citing *Qingdao*, 766 F.3d at 1386), and Plaintiffs do not identify any

such new evidence to the court.

Accordingly, Commerce has supported its surrogate value selection with

substantial evidence such that a reasonable mind could find that the agency selected

the best information available.

### III.   Surrogate Financial Statements

#### a.  Background

For the *Final Results*, Commerce selected the 2018 financial statements of Bravo

Green, a Malaysian producer of granulated carbon and steam activated carbon, to

calculate the surrogate financial ratios.  I&D Mem. at 31–33.  In addition to the 2018

Bravo Green financial statements, the record contained seven other sets of financial

---

activated carbon.  *See* Issues and Decision Mem. for Certain Activated Carbon from
China, A-570-904, (Nov. 20, 2013), at 36 ("Petitioners correctly state that activated
carbon may be manufactured from wood or nut charcoal in addition to coal."),
https://access.trade.gov/Resources/frn/summary/prc/2013-28359-1.pdf (last visited April
28, 2023); *see also Jacobi Carbons AB v. United States*, 619 Fed. App'x. 992, 999
(Fed. Cir. 2015) ("Wood charcoal is also a type of charcoal and can also be used to
create [activated carbon].").

statements, including the 2018 financial statements of Joint Stock Company Sorbent ("JSC Sorbent"), "a Russian producer of respiratory personal protective equipment, activated carbons, coagulants, and water treatment systems," and S.C. Romcarbon S.A. ("Romcarbon"), "a Romanian producer of filters, polyethylene packaging, charcoal and other chemical products." *Id*. at 32–33.

The court found Commerce's selection of Bravo Green's 2018 financial statements to be "conclusory" because the agency failed to explain why the selected financial statements were preferable to those of JSC Sorbent and Romcarbon, despite the agency's acknowledgement that the 2018 Bravo Green financial statements were "not as detailed as [the agency] prefer[ed]." *Carbon Activated I*, 586 F. Supp. 3d at 1381 (quoting I&D Mem. at 33). The court found that Commerce failed to "explain why [Bravo Green's] association with the primary surrogate country outweighed other considerations or criteria" and remanded to Commerce to "fairly weigh the available options [for financial statements] and explain its decision in light of its selection criteria, addressing any shortcomings." *Id*.

On remand, Commerce again selected the 2018 financial statements of Bravo Green to calculate the surrogate financial ratios. Remand Results at 9, 28. Commerce distinguished the business operations and production experiences of Bravo Green from those of JSC Sorbent and Romcarbon. *Id*. at 10–11. Commerce found that JSC Sorbent produces numerous other types of merchandise and Commerce explained it was unable to determine what proportion of the company's production activity was related to activated carbon. *Id*. For that reason, Commerce found that it was unable to

determine whether JSC Sorbent's production experience was similar to that of
Respondents or Bravo Green.  *Id*. at 10–11, 21–22, 25–26.

With respect to Romcarbon, Commerce noted that the company's production of
activated carbon was carried out exclusively in one discrete profit center accounting for
only 1.34 percent of Romcarbon's 2018 sales.  *Id*. at 11, 21, 26.  Furthermore, that profit
center produced protective equipment in addition to activated carbon, such that
Commerce inferred that Romcarbon's sales of activated carbon represented an even
smaller percentage of its total sales.  *Id*. at 11.  In contrast, Commerce noted, one
hundred percent of Bravo Green's revenue was derived from the production and sale of
activated carbon, similar to Respondents' operations and sales.  *Id*.

Commerce noted that "there [was] no information indicating that [JSC Sorbent] is
a producer of *steam* activated carbon" and that there was no information as to whether
the production process for JSC Sorbent's coagulants was similar to that of steam
activated carbon or whether those coagulants were comparable to steam activated
carbon.  *Id*. at 23–24.  Commerce also noted that the record contained no information
regarding the production process of Romcarbon's automotive and industrial filters or
whether these products shared any similarities with steam activated carbon, nor did the
record indicate any similarities between steam activated carbon and certain plastic
products made by Romcarbon.  *Id*. at 24–25.

Commerce found that the Bravo Green financial statements "provide[d] a cost of
sales and depreciation expenses related to equipment and machinery from which to

derive an overhead surrogate ratio, SG&A[9] expenses from which to derive a surrogate

SG&A ratio, and a profit from which to calculate a profit ratio."  *Id*. at 20.  While

Commerce again acknowledged that the financial statements were not as detailed as

the agency preferred, it concluded they were detailed enough and the best choice to

calculate surrogate financial ratios.  *Id*.

### b.  Parties' Contentions

Plaintiffs contend that Commerce's selection of the Bravo Green financial

statements is unsupported by substantial evidence.  Pls.' Opp'n Cmts. at 5–10.

Plaintiffs contend that Commerce's rejection of the JSC Sorbent and Romcarbon

financial statements based on these entities' unknown or relatively low proportion of

sales of activated carbon in relation to overall sales "replaces longstanding Commerce

practice requiring that surrogate companies produce only some proportion of

identical/comparable merchandise with a rigid formula requiring an unspecified

production level of the identical merchandise."  *Id*. at 7.

Defendant and Calgon contend that substantial evidence supports Commerce's

selection of the Bravo Green financial statements to calculate the surrogate financial

ratios.  *See* Def.'s Supp. Cmts. at 7–14; Calgon's Supp. Cmts. at 7–11.

### c.  Analysis

In *Carbon Activated I*, the court found Commerce's selection of the 2018 Bravo

Green financial statements over the financial statements of JSC Sorbent and

---

[9] SG&A stands for "sales, general, and administrative."

Romcarbon to be "conclusory" because Commerce had failed to consider the potential

merits of the non-Malaysian data or explain why Commerce's preference to select data

from the primary surrogate country outweighed the shortcomings of the Bravo Green

data.  586 F. Supp. 3d at 1381.  In the Remand Results, Commerce has supported its

selection of the 2018 Bravo Green financial statements with substantial evidence.

On remand, Commerce compared the relative shortcomings of the 2018 Bravo

Green financial statements to those of the JSC Sorbent and Romcarbon financial

statements.  *See* Remand Results at 20–26.  Specifically, Commerce explained that

because Romcarbon's financial statements were not broken down by business units,

and because activated carbon accounted for only a small or unknown percentage of

Romcarbon's revenue, use of either of those financial statements would result in

surrogate financial ratios "largely unrelated to the production experience of

[Respondents] and thus introduce distortions in the margin calculations."  *Id*. at 21; *see*

*also id*. at 21–22 (noting "similar deficiencies" in JSC Sorbent's financial statements).

Furthermore, Commerce noted that the financial ratios submitted by Respondents

based on JSC Sorbent's financial statements did not capture JSC Sorbent's

administrative expenses and their use would thus be "inconsistent with Commerce's

well-established methodology for calculating the [financial] ratio."  *Id*. at 22; *see id*. at

21–22.  Finally, Commerce explained that the Bravo Green financial statements

represented the best available information because Romcarbon and JSC did not

produce only identical or comparable merchandise.  *Id*. at 23–25 (noting that the record

did not contain evidence indicating that JSC Sorbent or Romcarbon produced *steam*

activated carbon and that other products these entities produced were not comparable to activated carbon).

Plaintiffs rely on Commerce's determination in the investigation of certain steel nails from China ("*Steel Nails Investigation*") to argue that a potential surrogate's limited production of subject merchandise does not disqualify that surrogate from selection. *See* Pls.' Opp'n Cmts. at 8–9 (citing Issues and Decision Mem. for Certain Steel Nails from China ("Steel Nails Inv. I&D Mem.") at 36, A-570-909, (June 6, 2008), https://access.trade.gov/Resources/frn/summary/prc/E8-13474-1.pdf (last visited April 28, 2023)). While that may be true, in the *Steel Nails Investigation*, Commerce addressed the question of whether to combine the ratios of a producer of a small quantity of identical merchandise with the ratios of one or more producers of comparable merchandise. *See* Steel Nails Inv. I&D Mem. at 36. Commerce declined to do so on the basis that it would "dilute the extent to which the resulting ratios represent production of [subject merchandise]." *Id*. at 36. Here, the record indicates that Bravo Green manufactures only activated carbon, which is also true of Respondents. Remand Results at 26. Thus, selecting either JSC Sorbent's or Romcarbon's financial statements, or combining them with the Bravo Green financials, would dilute the extent to which the resulting financial ratios represent production of activated carbon. *See id*. at 26–27.[10]

---

[10] Plaintiffs also argue that Commerce misplaces reliance on *Chlorinated Isocyanurates from China*, and that this determination supports the use of JSC Sorbent's and Romcarbon's financial statements because both companies "produce some activated

Plaintiffs further contend that Commerce misplaces reliance on the second administrative review of *Certain Steel Nails from China* ("*Steel Nails AR2*") to support its selection of Bravo Green's financial statements.  *See* Pl.'s Opp'n Cmts. at 9–10.  In the Remand Results, Commerce explained that, in cases where the record contained detailed evidence of the relative amount of merchandise produced by a surrogate company, the agency would "analyze a surrogate company's product mix to make a determination of whether it is more reasonable to consider the company an 'identical' producer . . . or a producer of comparable merchandise depending on the facts of the case."  Remand Results at 23 (quoting Issues and Decision Mem. for Certain Steel Nails from China, A-570-909, (Feb. 23, 2012) ("Steel Nails AR2 I&D Mem."), at 13–14 https://access.trade.gov/Resources/frn/summary/prc/2012-4877-1.pdf (last visited April 28, 2023)).  Plaintiffs argue that *Steel Nails AR2* precludes Commerce from rejecting

---

carbon."  Pls.' Opp'n Cmts. at 9.  In *Chlorinated Isocyanurates from China*, Commerce selected the financial statements of a surrogate company whose sales of subject merchandise accounted for less than ten percent of its overall revenue; however, in that review, there were no more comparable surrogate financials available on the record. Issues and Decision Mem. for Chlorinated Isocyanurates from China, A-570-898, (Nov. 10, 2010), ("Chlorinated Isocyanurates I&D Mem.") at 15–17, https://access.trade.gov/Resources/frn/summary/prc/2010-29020-1.pdf (last visited April 28, 2023).  Moreover, Commerce ultimately selected one company over the other based on suspected subsidization of the other potential surrogate.  *See id.* at 17.  Thus, that determination does not stand for the proposition that Commerce must select the financial statements of a company that produces "some" subject merchandise, but instead reinforces that Commerce will select the best available information on each individual record.  Commerce merely referenced the Chlorinated Isocyanurates Issues and Decision Memorandum to explain its continued practiced "of finding the best available information with respect to the valuation of surrogate financial ratios based on similarities between . . . respondents' operations and [ ] surrogate financial compan[ies'] operations."  Remand Results at 26–27.

the JSC Sorbent or Romcarbon financial statements "without comparing their data

quality against" Bravo Green's financial statements.  Pl.'s Opp'n Cmts. at 9.

Plaintiffs' argument is unavailing.  In *Certain Steel Nails from China*, the only

contemporaneous financial statements on the record came from surrogate companies

of comparable, not identical, merchandise.  *See* Steel Nails AR2 I&D Mem. at 12–14.

Here, as Commerce explained, Bravo Green produced *only* identical merchandise,

while the record indicated that activated carbon represented only a small or unknown

percentage of all merchandise produced by JSC Sorbent or Romcarbon.  Remand

Results at 23–25.  Contrary to Plaintiffs' claims, Commerce *did* compare the data quality

of Bravo Green's financial statements with those placed on the record by Respondents.

Although the Bravo Green financial statements were not as detailed as Romcarbon's or

JSC Sorbent's financial statements, Commerce found that "any 'potential' distortions"

caused by this lack of detail were not as significant as the distortions that would arise

from the use of financial statements of companies whose production experience was

largely unrelated to that of Respondents.  *See id*. at 20–22.

Nor does Plaintiffs' reliance on the tenth ("AR10") or eleventh ("AR11")

administrative reviews of the antidumping duty order on certain activated carbon from

China indicate that Commerce deviated from its prior selection of Romcarbon's financial

statements "without explanation."  *See* Pls.' Opp'n Cmts. at 9–10 (arguing that the

underlying facts of AR10 and AR11 are "identical for Romcarbon and similar for [JSC

Sorbent]," and thus, Commerce needed to "provide a 'reasonable explanation'" for its

deviation from selecting Romcarbon's financial statements).  In AR10, the court

sustained Commerce's selection of Romcarbon's financial statements, noting that the

petitioner had failed to "identify a standard for determining the reliability of financial

statements based on the level of production of the same or comparable merchandise"

and declined to "reweigh the evidence considered by Commerce." *Calgon Carbon*

*Corp. v. United States*, 44 CIT __, __, 443 F. Supp. 3d 1334, 1352 (2020).  In AR11,

Commerce selected Romcarbon's financial statements because other financial

statements on the record were either non-public, or "lack[ed] usable financial data"

because the statements did not break down the cost of raw materials and energy into

separate line items, Prelim. Decision Mem. for Certain Activated Carbon From China, A-

570-904 (June 10, 2019) at 16, https://access.trade.gov/Resources/frn/summary/prc/

2019-12616-1.pdf (last visited April 28, 2023) (unchanged in final issues and decision

memorandum), and the parties did not dispute Commerce's selection of Romcarbon's

financial statements, *see* Issues and Decision Mem. for Certain Activated Carbon from

China, A-570-904 (Dec. 11, 2019) at 20–21, https://access.trade.gov/Resources/frn/

summary/prc/2019-27134-1.pdf (last visited April 28, 2023).

    Unlike in AR10 and AR11, the record here contained publicly available financial

statements from a company in the primary surrogate country that produced identical

merchandise, and which did not show evidence of countervailing subsidies.  Remand

Results at 20.  Commerce found that the financial statements were "sufficiently detailed

to calculate surrogate financial ratios" because they included "cost of sales and

depreciation expenses . . . from which to derive an overhead surrogate ratio, SG&A

expenses from which to derive a surrogate SG&A ratio, and a profit from which to

calculate a profit ratio."  *Id*. at 20.  Furthermore, to the extent that Plaintiffs argue that

Commerce must continue to select Romcarbon's financial statements because the

agency has done so in past reviews, this argument is mistaken.  "[E]ach administrative

review is a separate exercise of Commerce's authority that allows for different

conclusions based on different facts in the record," *Jiaxing II,* 822 F.3d at 1299 (quoting

*Qingdao*, 766 F.3d at 1387), and the financial statements placed on the record in this

review were not identical to those in AR10 or AR 11.

In sum, although Commerce continues to acknowledge that the Bravo Green

financial statements are not as detailed as the agency prefers, *id*. at 10, 20,

Commerce's assessment of the financial statements shows that the agency sufficiently

considered and explained its selection of Bravo Green's financial statements as the best

available information on the record, *see Jiaxing II*, 822 F.3d at 1300–01.  Plaintiffs have

failed to show that the reasoning behind Commerce's selection was contrary to

established agency practice or that Commerce otherwise failed to account for evidence

that detracted from its choice.  Thus, the court refuses Plaintiffs' invitation to reweigh the

evidence considered by Commerce.

## CONCLUSION

For the foregoing reasons, the court will sustain Commerce's *Final Results* as

modified by the Remand Results.  Judgment will enter accordingly.

/s/       Mark A. Barnett
Mark A. Barnett, Chief Judge

Dated:   April 28, 2023
New York, New York